**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

*Counsel for Plaintiff City of*
*Hallandale Beach Police Officers'*
*and Firefighters' Personnel*
*Retirement Trust*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF HALLANDALE BEACH POLICE OFFICERS' AND FIREFIGHTERS' PERSONNEL RETIREMENT TRUST, on behalf of itself and all others similarly situated, | Case No.  '20CV0565 W    BLM |
| | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Plaintiff, | |
| | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| ANAPTYSBIO, INC., HAMZA SURIA, MARCO LONDEI, and DOMINIC G. PISCITELLI, | |
| Defendants. | |

Plaintiff City of Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (i) regulatory filings made by AnaptysBio, Inc. ("AnaptysBio" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued and disseminated by the Company; (iii) analyst reports concerning AnaptysBio; and (iv) other public information regarding the Company.

# I.   <u>INTRODUCTION</u>

1.   Plaintiff brings this securities class action against AnaptysBio and certain of its current and former senior executives (collectively, "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder, on behalf of all investors who purchased or otherwise acquired AnaptysBio common stock between October 10, 2017 and November 7, 2019, inclusive (the "Class Period").

2.   Based in San Diego, California, AnaptysBio is a clinical stage biotechnology company focused on the discovery and development of drugs for the treatment of inflammation and immuno-oncology conditions with unmet medical needs.  During the Class Period, the Company's lead asset was etokimab (formerly ANB020), a drug intended for the treatment of various inflammatory diseases.  This matter arises from Defendants' material misrepresentations and omissions regarding the efficacy of etokimab for the treatment of atopic dermatitis, a chronic inflammatory skin disease otherwise known as eczema, as well as peanut allergies.

3.   On October 10, 2017—the first day of the Class Period—the Company reported data from an interim analysis of its Phase 2a clinical trial of etokimab in atopic dermatitis.   Specifically, the Company touted the "positive" data as

"provid[ing] a solid foundation for the continued development of [etokimab] across a number of atopic diseases."  In addition, the Company described the drug's efficacy as "very encourag[ing]" and told investors that "we believe we can build on that with multidosing … in a Phase IIb study, we anticipate that we can get to even greater EASI scores."

4.    Throughout the Class Period, the Company touted the prospects of etokimab and the drug's efficacy based on clinical trial data.  In truth, however, the Company failed to disclose key information from the trials and used questionable analysis which made the trial results regarding etokimab's efficacy and its prospects appear far better than they were.   As a result of Defendants' material misrepresentations and omissions, shares of AnaptysBio's common stock traded at artificially inflated prices during the Class Period.

5.    The truth began to be disclosed on March 26, 2018, when the Company announced data from an interim analysis of a Phase 2a trial for etokimab in adult patients with peanut allergies.  Although the Company reported improvement among patients that received a single dose of etokimab compared to patients dosed with a placebo, later that day, an analyst from RBC Capital Markets issued a report that questioned the veracity of that data.   Specifically, the analyst reported that AnaptysBio misrepresented etokimab's response rate by only releasing data for a subset of patients in the study, rather than the results from the entire patient population that was initially enrolled and intended to be treated in the trial.  The RBC report also revealed that the response rate for etokimab in the full trial population "does not appear to be meaningfully differentiated" relative to the placebo, explaining that the difference between the etokimab-treated arm and the placebo arm was only approximately 7%—significantly less than the 46% response rate the Company reported from its deceptive analysis.  In addition, the RBC report noted that "[t]hese data remain challenging to interpret," highlighting that the "[l]ack of disclosure of improvement delta between baseline and day 14 in both trial arms

obfuscates the actual improvement data and complicates contextualization of clinical meaningfulness" and makes it "difficult to contextualize the breadth of allergic protection provided by [etokimab]."

6.     On this news, the price of AnaptysBio common stock declined nearly 6%, from a closing price of $113.83 per share on March 26, 2018, to a closing price of $107.52 on March 27, 2018.

7.     On April 4, 2018, the same RBC Capital Markets analyst issued another report, this time downgrading the Company's stock and reducing his price target to $86 per share from $144 "on increased skepticism regarding [etokimab's] path forward in peanut allergy" as well as "concern surrounding management credibility."   Significantly, the report highlighted concern that the Company's patient subgrouping and subgroup analysis in its peanut allergy trial based on symptomology to peanut doses (*i.e.*, mild, moderate, and severe patients) was "statistically questionable."

8.     Despite investors questioning the reliability of the Company's Phase 2a peanut allergy trial data, AnaptysBio continued to misrepresent etokimab's efficacy in the treatment of patients with atopic dermatitis and peanut allergy, touting data from the Phase 2a trial in peanut allergy as showing a "remarkable efficacy result" and describing the drug as having a "pretty profound efficacy" in its treatment of patients with atopic dermatitis based on the Company's Phase 2a trial data for that indication.

9.     On August 7, 2018, AnaptysBio announced that it had deprioritized further clinical development of etokimab in peanut allergy patients "[a]s a result of market assessment" and would not pursue a Phase 2b clinical trial of the drug for this indication.

10.     Even after the Company abandoned its pursuit of etokimab as a treatment for peanut allergy, AnaptysBio still continued to tout the efficacy of etokimab in the treatment of atopic dermatitis, touting the "time line and robustness"

1 of a single dose of etokimab and describing the drug's treatment of patients in its
2 Phase 2a trial in this indication as a "really remarkable result" with "widespread
3 efficacy."

4       11.    Then, on June 21, 2019, an analyst from Credit Suisse issued a report
5 questioning the veracity of the Company's Phase 2a atopic dermatitis data.
6 AnaptysBio had released an interim analysis of atopic dermatitis data on October
7 10, 2017, followed by updated data on February 17, 2018. The analyses released by
8 the Company purported to show that etokimab demonstrated efficacy in treating
9 atopic dermatitis. The June 21 Credit Suisse report, however, questioned patients'
10 use of topical corticosteroids to supplement treatment of their symptoms as a rescue
11 therapy during the study and criticized AnaptysBio's failure to provide details on the
12 timing of rescue therapy use or whether the subjects that utilized rescue therapy were
13 classified as responders during the trial. Significantly, the Credit Suisse report noted
14 that even one patient responder who used rescue therapy during the trial "could
15 substantially skew the response rates" and "chang[e] the interpretation of the data as
16 it relates to the overall prospects of the asset." Thus, Credit Suisse concluded that,
17 due to the study's small sample size and a lack of critical details provided by the
18 Company, "we must consider the possibility that the presence of rescue medications
19 could have influenced the trial's response rates" and "we are now less certain about
20 etokimab's efficacy profile, particularly in atopic dermatitis." As a result, Credit
21 Suisse downgraded the Company's stock to neutral from outperform and slashed its
22 price target to $79 per share from $137.

23       12.    On this news, the price of AnaptysBio common stock declined nearly
24 12%, from a closing price of $67.02 per share on June 20, 2019, to a closing price
25 of $59.24 per share on June 21, 2019.

26       13.    Then, on November 8, 2019, the Company announced "very
27 disappoint[ing]" data from its ATLAS trial, a Phase 2b multi-dose study which
28 evaluated the efficacy of etokimab in approximately 300 patients with moderate-to-

severe atopic dermatitis.  Specifically, AnaptysBio revealed that each of the etokimab dosing arms "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the Eczema Area and Severity Index (EASI) relative placebo at week 16."  The Company also revealed that, as a result of this data, it had postponed the initiation of its Phase 2b etokimab clinical trial in asthma.

14.    This disclosure spurred several analyst downgrades, with analysts at Wedbush Securities stating that "we're disappointed and surprised by the readout" and "are now entirely removing etokimab from our valuation."  Analysts at Cantor Fitzgerald "were surprised by the results" and highlighted that "the largest risk to the shares is the growing number of investor questions we are getting around credibility and execution."  Analysts at RBC Capital Markets stated that although they "had reservations about prior data from etokimab programs" and the credibility of the Company's management, they were "surprised by this outright failure as well as the lack of an investor call to discuss the most significant development in the history of the company."

15.    On this news, the price of AnaptysBio common stock declined nearly 72%, from a closing price of $36.16 per share on November 7, 2019, to a closing price of $10.18 on November 8, 2019.

16.    As a result of Defendants' wrongful acts and omissions, which caused the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant damages.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  AnaptysBio maintains its corporate headquarters in San Diego, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

19.    Plaintiff City of Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust is a pension fund based in Hallandale Beach, Florida that provides retirement benefits for retired police officers and firefighters.  As of September 30, 2019, Plaintiff managed assets of approximately $180 million on behalf of hundreds of active members, retirees, and beneficiaries.  As indicated on the attached certification, Plaintiff purchased shares of AnaptysBio common stock on the public market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

20.    Defendant AnaptysBio is a clinical stage biotechnology company.  AnaptysBio is incorporated in Delaware and maintains its principal executive offices at 10421 Pacific Center Court, Suite 200, San Diego, California.   AnaptysBio common stock trades on the NASDAQ, which is an efficient market, under ticker symbol "ANAB."  As of February 27, 2020, AnaptysBio had over 27 million shares of common stock outstanding, owned by hundreds or thousands of investors.

21.    Defendant Hamza Suria ("Suria") is, and was at all relevant times, the Chief Executive Officer and President of the Company, as well as a Director of AnaptysBio.

22.     Defendant Marco Londei ("Londei") is, and was at all relevant times, the Chief Medical Officer of AnaptysBio.

23.     Defendant Dominic G. Piscitelli ("Piscitelli") served as AnaptysBio's Chief Financial Officer from January 2017 until September 2019.

24.     Defendants Suria, Londei, and Piscitelli are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with AnaptysBio, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.     BACKGROUND

25.     AnaptysBio is a clinical stage biotechnology company focused on the discovery and development of therapeutic antibodies for the treatment of inflammation and immuno-oncology conditions with unmet medical needs.  During the Class Period, AnaptysBio's lead drug asset was etokimab (formerly ANB020), a therapeutic antibody intended to treat various inflammatory diseases.

26.     By 2017, AnaptysBio began testing the efficacy of etokimab in various clinical trials for several inflammation disorders, including atopic dermatitis, peanut allergy, and asthma.  In October 2017, AnaptysBio reported data from an interim analysis of its Phase 2a trial of etokimab in atopic dermatitis, which enrolled 12 moderate-to-severe atopic dermatitis adult patients who were each given a single

dose of placebo within 14 days of enrollment, followed by a single dose of etokimab one week after receiving the placebo. Clinical response was assessed by the improvement of each patient's EASI score at key points after receiving the etokimab dose relative to their baseline EASI score. The primary efficacy objective of this study was to demonstrate at least an EASI-50 response, which is 50% or better improvement in EASI score relative to enrollment baseline, in at least half of the patients in the study on day 29 after receiving a dose of etokimab. In February 2018, the Company reported updated data from this trial.

27.     In late March 2018, AnaptysBio reported data from an interim analysis of its Phase 2a trial of etokimab in peanut allergy, which enrolled 20 adult peanut allergy patients with a clinical history of anaphylaxis after peanut exposure. This trial assessed the efficacy of etokimab in treating peanut allergy by measuring the cumulative dose of peanut protein (up to a maximum of 500mg) tolerated by patients in an oral food challenge conducted 14 days after a single dose of etokimab or placebo relative to a peanut tolerance established by a baseline oral food challenge.

28.     By May 2018, AnaptysBio had initiated a Phase 2b multi-dose study in 300 adult patients with moderate-to-severe atopic dermatitis, which it called the ATLAS trial.

**V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS**

29.     The Class Period begins on October 10, 2017, when AnaptysBio issued a press release announcing the results from an interim analysis of data from its Phase 2a clinical trial of etokimab in atopic dermatitis. The press release touted the drug's efficacy results as "very encourag[ing], highlighting the "rapid and sustained benefit observed in patients after a single dose of [etokimab]."

30.     That same day, the Company held a conference call with analysts to discuss the interim analysis of data from its Phase 2a atopic dermatitis trial. During the call, defendant Suria described the "positive" data as "provid[ing] a solid

foundation for the continued development of [etokimab] across a number of atopic diseases" and stated that "[w]e believe we can build on that with multidosing … in a Phase IIb study, we anticipate that we can get to even greater EASI scores." Defendant Londei stated that "[b]ased upon this data, we believe that a single dose of [etokimab] can maintain efficacy benefit in adult moderate-to-severe atopic dermatitis patients for approximately 2 months, which meaningfully differentiate [etokimab] in terms of patient convenience."  Further, during the call, defendant Suria explained that because the underlying physiological cause is similar across all the atopic diseases that etokimab is intended to treat, including atopic dermatitis, peanut allergy and asthma, "we are encouraged by what we're seeing so far in the results disclosed today and what that means in terms of potential translation to the peanut allergy trial."

31.    On or around October 12, 2017, AnaptysBio conducted a secondary offering (the "First SPO") pursuant to a registration statement (the "First SPO Registration Statement").  On October 13, 2017, AnaptysBio filed a prospectus for the First SPO with the SEC on Form 424B4, which incorporated and formed part of the First SPO Registration Statement (collectively, the "First SPO Offering Materials").

32.    The First SPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading.  Specifically, in the First SPO Offering Materials, the Company described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial.

33.     On November 7, 2017, AnaptysBio filed its quarterly report with the SEC on Form 10-Q for the third quarter of 2017.  The Company's 10-Q  described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial.

34.     On February 17, 2018, AnaptysBio issued a press release announcing updated data from its Phase 2a clinical trial of etokimab in atopic dermatitis, which was presented at the American Academy of Dermatology (AAD) Annual Meeting in San Diego.  The press release stated that "[etokimab] was efficacious in all 12 patients enrolled in this trial" and "[e]fficacy was sustained through day 140 following single dose administration of [etokimab] with five of 12 patients (42 percent) achieving EASI-50" and the drug's efficacy "was not limited by disease severity."  The press release also reported that "[d]ay 29 results exceeded the primary efficacy objective of the trial with 10 of 12 patients (83 percent) achieving EASI-50" and that "[o]ther atopic dermatitis efficacy endpoints … demonstrated rapid and sustained single dose [etokimab] efficacy results in a similar manner to the … EASI results."

35.     On March 5, 2018, AnaptysBio filed its annual report with the SEC on Form 10-K for the fourth quarter and full year 2017.  The Company's 10-K described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial.  The 10-K also stated that the drug's "efficacy was not limited by disease severity."

36.     On March 26, 2018, after the markets closed, the Company issued a

press release, which it also filed on Form 8-K with the SEC, announcing data from an interim analysis of a Phase 2a trial for etokimab in adult patients with peanut allergy.  The press release reported that six of 13 patients (or 46%) improved their peanut tolerance to a cumulative 500mg at day 14 after a single dose of etokimab compared to zero of three patients (or 0%) dosed with placebo.  The press release stated that the Company excluded two etokimab-dosed patients and two placebo-dosed patients from its interim analysis because they exhibited "mild" baseline symptoms, with one etokimab-dosed patient and two placebo-dosed patients being able to tolerate the 500mg maximum cumulative peanut dose at day 14 of the oral food challenge, but disclosed no further details on the excluded patients.  Although the Company had excluded 20% of the patients enrolled in the trial from the interim data analysis, the press release touted the drug as a "promising new paradigm for peanut allergy patients."  Thus, based on the "positive" data from the study, the Company announced its plans to continue development of etokimab in a multi-dose Phase 2b trial in moderate-to-severe baseline peanut allergy patients.

37.    On a conference call with analysts that day to discuss the Company's etokimab Phase 2a peanut allergy trial data, defendant Suria stated that "[w]e have demonstrated proof of concept in adult peanut allergy patients with moderate-to-severe baseline symptoms or a single dose of [etokimab] resulting in 46% of patients achieving the maximum-tested peanut tolerance in 14 days."  When asked by an analyst what the Phase 2a peanut allergy trial results would have been had the Company included the four patients excluded from the interim data because they exhibited mild symptoms, defendant Suria did not provide the details the analyst's question targeted, instead stating that "[w]e're not really providing a whole lot of context here on the mild because that's not our focus."  Defendant Suria also stated that "there was clear separation" in the peanut tolerability amongst those patients dosed with etokimab versus those patients dosed with placebo, assuring investors that "we're seeing a clear benefit of the drug here and a clear signal for us to move

forward in the moderate-to-severe baseline adult peanut allergy population." In response to another analyst's question about whether the exclusion of patients with mild symptoms was done in a prespecified manner, defendant Suria again avoided a direct answer, stating that "the intent of the study all along from the very beginning was to focus on the more severe patients." Defendant Suria then reassured investors that "not only did we get the signal that we wanted to in order to move forward, but we also learned how to focus in on the population and not just rely on anaphylaxis, but to take a look at their baseline severity as how you would segregate them."

38. The statements referenced in ¶¶ 29-37 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose (i) important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time; and (ii) key information from the Company's Phase 2a trial in peanut allergy, including patients' average cumulative peanut dose tolerated at day 14 after the administration of etokimab or placebo as well as whether the Company's decision to exclude 20% of the patients enrolled in the study from the interim analysis due to their mild symptoms was retrospective. As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis and peanut allergy were materially false and/or misleading and/or lacked a reasonable basis.

39. Later that day, however, an analyst from RBC Capital Markets issued a report questioning the reliability of the Company's Phase 2a peanut allergy data. The report stated that "[etokimab's] response rate in an [intent-to-treat] population does not appear to be meaningfully differentiated" relative to the placebo.

Specifically, the report explained that since AnaptysBio excluded two patients from each arm of the trial due to having mild symptoms, the difference between the etokimab-treated arm and the placebo arm was only approximately 7% on a 500mg tolerated cumulative dose intent-to-treat responder analysis basis—significantly less than the 46% response rate of etokimab-dosed patients over placebo-dosed patients the Company reported from its subgroup analysis.  When considering the patients the Company excluded from its trial data analysis, seven of 15 patients (or 47%) improved their peanut tolerance to a cumulative 500mg at day 14 after a single dose of etokimab compared to two of five patients (or 40%) dosed with placebo.  The report also noted that "[t]hese data remain challenging to interpret" because the Company did not disclose the average tolerated peanut dose at 14 days—it only disclosed the percentage of patients reaching 500mg tolerance—or the average improvement in peanut tolerance from the patients' baseline.  The report highlighted that the "[l]ack of disclosure of improvement delta between baseline and day 14 in both trial arms obfuscates the actual improvement data and complicates contextualization of clinical meaningfulness" and makes it "difficult to contextualize the breadth of allergic protection provided by [etokimab]."  The report also questioned the Company's use of a mild versus moderate-to-severe patient stratification and its decision to exclude those patients exhibiting mild symptoms, pointing out that these exclusions were neither detailed in the clinicaltrials.gov listing nor in management's prior trial descriptions.

40.    On this news, the price of AnaptysBio common stock declined nearly 6%, from a closing price of $113.83 per share on March 26, 2018, to a closing price of $107.52 on March 27, 2018.

41.    On April 4, 2018, the same RBC Capital Markets analyst issued a report downgrading the Company's stock and reducing its price target to $86 from $144 "on increased skepticism regarding [etokimab's] path forward in peanut allergy" as well as "concern surrounding management credibility."  In particular, RBC nearly

fully removed etokimab in the treatment of peanut allergy from its valuation model—decreasing its probability of success estimates for etokimab in severe adult peanut allergy to 5% from 35%.  Significantly, the report highlighted concern that the Company's patient subgrouping and subgroup analysis in its peanut allergy trial based on symptomology to peanut doses (*i.e.*, mild, moderate, and severe patients) "was likely retrospective and not prespecified" and thus "statistically questionable."

42.     However, despite these disclosures, AnaptysBio continued to misrepresent data from its clinical trials regarding etokimab's efficacy.  On May 8, 2018, AnaptysBio issued a press release, which it also filed on Form 8-K with the SEC, announcing the Company's financial results for the first quarter of 2018.  In the press release, defendant Suria is quoted as saying "[w]e demonstrated proof-of-concept for [etokimab] in Phase 2a trials in atopic dermatitis and peanut allergy."

43.     That same day, the Company also filed its quarterly report with the SEC on Form 10-Q for the first quarter of 2018.  The Company's 10-Q described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial.  Regarding the Company's interim analysis of data from its Phase 2a trial in peanut allergy, the 10-Q stated that "six of thirteen (46%) patients administered a single dose of [etokimab] improved peanut tolerance at the day 14 [oral food challenge] to the maximum tested cumulative 500mg dose, compared to none of the placebo dosed patients."

44.     On May 16, 2018, defendant Suria represented AnaptysBio and presented at the 2018 Bank of America Merrill Lynch Healthcare Conference.  During the conference, defendant Suria touted the data from the Phase 2a trial of etokimab for peanut allergy as showing a "remarkable efficacy result" and stated that "we're quite excited by this data" and "look forward to moving into a Phase IIb

1  trial." During the conference, defendant Suria also described etokimab as having a
2  "pretty profound efficacy" in its treatment of moderate-to-severe atopic dermatitis
3  patients based on the Company's Phase 2a trial data for that indication.

4      45.    On May 29, 2018, AnaptysBio issued a press release announcing the
5  presentation of updated data from its Phase 2a clinical trial of etokimab in atopic
6  dermatitis at the 2018 European Academy of Allergy and Clinical Immunology
7  (EAACI) Congress in Munich, Germany. The press release stated that "[etokimab]
8  was efficacious in all 12 patients enrolled in this trial" and "[e]fficacy was sustained
9  through day 140 following single dose administration of [etokimab] with five of 12
10 patients (42%) achieving EASI-50" and the drug's efficacy "was not limited by
11 disease severity." The press release also reported that "[d]ay 29 results exceeded the
12 primary efficacy objective of the trial with 10 of 12 patients (83%) achieving EASI-
13 50" and that "[o]ther atopic dermatitis efficacy endpoints … demonstrated rapid and
14 sustained single dose [etokimab] efficacy results in a similar manner to the … EASI
15 results."

16     46.    The statements referenced in ¶¶ 42-45 were materially false and
17 misleading and failed to disclose material adverse facts about the prospects of the
18 Company's lead drug asset. Specifically, Defendants willfully or recklessly made
19 and/or caused the Company to make materially false and misleading statements to
20 the investing public that failed to disclose (i) important data from the Company's
21 Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of
22 topical corticosteroids as a rescue therapy during the study and whether any of the
23 patients that utilized rescue therapy were classified as responders at a given time;
24 and (ii) key information from the Company's Phase 2a trial in peanut allergy,
25 including patients' average cumulative peanut dose tolerated at day 14 after the
26 administration of etokimab or placebo as well as whether the Company's decision
27 to exclude 20% of the patients enrolled in the study from the interim analysis due to
28 their mild symptoms was retrospective. As a result, Defendants' positive statements

about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis and peanut allergy were materially false and/or misleading and/or lacked a reasonable basis.

47. On August 7, 2018, less than three months after the Company touted etokimab's treatment of peanut allergy as "remarkable" and led investors to believe it was moving into a Phase 2b trial, the Company announced that "as a result of market assessment regarding the adoption of the peanut oral food challenge in future commercial usage of etokimab in peanut allergy patients, AnaptysBio has decided to deprioritize further company-sponsored clinical development of etokimab in moderate-to-severe baseline adult peanut allergy patients" and that the Company "does not intend to utilize its clinical development resources to pursue a Phase 2b clinical trial of etokimab in peanut allergy."

48. That same day, the Company filed its quarterly report with the SEC on Form 10-Q for the second quarter of 2018. The Company's 10-Q described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial. The 10-Q also stated that "[e]tokimab results were not limited by disease severity" and "[o]ther efficacy endpoints… demonstrated rapid and sustained single dose etokimab results in a similar manner to the… EASI results."

49. On or around September 25, 2018, AnaptysBio conducted a secondary offering (the "Second SPO") pursuant to a shelf registration statement that the Company filed with the SEC on Form S-3 on February 5, 2018 (the "Second SPO Registration Statement"). On September 26, 2018, AnaptysBio filed a prospectus supplement to the Second SPO Registration Statement with the SEC on Form

424B5, which incorporated and formed part of the Second SPO Registration Statement (collectively, the "Second SPO Offering Materials").

50.     The Second SPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading.  Specifically, in the Second SPO Offering Materials, the Company described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.

51.     On November 8, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the third quarter of 2018.  The Company's 10-Q described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.

52.     On January 8, 2019, defendant Suria represented AnaptysBio and presented at the JPMorgan Global Healthcare Conference.  During the conference, in describing the results from the Phase 2a trial in atopic dermatitis, defendant Suria stated that the Company had exceeded its goal of 50% responders "quite robustly" and touted the results as "a very exciting data event" because all the patients administered with a single dose of etokimab achieved at least 50 percent improvement in their EASI relative to enrollment baseline.  Defendant Suria also stated that the "time line and robustness of that single dose efficacy… gave us a sense that we could robustly advance this program into a multidose Phase IIb."

53.     On February 28, 2019, the Company filed its annual report with the

SEC on Form 10-K for the fourth quarter and full year 2018.  The Company's 10-K described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication and "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience."  The 10-K also stated that "etokimab efficacy was not limited by disease severity."

54.     On May 14, 2019, defendant Suria represented AnaptysBio and presented at the Bank of America Merrill Lynch Health Care Conference.  During the conference, defendant Suria described etokimab's treatment of patients in the Phase 2a trial in atop dermatitis as a "really remarkable result where a single dose of our drug… had widespread efficacy across all these individuals."  Based on the "efficacy data" from the Phase 2a trial, defendant Suria then touted etokimab as "a widespread, rapid and durable response in atopic dermatitis."

55.     The statements referenced in ¶¶ 48-54 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset.  Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

56.     On June 21, 2019, an analyst from Credit Suisse issued a report that questioned the veracity of the Company's Phase 2a atopic dermatitis data because of patients' use of topical corticosteroids as a rescue therapy during the study.  In particular, the report noted that the Company did not provide any details on the timing of rescue therapy use or whether the subjects that utilized rescue therapy were

classified as responders at a given time during the trial.  Significantly, the report explained that because of the trial's small sample size, even a single subject who used a rescue therapy during the study and was classified as a responder "could substantially skew the response rates" and "chang[e] the interpretation of the data as it relates to the overall prospects of the asset."  Thus, the report concluded that due to the study's small sample size and a lack of further details provided by the Company, "we must consider the possibility that the presence of rescue medications could have influenced the trial's response rates" and "we are now less certain about etokimab's efficacy profile, particularly in atopic dermatitis."  In addition, "concerns about the interpretability of prior [Phase 2a] atopic dermatitis data" prompted Credit Suisse "to adopt a lower probability of success assumption ahead of [Phase 2b trial] data."  As a result, Credit Suisse downgraded the Company's stock to neutral from outperform and slashed its price target to $79 per share from $137.

57.     On this news, the price of AnaptysBio common stock declined nearly 12%, from a closing price of $67.02 per share on June 20, 2019, to a closing price of $59.24 per share on June 21, 2019.

58.     Then, on November 8, 2019, the Company announced "very disappoint[ing]" data from its ATLAS trial, a Phase 2b multi-dose study which evaluated the efficacy of etokimab in approximately 300 patients with moderate-to-severe atopic dermatitis.  Specifically, AnaptysBio revealed that each of the etokimab dosing arms "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the Eczema Area and Severity Index (EASI) relative placebo at week 16."  The Company also revealed that, as a result of this data, it had postponed the initiation of its Phase 2b etokimab clinical trial in asthma.

59.     This disclosure caused several securities analysts to immediately downgrade AnaptysBio's stock.  For example, Wedbush Securities downgraded the Company's stock to neutral from outperform and slashed its price target to $20 per

share from $96 following the Phase 2b miss from the ATLAS study evaluating etokimab in patients with moderate-to-severe atopic dermatitis. The report stated that "we're disappointed and surprised by the readout" and "are now entirely removing etokimab from our valuation." Analysts at Guggenheim Securities, LLC downgraded the Company's stock to neutral from buy and removed its price target entirely "following negative Phase IIb results from their key drug etokimab…in atopic dermatitis" and concluded that etokimab is "likely to be discontinued." Analysts at Cantor Fitzgerald "were surprised by the results" and highlighted that "the largest risk to the shares is the growing number of investor questions we are getting around credibility and execution." As a result, Cantor Fitzgerald removed credit to etokimab in its valuation model of the Company and slashed its price target for AnaptysBio's common stock to $28 per share from $140. Analysts at RBC Capital Markets stated that "[w]hile we had reservations about prior data from etokimab programs…as well as [management] credibility…we're surprised by this outright failure as well as the lack of an investor call to discuss the most significant development in the history of the company." Stifel Nicolaus analysts noted that the "all out failure of etokimab" in the Company's ATLAS study "calls into question its ability to demonstrate any efficacy in other atopic diseases and is no doubt the worst case scenario" for the Company.

60.     On this news, the price of AnaptysBio common stock declined nearly 72%, from a closing price of $36.16 per share on November 7, 2019, to a closing price of $10.18 on November 8, 2019.

## VII. <u>LOSS CAUSATION</u>

61.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This conduct artificially inflated the price of AnaptysBio's common stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were

1  disclosed to the market, the price of AnaptysBio's common stock fell precipitously
2  as the prior artificial inflation came out of the price over time.  As a result of their
3  purchases of AnaptysBio's common stock during the Class Period, Plaintiff and
4  other members of the Class suffered economic loss, *i.e.*, damages, under the federal
5  securities laws, which were caused by Defendants' material misrepresentations and
6  omissions.

7  **VIII.  CLASS ACTION ALLEGATIONS**

8       62.    Plaintiff brings this action as a class action pursuant to Rule 23 of the
9  Federal Rules of Civil Procedure on behalf of all persons who purchased or
10 otherwise acquired the publicly traded common stock of AnaptysBio during the
11 Class Period (the "Class").  Excluded from the Class are Defendants and their
12 families, directors, and officers of AnaptysBio and their families and affiliates.

13      63.    The members of the Class are so numerous that joinder of all members
14 is impracticable.  The disposition of their claims in a class action will provide
15 substantial benefits to the parties and the Court.  As of February 27, 2020,
16 AnaptysBio had over 27 million shares of common stock outstanding, owned by
17 hundreds or thousands of investors.

18      64.    There is a well-defined community of interest in the questions of law
19 and fact involved in this case.  Questions of law and fact common to the members
20 of the Class which predominate over questions which may affect individual Class
21 members include:

22              (a)    Whether Defendants violated the Exchange Act;

23              (b)    Whether Defendants omitted and/or misrepresented material
24 facts;

25              (c)    Whether Defendants' statements omitted material facts
26 necessary in order to make the statements made, in light of the circumstances under
27 which they were made, not misleading;

28              (d)    Whether the Individual Defendants are personally liable for the

---

1  alleged misrepresentations and omissions described herein;

2        (e)    Whether Defendants knew or recklessly disregarded that their

3  statements and/or omissions were false and misleading;

4        (f)    Whether Defendants' conduct impacted the price of AnaptysBio

5  common stock;

6        (g)    Whether Defendants' conduct caused the members of the Class

7  to sustain damages; and

8        (h)    The extent of damage sustained by Class members and the

9  appropriate measure of damages.

10      65.    Plaintiff's claims are typical of those of the Class because Plaintiff and

11 the Class sustained damages from Defendants' wrongful conduct.

12      66.    Plaintiff will adequately protect the interests of the Class and has

13 retained counsel experienced in class action securities litigation.  Plaintiff has no

14 interests which conflict with those of the Class.

15      67.    A class action is superior to other available methods for the fair and

16 efficient adjudication of this controversy.   Joinder of all Class members is

17 impracticable.

18 **IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR**

19      68.    AnaptysBio's "Safe Harbor" warnings accompanying its forward-

20 looking statements issued during the Class Period were ineffective to shield those

21 statements from liability.

22      69.    Defendants are also liable for any false or misleading forward-looking

23 statements pleaded herein because, at the time each such statement was made, the

24 speaker knew the statement was false or misleading and the statement was

25 authorized and/or approved by an executive officer of AnaptysBio who knew that

26 the statement was false.  None of the historic or present tense statements made by

27 Defendants were assumptions underlying or relating to any plan, projection, or

28 statement of future economic performance, as they were not stated to be such

1   assumptions underlying or relating to any projection or statement of future economic

2   performance when made, nor were any of the projections or forecasts made by

3   Defendants expressly related to, or stated to be dependent on, those historic or

4   present tense statements when made.

5   **X.    PRESUMPTION OF RELIANCE**

6         70.    At all relevant times, the market for AnaptysBio's common stock was

7   an efficient market for the following reasons, among others:

8         (a)    AnaptysBio common stock met the requirements for listing, and

9   was listed and actively traded on the NASDAQ, a highly efficient and automated

10  market;

11        (b)    As a regulated issuer, AnaptysBio filed periodic public reports

12  with the SEC and the NASDAQ;

13        (c)    AnaptysBio regularly and publicly communicated with investors

14  via established market communication mechanisms, including through regular

15  disseminations of press releases on the national circuits of major newswire services

16  and through other wide-ranging public disclosures, such as communications with the

17  financial press and other similar reporting services; and

18        (d)    AnaptysBio was followed by several securities analysts

19  employed by major brokerage firm(s) who wrote reports which were distributed to

20  the sales force and certain customers of their respective brokerage firm(s).  Each of

21  these reports was publicly available and entered the public marketplace.

22        71.    As a result of the foregoing, the market for AnaptysBio common stock

23  promptly digested current information regarding AnaptysBio from all publicly

24  available sources and reflected such information in the price of AnaptysBio common

25  stock.  Under these circumstances, all purchasers of AnaptysBio common stock

26  during the Class Period suffered similar injury through their purchase of AnaptysBio

27  common stock at artificially inflated prices and the presumption of reliance applies.

28        72.    A Class-wide presumption of reliance is also appropriate in this action

under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the results of clinical trials of the Company's lead drug asset—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the clinical trial results to the approval of etokimab and AnaptysBio's subsequent commercialization of the drug, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5Against All Defendants

73.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AnaptysBio common stock at artificially inflated prices.

75.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for AnaptysBio common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

76.    Defendants, individually and in concert, directly and indirectly, by the

use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information and misrepresented the truth about the prospects of the Company's lead asset.

77.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal AnaptysBio's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

79.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AnaptysBio's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for AnaptysBio's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

80.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

81.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

82.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of AnaptysBio within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about AnaptysBio, the Individual Defendants had the power and ability to control the actions of AnaptysBio and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.   PRAYER FOR RELIEF

84.     WHEREFORE, Plaintiff prays for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.   JURY DEMAND

85.     Plaintiff demands a trial by jury.

DATED: March 25, 2020

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

/s/ Jonathan D. Uslaner
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

-and-

HANNAH ROSS
(hannah@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
MICHAEL D. BLATCHLEY
(michaelb@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Plaintiff City of Hallandale Beach*
*Police Officers' and Firefighters' Personnel*
*Retirement Trust*

**KLAUSNER KAUFMAN JENSEN**
**& LEVINSON**
ROBERT D. KLAUSNER
(bob@robertdklausner.com)
STUART A. KAUFMAN
(stu@robertdklausner.com)
7080 NW 4th Street
Plantation, FL 33317
Tel:    (954) 916-1202
Fax:    (954) 916-1232

*Additional Counsel for Plaintiff City of*
*Hallandale Beach Police Officers' and*
*Firefighters' Personnel Retirement Trust*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alan B. Miller, on behalf of City of Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust ("Hallandale Beach"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Chairman of Hallandale Beach.  I have reviewed the complaint with the Fund's legal counsel.  Based on the legal counsel's knowledge and advice, Hallandale Beach has authorized the filing of the complaint.

2.  Hallandale Beach did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  Hallandale Beach is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Hallandale Beach's transactions in the AnaptysBio, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.  Hallandale Beach is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

    *City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Pluralsight, Inc.,* No. 19-cv-00128 (D. Utah)

6.  Hallandale Beach will not accept any payment for serving as a representative party on behalf of the Class beyond Hallandale Beach's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of March, 2020.

_____

Alan B. Miller
Chairman
*City of Hallandale Beach Police Officers'*
*and Firefighters' Personnel Retirement Trust*

**City of Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust Transactions in AnaptysBio, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/19/2018 | 16 | 90.0614 |
| Purchase | 9/20/2018 | 49 | 91.6036 |
| Purchase | 9/20/2018 | 32 | 91.3100 |
| Purchase | 9/20/2018 | 142 | 91.8600 |
| Purchase | 9/21/2018 | 28 | 93.4710 |
| Purchase | 9/21/2018 | 50 | 93.0727 |
| Purchase | 9/21/2018 | 73 | 93.0282 |
| Purchase | 9/26/2018 | 255 | 94.4600 |
| Sale | 2/21/2019 | (40) | 65.5500 |
| Sale | 6/24/2019 | (90) | 54.9636 |
| Sale | 6/24/2019 | (20) | 54.9400 |
| Sale | 6/25/2019 | (245) | 53.7930 |
| Sale | 6/25/2019 | (75) | 55.3188 |
| Sale | 6/26/2019 | (175) | 53.9307 |