**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

*Counsel for Lead Plaintiff Iron Workers
Local 580 Joint Funds and the Class*

[Additional counsel appear on signature page]


# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| *In re AnaptysBio, Inc. Securities Litigation* | Case No. 3:20-cv-00565-TWR-DEB |
|---|---|
| | CLASS ACTION |
| | **CONSOLIDATED AMENDED COMPLAINT** |
| | JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Pages**

I.  INTRODUCTION ...................................................................... 1

II.  JURISDICTION AND VENUE................................................. 8

III.  PARTIES .................................................................................. 8

IV.  BACKGROUND AND NATURE OF THE FRAUD ........................ 10

    A.  The Development of Etokimab Is Key To AnaptysBio's Success ......................................................................... 10

    B.  Positive Phase 2a Atopic Dermatitis Trial Results Dramatically Increase AnaptysBio's Value At The Start Of The Class Period ..................................................... 17

    C.  Analysts Raise Serious Concerns About The Phase 2a Peanut Allergy Trial's Design And Results.................................. 27

    D.  Defendants Unceremoniously Halt the Peanut Allergy Development ................................................................. 37

    E.  Defendants Assure Investors That The Phase 2b Atopic Dermatitis ATLAS Trial Is On Track ........................... 38

    F.  Reports of Serious Design Flaws In The Phase 2a AD Trial Raise Concerns About Etokimab's Efficacy— Concerns That Are Confirmed When The Phase 2b Trial And Atopic Dermatitis Program Fails.......................... 42

    G.  Post-Class Period Events................................................. 47

    H.  The Officer Defendants Reaped Nearly $19 Million From Insider Stock Sales While In Possession Of Material Non-Public Information.................................... 48

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING  STATEMENTS AND OMISSIONS........................... 53

    A.  October 10, 2017 Press Release and Conference Call................ 54

    B.  October 12, 2017 First SPO Offering Materials .......................... 58

C.   November 7, 2017 Statements .......................................................... 59

D.   January 9, 2018 Statements............................................................. 60

E.   February 17, 2018 Press Release .................................................... 61

F.   March 5, 2018 Form 10-K Annual Report...................................... 62

G.   March 26, 2018 Press Release ........................................................ 63

H.   May 8, 2018 First Quarter 2018 Press Release and Form
     10-Q................................................................................................ 65

I.   May 16, 2018 Bank of America Merrill Lynch
     Healthcare Conference .................................................................... 67

J.   May 29, 2018 Press Release............................................................ 68

     1.   August 7, 2018 Press Release and Form 10-Q .................. 69

K.   September 25, 2018 SPO Offering Materials ................................. 70

L.   November 8, 2018 Form 10-Q ........................................................ 71

M.   January 8, 2019 JPMorgan Global Healthcare
     Conference...................................................................................... 72

N.   February 28, 2019 Form 10-K Annual Report................................ 73

O.   May 14, 2019 Bank of America Merrill Lynch Health
     Care Conference ............................................................................. 74

VI.   ADDITIONAL LOSS CAUSATION ALLEGATIONS ........................ 75

VII.   SUMMARY OF SCIENTER ALLEGATIONS .................................... 79

A.   The Officer Defendants Reaped $18.8 Million From
     Insider Sales .................................................................................... 80

B.   The Officer Defendants Were Subject-Matter Experts in
     Clinical Drug Development, or Falsely Claimed to Have
     Such Expertise................................................................................. 82

C.   The Officer Defendants Spoke Authoritatively to
     Investors about Etokimab and the Clinical Trials
     Studying Etokimab and Held Themselves Out as

Knowledgeable About These Topics ........................................... 85

D.    Etokimab Was AnaptysBio's Lead Drug Candidate and
      Was Critically Important to the Financial Success of the
      Company and the Officer Defendants .......................................... 87

E.    Defendants Refused to Answer Pointed Questions from
      Analysts Regarding the Company's Clinical Trial Data
      from the Phase 2A AD and Peanut Allergy Trials ...................... 90

F.    Defendant Piscitelli's and Defendant Londei's Untimely
      Departures ..................................................................................... 92

VIII.  CLASS ACTION ALLEGATIONS ........................................................ 93

IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR
       AND BESPEAKS CAUTION DOCTRINE .......................................... 94

X.     PRESUMPTION OF RELIANCE – FRAUD ON THE
       MARKET .............................................................................................. 95

XI.    CAUSES OF ACTION .......................................................................... 96

COUNT I ......................................................................................................... 96

COUNT II ........................................................................................................ 98

XII.   PRAYER FOR RELIEF ........................................................................ 98

XIII.  JURY DEMAND .................................................................................... 99

Lead Plaintiff Iron Workers Local 580 Joint Funds ("Iron Workers" or "Plaintiff"), by and through its attorneys, and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (i) public filings with the United States Securities and Exchange Commission ("SEC") made by Defendant by AnaptysBio, Inc. ("AnaptysBio" or the "Company"); (ii) research reports by securities and financial analysts; (iii) articles published by the news media; (iv) transcripts of AnaptysBio's earnings conference calls and industry conferences; (v) AnaptysBio's publicly-available investor presentations; (vi) AnaptysBio's press releases and media reports; (vii) economic analyses of AnaptysBio's securities movement and pricing data; (viii) consultations with relevant experts; (ix) information obtained from former AnaptysBio employees throughout the course of counsel's investigation; and (x) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is ongoing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and/or discovery.

## I.   INTRODUCTION

1.   Plaintiff brings this securities class action against AnaptysBio and certain of its current and former senior executives (collectively, "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder, on behalf of all investors who purchased or otherwise acquired AnaptysBio common stock between October 10, 2017 and November 7, 2019, inclusive (the "Class Period").

2. Based in San Diego, California, AnaptysBio is a clinical stage biotechnology company focused on the discovery and development of drugs for the treatment of inflammation and immuno-oncology conditions with unmet medical needs. During the Class Period, the Company's lead asset was etokimab (known as ANB020 until July 2018)[1], a drug intended for the treatment of various inflammatory diseases. This matter arises from Defendants' material misrepresentations and omissions regarding the efficacy of etokimab for the treatment of atopic dermatitis, a chronic inflammatory skin disease otherwise known as eczema, as well as peanut allergies.

3. On October 10, 2017—the first day of the Class Period—the Company reported data from an interim analysis of its Phase 2a[2] clinical trial of etokimab in atopic dermatitis (the "Phase 2a AD Trial"). Specifically, the Company touted the "positive" data as "provid[ing] a solid foundation for the continued development of [etokimab] across a number of atopic diseases." In addition, the Company described the drug's efficacy as "very encourag[ing]" and told investors that "we believe we can build on that with multidosing … in a Phase IIb study [and] we anticipate that

_____

[1] Plaintiff will refer to the drug as "etokimab" or "ANB020" herein.

[2] Before a drug is approved by the Food and Drug Administration ("FDA") for sale, it must complete three distinct phases of clinical studies. Phase 1 studies evaluate the safety of the drug candidate. Phase 1 studies, typically conducted in healthy volunteers, determine the drug's most frequent side effects and how the drug is metabolized and excreted. These studies typically enroll 20 to 80 subjects. Phase 2 studies begin if the Phase 1 study determines that there is an acceptable level of safety. The aim of Phase 2 studies is to assess the effectiveness of treating patients with a certain disease or medical condition. Phase 2 studies typically enroll a few dozen to 300 subjects. Once effectiveness is shown in Phase 2 studies, Phase 3 studies begin with the aim to study the drug's use in different populations, under different dosages and using the drug candidate in combination with other drugs. These studies are larger than Phase 2 studies and typically enroll several hundred to about 3,000 subjects. Source: https://www.fda.gov/drugs/drug-information-consumers/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

we can get to even greater EASI scores." Defendants also touted the Company's etokimab adult peanut allergy phase 2a study (the "Phase 2a Peanut Allergy Trial"), with the Company's CEO, Defendant Hamza Suria, stating in January 2018 that the trial had enrolled 20 patients "that have a history of anaphylaxis" and was "treating 20 of those individuals with a single dose of [etokimab] versus placebo" to test the individuals' response to an oral food challenge.

4.      Throughout the Class Period, the Company touted the prospects of etokimab and the drug's efficacy based on its two Phase 2a clinical trial data. In truth, however, the Company failed to disclose key information from the trials and used questionable analysis—including cherry-picking best results and hiding the use of controversial rescue therapy on patients—which made the trial results regarding etokimab's efficacy and its prospects appear far better than they were. As a result of Defendants' material misrepresentations and omissions, shares of AnaptysBio's common stock traded at artificially inflated prices during the Class Period.

5.      Investors began to question Defendants' credibility and the legitimacy of the design and application of AnaptysBio's etokimab clinical trials when, on March 26, 2018, the Company announced data from an interim analysis of its Phase 2a Peanut Allergy Trial. Although the Company reported improvement among patients that received a single dose of etokimab compared to patients dosed with a placebo, the Company misleadingly concealed the fact that these professed results were possible only because the Company had excluded 20% of the enrolled trial patients, possibly after the interim results had been calculated. Later that day, an analyst from RBC Capital Markets ("RBC") issued a report that directly questioned the Company's decision to cherry pick the trial results, and concluded that the reported results would have been far more negative with the inclusion of those excluded patients. Specifically, the analyst reported that AnaptysBio misrepresented etokimab's response rate by only releasing data for a subset of patients in the study, rather than the results from the entire patient population that was initially enrolled

1  and intended to be treated in the trial.  The RBC report also revealed that the response

2  rate for etokimab in the full trial population "does not appear to be meaningfully

3  differentiated" relative to the placebo, explaining that the difference between the

4  etokimab-treated arm and the placebo arm was only approximately 7%—

5  significantly less than the 46% response rate the Company reported from its

6  deceptive analysis.  In addition, RBC noted that "[t]hese data remain challenging to

7  interpret," highlighting that the "[l]ack of disclosure of improvement delta between

8  baseline and day 14 in both trial arms obfuscates the actual improvement data and

9  complicates contextualization of clinical meaningfulness" and makes it "difficult to

10  contextualize the breadth of allergic protection provided by [etokimab]."

11       6.       On this news, despite Defendants' characterization of the trial as a

12  success, the price of AnaptysBio common stock declined nearly 6%, from a closing

13  price of $113.83 per share on March 26, 2018, to a closing price of $107.52 on March

14  27, 2018.

15       7.       On April 4, 2018, the same RBC analyst issued another report, this time

16  downgrading the Company's stock and reducing his price target to $86 per share

17  from $144 "on increased skepticism regarding [etokimab's] path forward in peanut

18  allergy" as well as "concern surrounding management credibility."  Significantly,

19  RBC worked with a peanut allergy physician expert, who concluded that the

20  Company's patient subgrouping and subgroup analysis in its peanut allergy trial

21  based on symptomology to peanut doses (*i.e.*, mild, moderate, and severe patients)

22  both did not exist in the industry and, even if it did, was "statistically questionable."

23  In response, AnaptysBio common stock dropped again, going from a close of $94.35

24  per share on April 4, 2018, down to a close of $87.32 per share on April 5, 2018, a

25  drop of $7.03 per share, or approximately 7.5%.

26       8.       On August 7, 2018, faced with the critical weaknesses in its peanut

27  allergy study, AnaptysBio quietly announced that it had deprioritized further clinical

28  development of etokimab in peanut allergy patients, purportedly "[a]s a result of

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:20-cv-00565-TWR-DEB                                                                4

1    market assessment" and would not pursue a Phase 2b clinical trial of the drug for
2    this indication.    Analysts viewed this as a likely outcome, given the issues
3    surrounding the earlier results.

4         9.    Even after the Company abandoned its pursuit of etokimab as a
5    treatment for peanut allergy, throughout the following year, AnaptysBio continued
6    to tout the efficacy of etokimab in the treatment of atopic dermatitis. Defendants
7    repeated the Company's exceedingly positive Phase 2a AD Trial results,
8    emphasizing the "time line and robustness" of a single dose of etokimab in treating
9    atopic dermatitis, and describing the drug's treatment of patients in its Phase 2a trial
10   in this indication as a "really remarkable result" with "widespread efficacy."

11        10.   In contrast to these public statements concerning the "remarkable
12   results" in the Phase 2a AD Trial, and repeated statements touting the next stage
13   Phase 2b trial, the Officer Defendants promptly took advantage of AnaptysBio's
14   inflated stock price following the failed and manipulated peanut allergy trial to
15   enrich themselves by nearly $19 million through enormous insider selling.   The
16   Officer Defendants made these trades while possessing the knowledge that the use
17   of rescue therapy in the Phase 2a AD Trial had been concealed from investors and
18   posed a material threat to the future efficacy and development of the drug. Defendant
19   and Chief Executive Officer ("CEO") Hamza Suria made approximately $12.1
20   million from sales of nearly 170,000 shares of AnaptysBio stock between December
21   2018 and June 2019—representing a staggering 91% of his total holdings in just 7
22   months. Similarly, Defendant and Chief Medical Officer ("CMO") Marco Londei,
23   sold 73% percent of his holdings of AnaptysBio stock during that same period of
24   time, raking in more than $4 million. And Defendant and Chief Financial Officer
25   ("CFO") Piscitelli sold *all* of his holdings for a total of approximately $2.7 million
26   on a single day in December 2018. In total, AnaptysBio's executives reaped nearly
27   $19 million for themselves in Class Period stock sales.

28

11.     Then, on June 21, 2019, an analyst from Credit Suisse issued a report questioning the veracity of the Company's Phase 2a AD Trial data.  Credit Suisse was compelled to look deeper into the Company's Phase 2a AD Trial results after learning that an investigator on the trial had discussed the use of corticosteroid "rescue therapy" in some of the 12 patients in the trial, a data point that had not been disclosed by Defendants.  The analyses released by the Company between October 10, 2017 and June 2019 purported to show that etokimab demonstrated efficacy in treating atopic dermatitis.   The June 21, 2019 Credit Suisse report, however, questioned the earlier results because it was now clear that trial patients had used undisclosed amounts of corticosteroids to supplement treatment of their symptoms during the trial. Credit Suisse criticized AnaptysBio's failure to provide details on the timing and amount of rescue therapy use, or whether the subjects that utilized rescue therapy were classified as responders during the trial.  Significantly, the Credit Suisse report noted that even one patient responder who used rescue therapy during the trial "could substantially skew the response rates" and "chang[e] the interpretation of the data as it relates to the overall prospects of the asset."  Thus, Credit Suisse concluded that, due to the study's small sample size and a lack of critical details provided by the Company, "we must consider the possibility that the presence of rescue medications could have influenced the trial's response rates" and "we are now less certain about etokimab's efficacy profile, particularly in atopic dermatitis."  As a result, Credit Suisse downgraded the Company's stock to neutral from outperform and slashed its price target to $79 per share from $137.

12.     On this news, the price of AnaptysBio common stock declined nearly 12%, from a closing price of $67.02 per share on June 20, 2019, to a closing price of $59.24 per share on June 21, 2019.

13.     Defendants did not respond to the Credit Suisse analyst report or to questions raised by other analysts in its wake.  Then, on November 8, 2019, the Company announced in a press release announcing third quarter results and other

updates that it had "very disappoint[ing]" data from its Phase 2b atopic dermatitis multi-dose study that followed that Phase 2a AD Trial  and that evaluated the efficacy of etokimab in approximately 300 patients with moderate-to-severe atopic dermatitis.  Specifically, AnaptysBio revealed that each of the etokimab dosing arms "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the Eczema Area and Severity Index (EASI) relative placebo at week 16."  The Company also revealed that, as a result of this data, it had postponed the initiation of its Phase 2b etokimab clinical trial in asthma. The Company disclosed no more data on the Trial and failed to hold a conference call, a fact that was negatively commented on by analysts.  This disastrous news was a surprise as the trial's failure was completely inconsistent with the reported Phase 2a AD Trial results.

14.    The complete failure of the Company's attempt to treat atopic dermatitis with etokimab spurred several analyst downgrades.  Analysts at Wedbush Securities ("Wedbush") stating that "we're disappointed and surprised by the readout" and "are now entirely removing etokimab from our valuation."  Analysts at Cantor Fitzgerald "were surprised by the results" and highlighted that "the largest risk to the shares is the growing number of investor questions we are getting around credibility and execution."  Analysts at RBC Capital Markets stated that although they "had reservations about prior data from etokimab programs" and the credibility of the Company's management, they were "surprised by this outright failure as well as the lack of an investor call to discuss the most significant development in the history of the company."

15.    On this news, the price of AnaptysBio common stock declined nearly 72%, from a closing price of $36.16 per share on November 7, 2019, to a closing price of $10.18 on November 8, 2019.

16.    Months later, the Company pushed out Defendant Londei, who had helmed and designed the etokimab trials.  As a result of Defendants' wrongful acts

and omissions, which caused the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant damages.

## II.   JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  AnaptysBio maintains its corporate headquarters in San Diego, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

19.    Plaintiff Iron Workers is a provider of pension and health benefits to active and retired participants in the iron working industry.  As indicated on the previously filed certification (ECF No. 24-3), Plaintiff purchased shares of AnaptysBio common stock on the public market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

20. Defendant AnaptysBio is a clinical stage biotechnology company. AnaptysBio is incorporated in Delaware and maintains its principal executive offices at 10421 Pacific Center Court, Suite 200, San Diego, California. AnaptysBio common stock trades on the NASDAQ, which is an efficient market, under ticker symbol "ANAB." As of August 6, 2020, AnaptysBio had 27,303,581 million shares of common stock outstanding, owned by hundreds or thousands of investors.

21. Defendant Hamza Suria ("Suria") is, and was at all relevant times, the Chief Executive Officer ("CEO") and President of the Company, as well as a Director of AnaptysBio. Defendant Suria signed or authorized the signing of the Company's annual and quarterly reports filed with the SEC, which contained materially false and misleading statements and omissions, as described herein. Defendant Suria also participated in conference calls with securities analysts, and interviews with analysts and media, during which he made additional materially false and misleading statements and omissions.

22. Defendant Marco Londei ("Londei") was at all relevant times, the Chief Medical Officer ("CMO") of AnaptysBio. Defendant Londei participated in conference calls with securities analysts, and interviews with analysts and media, during which he made materially false and misleading statements and omissions. Defendant Londei departed AnaptysBio in March 2020.

23. Defendant Dominic G. Piscitelli ("Piscitelli") served as AnaptysBio's Chief Financial Officer from January 2017 until September 9, 2019. Defendant Piscitelli signed or authorized the signing of the Company's annual and quarterly reports filed with the SEC, which contained materials false and misleading statements and omissions, as described herein.

24. Defendants Suria, Londei, and Piscitelli are collectively referred to hereinafter as the "Officer Defendants." The Officer Defendants, because of their positions with AnaptysBio, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities

analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.   BACKGROUND AND NATURE OF THE FRAUD

### A.    The Development of Etokimab Is Key To AnaptysBio's Success

25.    AnaptysBio was founded in 2005 as a clinical stage biotechnology company focused on the discovery and development of first-in-class therapeutic antibody treatments for inflammatory diseases and cancers. According to the Company, it develops product candidates using its proprietary antibody discovery technology platform, which is designed to replicate *in vitro* the natural process of antibody generation by incorporating the cellular mechanism of somatic hypermutation ("SHM")—the human body's natural process of antibody generation.

26.    Throughout the Class Period, Defendant Suria led AnaptysBio as CEO. Defendant Suria joined the Company in December 2008 as a Vice President of Corporate Development and was elevated to the CEO and Chief Business Officer positions in October 2011. In October 2014, Defendant Londei, a clinical immunologist, assumed the newly-created role of Chief Development Officer. Defendant Londei was tasked with leading the preclinical and clinical development of the Company's antibody treatment pipeline. At the time of his hiring, Defendant Suria touted Defendant Londei as having "extensive expertise" relevant to "[n]ovel anti-inflammatory programs [that] are a strategic priority for AnaptysBio's

proprietary pipeline, particularly our first-in-class anti-IL-33 antibody program applicable to a variety of Th2-driven diseases," i.e., ANB020.  In January 2017, Defendant Piscitelli joined AnaptysBio as its Chief Financial Officer.  By press release dated January 11, 2017, the Company stated that "Mr. Piscitelli will play a key role in AnaptysBio's finance strategy, as well as overseeing the company's accounting and SEC reporting functions."  Defendant Suria touted Defendant Piscitelli's experience in biotech finance, saying that this experience would "play a key role in the strategic growth of AnaptysBio as we advance our wholly-owned pipeline programs."

27.     On September 9, 2015, after 10 years of operating as a privately held company, AnaptysBio announced that it would seek to make an Initial Public Offering ("IPO") and filed a registration statement on Form S-1 with the SEC.  In this initial registration statement, the Company noted that its "most advanced, wholly-owned programs, ANB020 and ANB019, are being developed to treat severe inflammatory disorders with unmet medical needs," and further noted that "[i]n 2016, we plan to initiate clinical trials of ANB020, an antibody that inhibits the activity of interleukin-33 for the treatment of severe adult asthma and severe adult peanut allergy."  The Company stated that, as of September 9, 2015, "[w]e have not yet initiated any clinical trials or dosed any of our product candidates, including ANB019 and ANB020, in humans."

28.     The Company's plans for an IPO stalled for over a year, during which time the Company filed several amended S-1 registration statements, on December 23, 2015, February 16, 2016, May 10, 2016, August 19, 2016, November 15, 2016, and December 28, 2016.  During this time, AnaptysBio continued its development of ANB020, which garnered further support for the IPO.

29.     ANB020—later named etokimab—was the Company's most prominent drug in development at the start of the Class Period.  AnaptysBio developed ANB020 to treat severe inflammatory disorders with unmet medical

needs, such as atopic dermatitis, peanut allergies, and asthma.  ANB020 is an antibody that inhibits the activity of interleukin-33, or IL-22, a pro-inflammatory cytokine that, according to the Company, multiple studies indicated was a central mediator of atopic diseases, including asthma, food allergies and dermatitis.  The Company stated that ANB020 "is potentially the first-in-class therapy targeting IL-33."

30.    On October 3, 2016, AnaptysBio issued a press release that announced its top-line results from its Phase 1 trial of ANB020.  This Phase 1 trial was conducted in Australia under an approved Clinical Trial Notification (CTN), and tested the Drug's "safety, tolerability, pharmacokinetic and pharmacodynamic profiles" in healthy volunteers—that is, those not suffering from any "IL-33-mediated inflammatory conditions," such as atopic dermatitis or peanut allergies. The Company stated that the Phase 1 trial showed that the Drug was "well-tolerated" and no "dose-limiting toxicities" were observed at any dose level.  Further, the Company stated that the trial showed that a single dose of the Drug at certain dose levels was enough to suppress IL-33 function for about three months after dosing. The Company further noted that AnaptysBio planned to conduct Phase 2 clinical trials of ANB020 in patient population, "including [those with] moderate-to-severe adult atopic dermatitis, severe adult peanut allergy and uncontrolled adult eosinophilic asthma."  AnaptysBio stated that it would report the detailed results from the Phase 1 trial at "a future scientific conference."

31.    Market commentators took note of the large market for anti-inflammatory therapeutics that AnaptysBio was claiming to serve.  In an article titled "AnaptysBio Files for IPO and Shows Real Promise" dated November 17, 2016, an analyst for *Seeking Alpha* noted that "[t]he market for anti-inflammatory therapeutics is expected to exceed $100 billion in 2020" and that of this market, "biologics hold the largest market share by drug class, at 60%," which "is also expected to grow the fastest through 2020."

32.     On December 13, 2016, AnaptysBio announced that the United States Food and Drug Administration ("FDA") had cleared the company's "investigational new drug application" ("IND") for ANB020 for the treatment of adults with severe peanut allergy, a condition that can result in systemic life-threatening anaphylaxis. In addition, the Company announced that the United Kingdom Medicines and Healthcare Products Regulatory Agency had cleared the Company's "clinical trial authorisation" ("CTA") for ANB020 for the treatment of adults with moderate-to-severe atopic dermatitis, a type of skin inflammation.  These approvals cleared the way for the two Phase 2a trials to commence in the first half of 2017, with the expectation that the Phase 2a trials would be complete in the second half of 2017.

33.     On January 17, 2017, AnaptysBio filed its seventh amendment to its Form S-1 registration statement, indicating that the Company would sell 4,000,000 shares of newly-issued AnaptysBio common stock at a price between $14 and $16 per share on January 26, 2017.  By the time of the IPO, on January 26, 2017, AnaptysBio increased its offering size to 5,000,000 shares, with the underwriters' option of selling an addition 750,000 shares, priced at $15 per share.  All told, the Company raised $75 million in its IPO, and began trading shares of its common stock under the ticker "ANAB".  Common stock shares were priced at $15 per share. The underwriters of the IPO also exercised a 30-day option and purchased an additional 750,000 shares of common stock, raising an additional $11.25 million, bringing the total IPO value to $86.25 million.

34.     In the IPO prospectus, Defendants stated that the Company would apply $25 million of the IPO proceeds towards clinical trials of ANB020 and its slightly newer drug, ANB019.  Throughout 2017, in response to the Phase 1 trial data, analysts reported that AnaptysBio could have a blockbuster drug on its hands.

35.     Following the IPO, analysts valued AnaptysBio highly, based largely on forecasts of significant revenue generation from ANB020.  In its first analyst report covering AnaptysBio on February 21, 2017, Credit Suisse initiated coverage

with an "Outperform" rating and a $34 per share target price.  Credit Suisse noted that "ANB020 is a first-in-class asset targeting large markets," and reported that they "see potential for ANB020 to achieve peak global risk-unadjusted sales of ~$9B in [atopic dermatitis, peanut allergy, and asthma] with best-in-class efficacy and safety, though we note significant competition."  According to Credit Suisse, more than half of its target price projections were attributable to the potential value of ANB020.

36.    On July 27, 2017, AnaptysBio's Chief Scientific Officer, Matthew Moyle, resigned only one year after joining the Company.  As reported at the time in *Global Data Point*, the "famously tight-lipped" Company said nothing about Moyle's departure except that it was "effective immediately."  Analysts from Credit Suisse questioned management about Moyle's departure, raising concerns that the resignation was related to the ongoing Phase 2A AD Trial and Phase 2a Peanut Allergy Trial.  In a July 27, 2017 report, Credit Suisse noted that Defendants Suria and Piscitelli gave Credit Suisse "comfort" that Moyle's resignation was not related to the ongoing trials.

37.    AnaptysBio reported its second quarter 2017 financial results on August 10, 2017, touting its "significant progress in the clinical development" of ANB020.  Defendant Suria stated that "[t]he second half of the year is poised to be a catalyst-rich period, and we look forward to clinical data announcements from our ANB020 and ANB019 programs."  Specifically, the Company reported that its ongoing Phase 2a trial in 12 adults with moderate to severe atopic dermatitis (the "Phase 2a AD Trial") had completed enrollment, with the results on track for a second half of 2017 readout.

38.    Analysts at Credit Suisse, who continued to rate the Company as an "Outperform" with a $34 target price, noted that the ANB020 Phase 2a AD Trial "will be a very important readout for the company as it could demonstrate proof of concept for both IL33 as a target in allergic diseases and more importantly for the ANAB platform technology."

39.     Similarly, in a report dated September 14, 2017, analysts for RBC Capital Markets "forecast[ed] potential for ANB020 to command $7B+ in peak unadjusted sales from just 5-10% market penetration."  Analysts from JMP wrote, "In our view, AnaptysBio *represents a rare investment opportunity in the small cap inflammatory and immunology (I&I) space*."  RBC also directly compared ANB020's success to that of a chief drug competitor, writing "[w]e see [severe asthma, atopic dermatitis, and peanut allergies each] as a potential blockbuster opportunity, and anticipate that competitive data in one of these indications could lead to an inflection point for the stock.  Should ANB020 prove effective, it could command sales estimates similar to [rival drug Dupixent]."

40.     While AnaptysBio was engaging in its phase 2a studies of ANB020, another drug called dupilumab, sold under the commercial name "Dupixent," beat etokimab to the marketplace.  Dupixent, manufactured by Sanofi/Regeneron, was approved by the FDA on March 28, 2017, as the first targeted biologic therapy for adults with moderate-to-severe atopic dermatitis.  Analysts noted that Dupixent was a financial success from its outset and believed it would pave the way for ANB020 by building a market for biologic therapies to treat atopic dermatitis.  Indeed, in a report dated March 29, 2017, analysts for Wedbush wrote, "We expect Dupixent . . . will build the market for biologics in AD."  Later, in a report dated May 15, 2017, Wedbush analysts noted that Dupixent had a successful commercial launch, where Dupixent prescriptions had been "written by 1800 physicians in the first five weeks after launch, a rate which outperforms that of other recent high-profile product launches in derm space (including Cosentyx and Otezla)."  Given Dupixent's early success as the first FDA-approved biologic therapy for the treatment of atopic dermatitis, in their report dated May 9, 2017, analysts for Credit Suisse modeled Dupixent's peak adjusted sales to be approximately $5 billion, with $4 billion of those sales from the market to treat atopic dermatitis.  In light of this large market,

the analysts for Credit Suisse noted that should ANB020's "early data show[] clinical activity, we think this could be an important catalyst for [AnaptysBio]."

41.     With the market's enthusiasm for new targeted-biologic treatments for atopic dermatitis, analysts also recognized that the efficacy data that Dupixent exhibited in its clinical trials set the bar for possible commercial success of ANB020. In their report dated September 21, 2017, analysts for RBC noted that one of the "Key Caveats" for interpreting AnaptysBio's upcoming readout of its Phase 2a AD Trial data was achieving a response rate for ANB020 that suggested a competitive profile with Dupixent.  Defendants were cognizant of the need to report efficacy data in ANB020's Phase 2a AD Trial that made it competitive with the efficacy shown by Dupixent.  Indeed, the RBC analysts wrote that their "***conversations with ANAB mgmt.*** suggest a 50% EASI-50 response following a single dose of ANB020 would be ***suggestive of clear efficacy and a potential competitive profile with Dupixent.***"

42.     At the time of etokimab's Phase 2a AD Trial design, Dupixent was the only biologic that had been approved by the FDA for atopic dermatitis.   In Dupixent's Phase 2 trial, patients who used corticosteroids as rescue therapy were excluded from the competitor's efficacy analysis (with the partial exception of those who used rescue therapy in the first two weeks of the trial).  Instead, results from those who used rescue therapy "were set to missing and missing values imputed by last observation carried forward (LOCF)."  This means that, after using rescue therapy, all subsequent values observed in those patients were omitted, and the last value observed before the patient's use of rescue therapy was used going forward for purposes of the efficacy analysis.  Because Dupixent had been approved by the FDA on March 28, 2017, Defendants had access to information about Dupixent's Phase 2 trial design before the start of etokimab's Phase 2a trial, which began enrollment in mid-2017, and would have known that Dupixent's standard-setting efficacy was achieved without including the results of those patients who used rescue therapy.

**B.     Positive Phase 2a Atopic Dermatitis Trial Results Dramatically Increase AnaptysBio's Value At The Start Of The Class Period**

43.     On October 10, 2017, the first day of the Class Period, AnaptysBio, reported the highly-anticipated topline proof-of-concept data from an interim analysis of its Phase 2a AD Trial through a press release, conference call and accompanying slide presentation, all released before the start of trading.

44.     Phase 2 clinical trials are of vital importance in the drug development process as they usually gather preliminary evidence of efficacy of potentially new therapies and support the go/no-go decision for Phase 3 pivotal trials.  "Topline" results of Phase 2 trials are typically first disclosed so that key stakeholders, including investors, can have timely access to a high-level summary of the important findings.  The sponsors of the trials often will save more detailed findings for future medical conference presentations and/or peer-reviewed journal publications, and as a result there may be an extended period of time where only the topline results are available on which investors can rely.  It is therefore critical for trial sponsors to release objective findings and avoid selective disclosure of favorable results when reporting topline results to investors.

45.     Defendants announced that the Company's Phase 2a AD Trial interim results had demonstrated "proof of concept," i.e., the trial verified that the Company's thesis had significant practical potential sufficient to justify the next trial phase.  The Company reported that the interim results had met the "key efficacy objective" of the Phase 2a AD Trial, which was to "demonstrate 50% EASI score improvement (EASI-50) in at least 50% of enrolled patients at 4 weeks after a single dose of ANB020."[3]

---

[3] A patient's EASI score is determined by an inspection of four different regions of the body (head/neck, trunk, upper extremities, and lower extremities) for four different signs of AD on the skin (erythema, edema/papulation, excoriation, and lichenification).  For each region of the body, a patient is rated to have "none,"

46.     Defendants released detailed data describing the Phase 2a AD Trial design, namely that the trial:

- Enrolled 12 adult moderate-to-severe atopic dermatitis patients;
- All patients were previously inadequately controlled by topical corticosteroids, of whom 7 of 12 were previously treated with systemic therapy;
- Each patient administered with single dose of IV placebo (Day -7) followed by single dose of 300 mg IV ANB020 (Day 1);
- Eczema Associated Severity Index (EASI) and 5-D pruritus clinical scores (i.e., itchiness) determined at certain time points (Day 15, Day 29 and Day 57);
- Aspirate skin lesion for exploratory biomarker analysis at 5 days post-placebo and 5 days post-ANB020 administration

47.     Defendants reported that the interim trial results far exceeded the key efficacy objective of EASI-50 in at least 50% of enrolled patients at 4 weeks after a single dose of ANB020.  In its October 10, 2017 slide presentation, the Company stated that "EASI Score Improvement Observed [was] Early and Sustained Until Day 57," with well over 50% of the 12 enrolled patients demonstrating EASI-50 at two weeks, four weeks, and nearly eight weeks.  Specifically, the Company reported in the October 10, 2017 press release that:

> After a single dose of ANB020, 75 percent of patients achieved an Eczema Area Severity Index (EASI) score improvement of 50 percent relative to enrollment baseline (EASI-50) at day 15, 83 percent of patients achieved EASI-50 at day 29 and 75 percent of patients

"mild," "moderate," or "severe" presentation of each sign.  The percentage of skin involved on each region of the body in the presentation of the signs is also recorded. Using this information, a patient receives a score of 0 to 72, where 0 means that there are no signs of AD on any region of the body, and 72 means that there is the most severe presentation of every sign on 100% of each of the four regions.  EASI-50 refers to a 50% improvement relative to baseline EASI score.

achieved EASI-50 at day 57.  All 12 patients achieved EASI-50 at one or more timepoints through Day 57 post-ANB020 administration. ANB020 was generally well tolerated in all patients as of this interim analysis.

48.     The Company touted its next steps after these positive results: (a) complete the Phase 2a AD Trial data and present results at a future medical conference; and (b) initiate Phase 2b randomized, double-blinded, placebo-controlled, multi-dose trial to evaluate different dosing frequencies of ANB020 in 200-300 adult moderate-to-severe atopic dermatitis patients during the first half of 2018, with resulting data to be released in 2019.

49.     In the October 10, 2017 press release, Defendant Suria stated, "We are very encouraged by the efficacy results to date in this Phase 2a study, which exemplify our strategic focus on developing first-in-class anti-inflammatory antibody therapeutics to help patients suffering from debilitating inflammatory diseases," and that "[w]e look forward to further advancing the development of ANB020 for the treatment of patients with atopic diseases."  The press release highlighted the "rapid and sustained benefit observed in patients after a single dose of ANB020."

50.     The Officer Defendants participated in a conference call on the morning of October 10, 2017 to discuss the Phase 2a AD Trial Results.  During the October 10 conference call, Defendant Suria touted the "positive" data, stating that the Phase 2a AD Trial "*provides a solid foundation for the continued development of ANB020 across a number of atopic diseases*."  He further stated that "[w]e believe we can build on that with multidosing . . . [I]n a Phase IIb study, we anticipate that we can get to even greater EASI scores."  Further, because the underlying physiology is similar across all the atopic diseases that etokimab was intended to treat, including atopic dermatitis, peanut allergy, and asthma, Defendant Suria stated, "[W]e are encouraged by what we're seeing so far in the results disclosed today and what that means in terms of potential translation to the peanut allergy trial."  After describing

the trial design and results, Defendant Londei stated, "Based upon this data, we believe that a single dose of ANB020 can maintain efficacy benefit in adult moderate-to-severe atopic dermatitis patients for approximately 2 months, *which meaningfully differentiate [sic] ANB020 in terms of patient convenience*."

51.     Analysts immediately inquired about how the ANB2020 Phase 2a AD Trial results compared to the design and results of comparative drugs being analyzed for similar use including, specifically, Dupixent.  For example, an analyst from JMP asked:

> I just wonder if you could put into context the results relative -- been a lot of data readouts from competitive agents, both biologics and small molecules in the atopic derm space of late. And so I'm just wondering if you can put not only the results into context with some of the other agents and perhaps as well as the DUPIXENT Phase II data but also the baseline characteristics -- or maybe Marco wants to take a shot at that *as far as the baseline characteristics of the patients in this study versus the patients in the other studies*?

52.     Defendant Suria responded that, "[a]s far as the baseline characteristics of the 12 moderate-to-severe adult atopic dermatitis patients that we treated in this study, you saw from our disclosure today that these are all people that were inadequately controlled on topical corticosteroids.  7 out of 12 of them were so inadequately controlled that they ended up being put on systemic immunomodulatory drugs prior to enrollment in the study.  And hence, their EASI score at baseline was fairly high, was 32 in the EASI score index.  So these patients are solidly in the moderate-to-severe bucket of atopic dermatitis and, from our perspective, are more on the severe end given their history of needing systemic immunomodulatory therapies before being on this trial."  Defendant Suria then refused "to provide any direct comparison necessarily in terms of the efficacy measures here" as compared to Dupixent or other competitors, but did state that:

> [T]he key differentiators of ANB020 that we have surmised from the genesis of the study are threefold: one is that we're acting upstream in the atopic disease pathway by inhibiting IL-33, which then results in

the subsequent inhibition of IL-4, -5 and -13 as downstream cytokines involved in atopic disease. ***The second aspect that's really important about ANB020 is the duration of effect after a single dose and the persistence of that effect all the way out to 2 months, which is meaningful from a patient convenience standpoint relative to other therapies that perhaps may need to be dosed every other week or perhaps even as a daily dosing paradigm***. We believe that monthly or every other month administration would be significant differentiation for ANB020. And then third aspect is safety, which is really important in any inflammatory disease but particularly in atopic dermatitis. We're pleased to have a clear safety profile so far in all the humans that we have dosed between all the studies that we have completed and are ongoing; whereas, some of the competition has some safety issues that we believe are meaningful differentiators for us in the moderate-to-severe atopic dermatitis space. So that's the general guidance that I would give you with respect to your question.

53.     Later, in response to another question, Defendant Suria emphasized that analysts should "***remember that we are only administrating these patients once with a placebo and once with drug***."

54.     An analyst from Stifel, Nicolaus & Company ("Stifel") noted on the call that it was "[h]ard to imagine better data." That analyst then asked whether the Company would "need additional data for patients that . . . remain on all their other meds." In response, Defendant Suria stated that "***[e]ventually***, ***commercially, topical corticosteroids will be involved at some level***. However, we haven't specifically given guidance at this point beyond the general description of the Phase IIb that we would be running."

55.     As of October 10, 2017, the ANB020 AD Phase 2a trial was ongoing and the Company noted that EASI scores would be assessed for each patient up to 140 days post-ANB020 treatment. The Company planned to report full data from this trial at a medical conference following study completion.

56.     Analysts reacted positively to this news in their reports. For example, RBC increased its price target by $39 per share, to $79 from $40, noting that "ANAB remains our top small-cap pick." RBC wrote, "We view this morning's ph2a top-

line atopic dermatitis (AD) EASI-50 results for ANB020 as a best case scenario and highly competitive vs. other AD players (Dupixent; JAK inhibitors[)]."  As a result, "we have increased our probability-of-success (PoS) adjustment for ANB020 in AD to 50% (vs. 15% previously).  In addition, we have also increased our PoS for ANB020 in peanut allergies and eosinophilic asthma to 20% (from 15% previously) given what we view as a positive read-through from today's AD results."  RBC noted that the Company's "Q4:17 ph2a peanut allergies top-line read-out is the next key catalyst for the stock."

57.     Similarly, Credit Suisse raised its target price to $85 from $38, because "the company achieved proof of concept with their IL-33 in atopic dermatitis." Further, Credit Suisse wrote, "We remain positive this story into many catalysts over year end and 1H18.  We also think IL-33 is potential platform in other allergic diseases beyond AD . . . [T]he atopic dermatitis data came in above our expectations. Stock is up close to 70%, but we continue to see upside into proof of concept data in food allergy, asthma and pustular psoriasis coming in the next 12 months."  Credit Suisse also raised the possibility of success "from 25% to 35% to ANB020 in atopic dermatitis" and "raised the peak (2026) market opportunity from $1B to $1.6B after the data showed the potential for a longer dosing interval."  In addition, Credit Suisse "raised our probability of success to asthma from 15% to 25% for ANB-020 after *the positive data for ANB-020 seen today we think validates the potential for ANB-020 in allergic diseases*."  Similarly, JMP wrote, "we reiterate our Market Outperform rating and increase our price target to $82 from $45 . . . *We view these data as highly compelling and believe they validate the company's approach to treating atopic diseases, including but not limited to atopic dermatitis*."  In addition, analysts at Wedbush raised the price target to $75 from $37 because "Ph 2 data leaves us *more positive on ANB020's prospects in atopic dermatitis and other conditions driven by atopy*.  With *clear evidence* of durable disease remission and

no serious safety signals observed, we see advantages in ANB020's clinical profile relative to other biologics on market and in development."

58.     At this news of the Phase 2a AD Trial results, AnaptysBio's stock price skyrocketed on the first day of the Class Period, more than doubling to close at $70.41 per share on October 10, 2017, compared to a close of $35.00 per share on October 9, 2017.

59.     Defendants immediately seized on the increased stock price by initiating an accelerated secondary offering of its common stock.  On October 10, 2017, the same day the Company announced the Phase 2a AD Trial results, the Company filed a Form S-1 secondary offering registration statement, indicating that it would offer 3,000,000 shares of common stock at a proposed offering price of $35.10 per share.  The Company contemporaneously sent a letter to the SEC, requesting accelerated treatment and approval of the offering by no later than 4:30 PM on October 12, 2017.

60.     By the following day, the Company raised the offering price to $68.50 per share—more than four times the IPO price.  On October 12, 2017, the Company conducted the offering, raising $205,000,000, with the underwriters optioning the sale of an addition 271,380 shares, for an additional $18.6 million, for a total offering value of $223.6 million.

61.     Buried in the Company's secondary offering prospectus, filed on October 13, 2017, AnaptysBio made a single mention of an aspect of the study that was neither referred to nor reported in any of the other statements concerning the Phase 2a AD Trial design and results: "*Patients were permitted to take a monitored amount of topical corticosteroids as rescue therapy during the course of the study.*"  While Defendants alluded to the possibility of the use of rescue therapy in the registration statement (but not in the press release, slide presentation, or conference call discussing the topline trial results), they reported no ***actual use*** of

rescue therapy, nor did they reveal the impact that such use would have on trial results.

62.     On November 7, 2017, AnaptysBio announced its third quarter 2017 financial results and issued its Form 10-Q for the third quarter 2017.   In the November 7, 2017 press release, the Company repeated its positive Phase 2a AD Trial results, and provided updates on its Phase 2a Peanut Allergy Trial and Phase 2a Asthma Trial, noting that, with respect to the peanut allergy trial:

> Enrollment continued in the company's ongoing Phase 2a double-blinded, placebo-controlled trial assessing the tolerance of oral food challenge before and after administration of a single dose of ANB020 or placebo in a total of 20 adult patients with severe peanut allergy.  As of October 31, 2017, 75 percent of the study has been enrolled and top-line data are expected in the first quarter of 2018.

63.     Also on November 7, 2017, Defendant Suria participated in the Credit Suisse Healthcare Conference, where he summarized the Phase 2a AD Trial results, stating, "We observed robust and rapid improvement in the EASI score, and 83% of patients achieved EASI 50 at approximately 1 month after a single dose of ANB020 and that effect ***was consistently maintained until approximately 2 months after a single dose***.  We were very excited by this data and look forward to continuing development of ANB020."   Defendant Suria made no mention of the use of corticosteroids as a rescue therapy.  Defendant Suria also touted the ongoing Phase 2a Peanut Allergy trial, noting that the trial "***involves 20 patients that are randomized 3:1 between drug and placebo***, and there, we are focused on assessing oral food-challenged tolerance of peanuts among these severe patients before and after being treated with drug or placebo."

64.     Analysts reacted enthusiastically to Defendants' November 7, 2017 statements.  In a November 7, 2017 report, RBC wrote, "We see significant progress for ANAB in 2017, highlighted by 1) the release of highly compelling ph2a data for [etokimab] in atopic dermatitis . . . We continue to like ANAB into 2018 with a catalyst-rich first half including expected ph2a peanut allergies and allergic asthma

read-outs, as well as planned trial starts for ANB020 in atopic dermatitis . . . We have updated our model to reflect Q3:17 financial results, and maintain our $79PT and Outperform rating."

65.    RBC noted that the Phase 2a Peanut Allergy Trial results had been postponed by one quarter (from Q4 2017 to Q1 2018) because, as RBC learned from "conversations with mgmt.," the Company had "difficulty in recruiting adult patients at the severe end of the disease spectrum who are wary of the potential to be randomized to placebo" which "led to the peanut allergy trial delay."  In a November 30, 2017 analyst report, Jefferies restated its price target of $101 per share, writing, "***Depending on the strength of [the Phase 2a Peanut allergy Trial] data, we could see shares move $20-30/share***."

66.    AnaptysBio's share price rose in the wake of the November 7, 2017 statements, and continued to rise through 2017.  On December 18, 2017, when AnaptysBio was trading at $91.96 per share, RBC raised its price target by $29 per share, to $108 per share based on "higher conviction in ANB020 in peanut allergy & asthma."

67.    Defendant Suria discussed the Phase 2a Peanut Allergy Trial during a January 9, 2018 JP Morgan Healthcare Conference, explaining how the trial had already begun with the enrollment of 20 patients:

> We are currently conducting our severe adult peanut allergy Phase IIa study, ***which is focused on severe patients, by definition, people that have a history of anaphylaxis that have previously had a severe episode in response to accidental peanut exposure***.  These are the people that are always next to their EpiPen all the time, always know where the nearest ER is.  ***We're treating 20 of those individuals with a single dose of our antibody versus placebo and the key clinical endpoint that we'll be looking for there is oral food challenge***, which we measured using the (inaudible) methodology, and that data is due out at a top-line level this quarter.

68.     AnaptysBio common stock rose in the wake of Defendant Suria's statements, from a closing price of $103.52 per share on January 9, 2018 to a closing price of $111.29 per share on January 10, 2018.

69.     Defendant Suria also discussed the ongoing Phase 2a AD Trial at the January 9, 2018 conference, repeating the results announced on October 10, 2017 and further noting that "we intend to report subsequent data points after the single dose administration in terms of EASI clinical response at a future scientific conference in 2018." The Phase 2a AD Trial full results were presented on February 17, 2018 at the American Academy of Dermatology (AAD) Annual Meeting in San Diego. The Company issued a news release the same day summarizing the trial's final results. In addition to results up to day 57, which had been released in October 2017, the Company reported that:

- ANB020 "*was efficacious in all 12 patients enrolled*" in the trial.

- *Efficacy was sustained through day 140 following single dose administration of ANB020* with five of 12 patients (42%) achieving EASI-50, of which three patients (25%) also achieved EASI-75.

- ANB020 efficacy *was not limited by disease severity* as ANB020 was similarly efficacious in the seven of 12 enrolled patients treated with systemic immuno-modulators pre-study, which exhibited an average EASI baseline score of 36 upon enrollment, relative to the remaining five of 12 enrolled patients that did not require systemic immuno-modulators pre-study and exhibited an average EASI baseline score of 27. The average baseline EASI score upon enrollment across all 12 patients was 32.

- Day 29 results "exceeded the primary efficacy objective of the trial with 10 of 12 patients (83 percent) achieving EASI-50" and "[o]ther atopic dermatitis efficacy endpoints . . . demonstrated rapid and sustained single dose ANB020 efficacy results in a similar manner to the . . . EASI results."

70.     As with their prior reported results, the Company made no mention of the possibility or actual usage of corticosteroids as rescue therapy.  In response to the final Phase 2a AD Trial results, several analysts issued positive reports and raised their price targets for the Company.  On February 19, 2018, analysts at Jefferies issued a report titled "'020 Shines at AAD Mtg with Efficacy in Line to Dupi," noting that "[s]ustained efficacy on a single dose of '020 was seen up to Day 78 (~11 wks) at EASI-50 in 75% of pts, comparable to PII data from competitor Dupixent. We think '020's PoC [proof of concept] performance will translate well to the upcoming placebo-controlled PIIb trial where pts will be given >1 dose."  Jefferies raised its price target from $101 per share to $145 per share in the wake of the news. Wedbush issued an analyst report on February 20, 2018 also raising its price target from $142 per share to $151 per share, touting that "updated results demonstrate an impressive sustained peak response through Day 78 following a single IV injection." Another analyst, SunTrust Robinson Humphrey ("SunTrust"), maintained its price target of $162 per share, reporting that the final results showed that "ANB020 [was] effective in 100% of patients" and "disease severity does not limit ANB020 effectiveness."  The analysts placed weight on the fact that "patients only received a single 300mg dose of ANB020 at study Day 1," and saw "an efficacy signal . . . through Day 140."  No analysts mentioned the possibility or actual usage of rescue therapy in the trial.

### C.     Analysts Raise Serious Concerns About The Phase 2a Peanut Allergy Trial's Design And Results

71.     Credit Suisse also issued a report on February 20, 2018 in the wake of the AAD presentation.  Credit Suisse stated that the "near term focus from here is upcoming proof of concept readouts in peanut allergy in March and in asthma in 2Q."  Credit Suisse further noted that it had learned "from speaking to the company" that Defendants were "looking for a trend in the ANB-020 dosed patients vs. placebo" in the Phase 2a Peanut Allergy Trial.   This indicated that Company

1 measures success in large part on the ability to report significant differentiation
2 between the placebo and treated groups.

3       72.     On March 26, 2018, AnaptysBio announced its much-awaited top-line
4 proof of concept data for the Phase 2a Peanut Allergy Trial.  In a press release issued
5 that day, the Company characterized the results as "positive top-line proof-of-
6 concept data for ANB020" and reported that "46% of adult peanut allergy patients
7 with moderate-to-severe baseline symptoms tolerated 500mg cumulative peanut
8 challenge at 14 days after a single dose of ANB020 compared to zero percent dosed
9 with placebo."  The Phase 2a trial was an oral food challenge analysis ("OFC"),
10 which is a procedure where patients eat food slowly, in gradually increasing amounts
11 on a daily basis, to accurately diagnose or rule out a food allergy.  According to
12 AnaptysBio,

13        This Phase 2a proof-of-concept trial enrolled 20 adult peanut allergy
14        patients with a clinical history of anaphylaxis.  The baseline peanut
15        tolerance of each patient was evaluated at enrollment using a blinded,
          placebo-controlled oral food challenge (OFC) according to
16        PRACTALL guidelines[4] where each patient experienced dose limiting
17        symptoms at or before a cumulative 500mg dose of peanut protein.
          Patients were subsequently randomized on a 3:1 basis to receive a
18        single intravenous 300mg dose of ANB020 or placebo at 14 days
19        following the baseline OFC, and then administered a second OFC at 14
          days after dosing.  Each OFC was limited to a maximum of 500mg
20        cumulative peanut dose.  Symptom severity was adjudicated by an
21        independent, blinded assessor that was not involved in performing the
          baseline or day 14 OFC.

22

23

24 [4] PRACTALL refers to the PRACTical ALLergy program, a "flagship common
   initiative of the European Academy of Allergy and Clinical Immunology and the
25 American Academy of Allergy, Asthma and Immunology.  The goal of this joint
   project led by the Presidents of both the Academies is to share updated authoritative
26 and evidence based recommendations for current hot topics relevant to our field."
27 PRACTALL sets out best practices and methodology for conducting oral food
   challenges in clinical studies.  Source: http://www.eaaci.org/documents/EAACI-
28 AAAAI_PRACTALL-The_role_of_the_microbiome.pdf.

73. However, after describing the trial design and patient pool of 20 patients, the Company disclosed that four patients (20% of the pool)—two from the placebo-dosed group and two from the ANB020-dosed group—were excluded from the analysis because they were at some point after enrollment determined to not have moderate-to-severe baseline symptoms, even though they all exhibited a "history of anaphylaxis" and "a severe episode in response to accidental peanut exposure"—the criteria described by Defendant Suria in January 2018—and otherwise were the same average age and exhibited the same "baseline peanut tolerability" of 239 mg of peanut.  Based on this reduced patient pool, the Company reported that "*six of 13 (46%) patients administered a single dose of ANB020 improved peanut tolerance at the day 14 OFC to the maximum tested cumulative 500mg dose, compared to none of the placebo dosed patients*."  The Company noted, however, that of the four excluded patients, "one ANB020 dosed patient and two placebo dosed patients improved peanut tolerance to the 500mg cumulative dose at the day 14 OFC."  In other words, in those excluded patients, the placebo actually outperformed the treated patients, a very negative result for a clinical trial drug.  The Company indicated that it planned "to report detailed data from this trial at a future medical conference following study completion."

74. In the press release, filed after the market closed, Defendant Suria stated, "We are encouraged by the rapid improvement in peanut tolerance and favorable safety profile observed to date in this study following a single dose of ANB020.  We believe ANB020 has the potential to prophylactically protect moderate-to-severe baseline adult peanut allergy patients from anaphylaxis.  In addition, we believe ANB020 may address multiple concomitant allergic conditions irrespective of the specific allergens involved."  The press release touted the drug as a "*promising new paradigm for peanut allergy patients*."

75. While the Company spun its Phase 2a Peanut Allergy Trial interim topline results in an exceedingly positive light, analysts immediately raised concerns

over the trial design and the post-enrollment removal of four of the 20 enrolled patients.

76.    During the March 26, 2018 conference call, which was conducted after the close of trading, Defendant Suria stated, "We have demonstrated proof of concept in adult peanut allergy patients with moderate-to-severe baseline symptoms [for] a single dose of ANB020 resulting in 46% of patients achieving the maximum-tested peanut tolerance in 14 days."  In that same call, Defendant Londei described the design and interim data from the Phase 2a Peanut Allergy Trial.  In contrast to Defendant Suria's January 9, 2018 statements, where he described that the trial was, at that time, focused "on severe patients, by definition, people that have a history of anaphylaxis that have previously had a severe episode in response to accidental peanut exposure," Defendant Londei explained during the conference that Defendants "excluded 2 ANB020 and 2 placebo dosed patients from the interim analysis because they exhibited mild symptoms at baseline."

77.    A slide presentation that accompanied the conference call provided some additional information concerning the four excluded patients, noting that the interim results that reported that 46% of the ANB020-dosed patients "improved peanut tolerance to cumulative 500mg at Day 14 OFC" compared to 0% of the placebo-dosed patients "[e]xcludes two ANB020 and two placebo dosed patients that exhibited mild symptoms at baseline, of which one ANB020 dosed and two placebo dosed patients improved peanut tolerance to 500mg cumulative at Day 14." Thus, while the inclusion of these patients would not materially impact the reported 46% success rate in the ANB020-dosed patients, raising it to just 47%, it would increase the success rate in placebo-dosed patients to 40%, just a 7% percent differential between the two groups, as compared to the reported 46% differential.

78.    Analysts asked several questions about the Company's unusual and unexpected announcement that 1 out of 5 enrolled patients were excluded from the trial's interim analysis.

79.     The first question came from a Credit Suisse analyst, Eliana Merle. Merle immediately homed in on the Company's decision to exclude four patients from its topline results:

> Could you just give us a little bit more color around what amount of peanut the 2 mild-treated patients were able to tolerate at the 14-day oral food challenge and the 2 mild placebo patients were able to tolerate at the 14-day oral food challenge? So basically, like ***what would the peanut challenge results have been at 14 days if you had included these 4 mild patients?***

80.     In response, Defendant Suria refused to answer Merle's questions about the results including the four excluded patients, stating, "We're not really providing a whole lot of context here on the mild because that's not our focus.  We'll talk about that more in a scientific conference in the future."

81.     Later in the call, Biren Amin, an analyst from Jefferies, asked several questions concerning the decision to exclude the four patients, and whether this determination was "prespecified", i.e., whether the potential exclusion of patients was in the study's original design, before any data was received or examined: "[W]hat was the threshold on symptom severity where you discern the 2 groups? ***And was it a prespecified design for the Phase II trial***?"  In response, Defendant Suria refused to say outright whether the threshold was "prespecified," and stated that "the thresholds are defined by the PRACTALL guidelines that have existed in this field since a 2012 publication that defined those."  Defendant Suria further stated:

> [T]he PRACTALL guidelines are not mysterious.  And ***they're quite clear, and they're used in common practice across virtually all the studies that have been occurring since 2012, with respect to oral food challenge assessment and assessment of efficacy in peanut allergy***. So I would say that's generally quite consistent across the whole field of peanut allergy, and in the future will be applied consistently across commercial usage of peanut allergy therapeutics.

82. After a series of back and forth exchanges, Amin once again asked his initial question which was still unanswered: "Just to be clear, ***the mild patients were prespecified and were excluded in a prespecified manner, correct***?" Defendant Suria responded again with a non-answer, but one which essentially confirmed that the mild patients were ***not*** "excluded in a prespecified manner" by first stating that "the intent of the study all along from the very beginning was to focus on the more severe patients" and that "[w]e did not want to enroll or want to include people with mild symptoms." Defendant Suria then stated that, "[h]owever, ***it turns out 20% of our patients were not of the right symptoms that would be relevant from an unmet medical need perspective***." Defendant Suria stated that the exclusion was "***consistent with the intent of the study and what we wanted to do with the program in the first place***." By focusing on the supposed "intent" of the study, and the "learning" that AnaptysBio had done by enrolling the excluded patients, Defendant Suria essentially admitted that these patients were not excluded in a prespecified manner.

83. RBC immediately questioned the methodology behind the study and AnaptysBio's decision to exclude certain patients from the results. In an analyst report published on March 26, 2018, RBC analyst Dr. Kennen MacKay wrote that the impact of the Company's top-line results was "negative" and that the "ANB020 adult ph2a peanut allergy data introduce more questions than answers." The report stated that "[etokimab's] response rate in an [intent to treat] population does not appear to be meaningfully differentiated" relative to the placebo. RBC disclosed that:

> Data from a sub-group analysis of moderate-to-severe patients showed that 46% of ANB020-treated patients tolerated a cumulative dose of 500mg at the Day 14 oral food challenge (OFC), however, ***ANAB screened out several patients in this analysis and the difference between the ANB020-treated arm vs. placebo arm appears to be ~7% on a 500mg tolerated cumulative dose intent-to-treat responder analysis basis (47% [7/15] ANB020 response rate vs. 40% [2/5] for***

*placebo*).  These data remain challenging to interpret given ANAB did not disclose average tolerated dose at 14 days (only percent reaching 500mg) or average improvement in peanut tolerization from baseline in patients . . . [W]e view this result as ***below our expectations*** . . .

84.     The report further stated that the "[l]ack of disclosure of improvement delta between baseline and day 14 in both trial arms obfuscates the actual improvement data and complicates contextualization of clinical meaningfulness" and makes it "difficult to contextualize the breadth of allergic protection provided by [etokimab]."

85.     RBC raised two material concerns over AnaptysBio's credibility, determining that "[f]ollowing ANAB's investor call ***it is unclear to us whether 1) this exclusion was defined on a prospective basis, and 2) whether the PRACTALL guidelines cited by ANAB to make this stratification actually standardize and recommend this approach***.  We therefore see ***more questions than answers from this mixed dataset***."  With respect to the exclusion of the four patients, RBC pointedly noted that "these exclusions were not detailed in the clinicaltrials.gov listing nor prior mgmt. trial descriptions."  And, with respect to the PRACTALL guidelines cited as the reason for the exclusions, RBC's own prior, detailed review of the guidelines "ha[s] not revealed any clear recommendations in defining patients as mild vs. moderate-to-severe."

86.     In other words, in RBC's own investigation, management's suggestion that the use of "mild" versus "moderate-to-severe" symptoms to "stratify (and exclude) patients was the intent for the study from initiation, and that the definitions are based on the PRACTALL guidelines" did not appear to be true.  Specifically, while the PRACTALL guidelines provided instruction on how to assess symptom severity for skin, upper respiratory, lower respiratory, gastrointestinal, and cardiovascular/neurologic symptoms, they provided no criteria for food-based peanut allergies.

87.   RBC analyst Dr. MacKay also indicated that Defendants Suria and Londei purposefully avoided and ignored his questions, noting that "ANAB mgmt would not accept my questions on the investor/analyst call and has not responded to my request for follow up."  As a result, Dr. Mackay ended the RBC report, noting that "I question:"

> 1) How was the PRACTALL challenge administered?  ANAB capped the maximal peanut dose in the PRACTALL challenge at 500mg.  How was 500mg reached given the DBPCFC protocol calls for challenges of 3mg, 10mg, 30mg, 100mg, 300mg, 1000mg, 3000mg, implying that after reaching the 300mg challenge the cumulative tolerated dose would be 443mg vs. the 500mg in ANAB's trial.

> 2) Did you prospectively pre-specify the sub-group analysis of "moderate-to-severe" vs. "mild" patients with the definition/criteria that was used to split patients in this dataset ahead of patient enrollment and data?

> 3) What was the exact definition/criteria of "moderate-to-severe" vs "mild" patients in this sub-group stratification analysis?

> 4) What was the average improvement (delta) in tolerated peanut protein between day 0 and day 14 in all patients in each treatment arm?

88.   As a result of the questions raised by the Company's disclosures concerning the Phase 2a Peanut Allergy Trial, AnaptysBio stock declined nearly 6%, from a closing price of $113.83 per share on March 26, 2018 to a closing price of $107.52 on March 27, 2018.  On March 27, 2018, SunTrust issued an analyst report, reiterating many of RBC's concerns:

> While data in the moderate-to-severe group were impressive, investors seem keenly focused on the four mild patients that were excluded from the trial.  If one were to include these 4 patients, (1 ANB020-treated patient and both of the placebo patients achieved 500mg peanut tolerance), the responder rate would stand at 47% (7/15) for ANB020 vs. and 40% (2/5) for placebo.  Given this dynamic, investors are asking the following questions on this mild patient subgroup, which we have addressed in more detail below.  (1) whether these patients should be excluded from analysis, (2) what is the definition of mild vs. moderate

patients, (3) why baseline peanut tolerance is not a good benchmark for disease severity, (4) was this trial designed appropriately, and finally, (5) what lessons could be applied to future trials to minimize clinical development risks.

89.    Overall, however, SunTrust believed management's statements concerning the trial's design and the reasons for excluding the four patients, and maintained its target price of $162 per share and noted that "[i]n our view, the overall dataset provided positive proof-of-concept for ANB020 in moderate-to-severe peanut patients."

90.    RBC's assessment worsened roughly one week later, when RBC issued another report, this time lowering its price target to $86 per share from $144 per share and downgrading the Company to "Sector Perform" from "Outperform" "on increased skepticism regarding ANB020's path forward in peanut allergy" and "concern[] surrounding management credibility."  RBC wrote that "[w]e see post-peanut data credibility concerns creating unfavorable risk/ reward."  RBC reiterated that, "questionable subgroup analysis in this update has increased investor skepticism and credibility concerns."  After noting that AnaptysBio's common stock price had fallen 21%, by $24 per share, since March 26, 2018, RBC foresaw greater losses, stating, "We anticipate potential for further downside given our increased concern surrounding a path forward in peanut allergy, and we think credibility concerns could overhang the stock into Q3:18 asthma results."  RBC then directly challenged the veracity of Defendants' March 26, 2018 statements concerning the exclusion criteria:

> Following ANAB's release, we hired a peanut allergy physician expert to review the data and ANAB's subgroup analysis based on baseline patient severity.  Our expert noted that this type of patient subgrouping/bucketing based on symptomology to peanut doses (i.e., ANAB's mild, moderate, and severe patients) *does not exist in current guidelines with "mild", "moderate", and "severe" definitions applying only to patient symptomology during oral food challenge (OFC) escalation*.  As such, we have increasing concern that this may

not represent a viable path forward (as we had initially concluded) and now nearly fully remove this indication from our model.  Further, ***given expert questions surrounding the very existence of these patient subgroups in PRACTALL guidelines, we're concerned this subgroup analysis was likely retrospective and not prespecified (aka statistically questionable)***.

91.    RBC also nearly fully removed etokimab in the treatment of peanut allergy from its valuation model—decreasing its probability of success estimate for etokimab in severe adult peanut allergy down to 5%.

92.    AnaptysBio's common stock price slid in the wake of this RBC report, dropping from a close of $94.35 per share on April 4, 2018, down to a close of $87.32 per share on April 5, 2018, a drop of $7.03 per share, or approximately 7.5%.

93.    On May 8, 2018, AnaptysBio announced its first quarter 2018 financial results, reporting a net loss of $15.9 million, and provided pipeline updates on its ANB020 Phase 2b atopic dermatitis and peanut allergy trials.  The Company, unusually, did not host a conference call in association with its reported financial data for the quarter.  In the related press release, Defendant Suria stated, "We demonstrated proof-of-concept for ANB020 in Phase 2a trials in atopic dermatitis and peanut allergy[.]"  The Company provided updates on the Phase 2b AD and Peanut Allergy trials, and indicated that further, detailed results from the two Phase 2a Trials were forthcoming at future medical conferences.  On May 16, 2018, Defendant Suria spoke at the Bank of America Merrill Lynch Healthcare Conference.  Regarding the Phase 2a Peanut Allergy Trial data, Defendant Suria continued to tout ANB020's success, nothing that the results were "***a remarkable efficacy result***," and that he was "***quite excited by this data***."

94.    In July 2018, etokimab was adopted as the nonproprietary name by the United States Adopted Names (USAN) Council, in consultation with the World Health Organization (WHO) International Nonproprietary Names Expert Committee, for AnaptysBio's anti-IL-33 antibody drug candidate previously

referred to as ANB020.  Hereafter, the Company referred to the drug in its public releases at etokimab.

### D.   Defendants Unceremoniously Halt the Peanut Allergy Development

95.   On August 7, 2018, the Company issued a press release containing AnaptysBio's Second Quarter 2018 financial results and pipeline updates.  In this release, just four months after the Phase 2a Peanut Allergy interim results and weeks after touting the upcoming Phase 2b trial, the Company announced the termination of its peanut allergy trials.  In the press release, the Company stated that it had "decided to deprioritize further company-sponsored clinical development of etokimab in moderate-to-severe baseline adult peanut allergy patients," citing "commercial considerations" for this decision.  Given the numerous serious questions raised by Defendants' March 26, 2018 statements concerning the Phase 2a results raised—which remained unanswered—analysts viewed this termination as a likely result.  RBC noted that "[w]e view this decision as appropriate, and a responsible decision by ANAB management."  RBC referred back to its March 26 and April 4, 2018 reports, stating, "Recall that we highlighted significant skepticism surrounding etokimab's potential in peanut allergy in our ANAB downgrade note, where we largely removed the peanut allergy market opportunity from our financial projections, and our initial first glance note upon ANAB's initial peanut allergy ph2a data release.  We now fully remove etokimab financial projections in the severe adult peanut allergy indication from our model."  Analysts at Wedbush reduced their target price in the wake of the news: "We are decreasing our PT to $138 (from $151) as we remove peanut allergy from our valuation and add chronic rhinosinusitis with nasal polyps (CRSwNP) following's ANAB's decision to de-prioritize clinical development of the former indication and initiation of the latter."

### E. Defendants Assure Investors That The Phase 2b Atopic Dermatitis ATLAS Trial Is On Track

96.     By May 2018, AnaptysBio had initiated a Phase 2b multi-dose study in 300 adult patients with moderate-to-severe atopic dermatitis, which it called the "ATLAS" Trial.

97.     At the European Academy of Allergy and Clinical Immunology ("EAACI") Congress conference on May 29, 2018, AnaptysBio presented an update on the ANB020 Phase 2a AD Trial clinical data.  In a press release issued by the Company on May 29, 2018, the Company reported that etokimab "was efficacious in all 12 patients enrolled in this trial" and "*[e]fficacy was sustained through day 140 following single dose administration of ANB020 with five of 12 patients (42%) achieving EASI-50, of which three patients (25%) also achieved EASI-75*."  The Company also reported that "*ANB020 efficacy was not limited by disease severity*."  The press release also reported that "*[d]ay 29 results exceeded the primary efficacy objective of the trial with 10 of 12 patients (83%) achieving EASI-50" and that "[o]ther atopic dermatitis efficacy endpoints … demonstrated rapid and sustained single dose [etokimab] efficacy results in a similar manner to the … EASI results*."

98.     However, the Company once again made no mention of the potential for or actual use of corticosteroid rescue therapies, and how that usage impacted the trial results.  In fact, to the contrary, analysts reported specifically that *no rescue therapy was utilized in the study*.  Analysts at SunTrust commented on the May 29, 2018 presentation and wrote:

> Our last look at these data was at AAD in February [] where we saw that ANB020 effectively reduced eczema symptoms in all patients, with 12/12 achieving EASI-50 on or before day 57, and 83% of patients achieving EASI-50 by Day 29 (primary efficacy endpoint).  ANB020 was efficacious irrespective of baseline EASI score and prior use of systemic immuno-modulators.  *In addition, no oral corticosteroids were used in the study to rescue patients*.

[Emphasis in original.] SunTrust continued, "ANB020 continues to impress in AD, new eosinophil biomarker data show robust reductions in eosinophil levels that correlate with disease improvements . . . In our view, the strong reduction in circulating [blood] eosinophil levels, and correlations with disease improvement, serve to further reinforce the ANB020 mechanism of action in the prevention of atopic diseases." Additionally, when compared to competitor Dupixent, SunTrust stated, "We believe [the data] could indicate that *ANB020 may be capable of larger improvements (both in depth of response with multiple doses and in population addressed) than Dupixent is capable of*, as eosinophils and the granules they release are major drivers of atopic diseases."

99. On August 7, 2018, in the same press release announcing the termination of the peanut allergy trials, the Company also provided a summary of the Phase 2a AD Trial results presented on May 29, 2018. Defendant Suria was quoted in the press release, where he ignored the termination of the peanut allergy studies and emphasized the promise of the atopic dermatitis Phase 2b study, based on the success of the Phase 2a AD Trial: "We made significant advances during the second quarter of 2018 in the clinical development of our first-in-class wholly-owned antibody therapeutics for patients with severe inflammatory conditions. We are excited to advance the clinical development of etokimab in large atopic disease markets, including our ongoing Phase 2b ATLAS trial in moderate-to-severe atopic dermatitis, our ongoing Phase 2a trial in severe eosinophilic asthma and our upcoming Phase 2 ECLIPSE trial in adult chronic rhinosinusitis with nasal polyps."

100. On September 24, 2018, AnaptysBio reported positive topline data from its Phase 2a proof-of-concept clinical trial of ANB020 in severe eosinophilic asthma. On its conference call the same day, Defendant Londei stated that the results of the asthma study were "consistent with eosinophil reduction data from our single-dose etokimab trial in moderate-to-severe adult atopic dermatitis patients, which was presented earlier this year." Notably, in contrast to the Phase 2a AD Trial, Defendant

Londei noted specifically with respect to the asthma study that "[n]o . . . rescue therapy usage was reported at this interim analysis."

101.   The Company immediately seized on this positive news and announced that it would again offer its common stock in a secondary public offering (the "Second SPO") on September 25, 2018.   The secondary offering closed on September 28, 2018, through which 2,530,000 shares of its public stock were offered at $94.46 per share, for gross proceeds of $239 million.  In the September 25, 2018 Second SPO Offering Materials (defined below), the Company again described the data from the Phase 2a AD Trial as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.  As before, Defendants noted only that "[p]atients were permitted to take a monitored amount of topical corticosteroids as rescue therapy" in the Phase 2a AD Trial, but provided no information on the actual usage or impact of any rescue therapy.  In contrast, with respect to the Phase 2a asthma trial, the Company described that "[n]o exacerbations or rescue therapy usage has been reported as of the interim analysis."  Defendants made similar statements in the Company's Form 10-Q filed on November 8, 2018 and Form 10-K filed on February 28, 2019.

102.   On January 8, 2019, Defendant Suria represented AnaptysBio and presented at the JPMorgan Global Healthcare Conference.  During the conference, Defendant Suria stated that the Company had exceeded its goal of 50% responders in the Phase 2a AD Trial "quite robustly" and touted the results as "a very exciting data event" because all the patients administered with a single dose of etokimab achieved at least 50 percent improvement in their EASI score relative to enrollment baseline.  Defendant Suria also stated that the "*time line and robustness of that*

*single dose efficacy… gave us a sense that we could robustly advance this program into a multidose Phase IIb*," continuing,

> We move forward into development initially into atopic dermatitis with a Phase IIa trial that was a single-dose study, *where we took 12 patients that had rather severe atopic dermatitis, and following placebo administration gave each of those patients a single dose of our drug to understand the efficacy and the safety of etokimab in atopic dermatitis patients*.
>
> Following that single dose on day 1, we observed a rapid improvement in the disease of atopic dermatitis in these patients.  The percent EASI scores for these individuals decreased very rapidly.  We achieved 83% EASI-50 responders, and 42% EASI-75.  *Our goal was to see at least 50% responders, and we exceeded that goal quite robustly*.
>
> *And this was a very exciting data event for us because all 12 of the patients achieved EASI-50 following just a single dose of our drug*.
>
> In addition to the efficacy that we observed on an EASI level, we also saw parallel efficacy at the level of pruritus, the SCORAD index, a patient reported outcome, called the DLQI, and also the traditional methodology of IGA.
>
> And the time line and robustness of that single dose efficacy extended all the way out to day-57 or beyond across all of those measures and gave us a sense that we could robustly advance this program into a multidose Phase IIb, which I'll show you in a minute.

103.  On May 14, 2019, Defendant Suria represented AnaptysBio and presented at the Bank of America Merrill Lynch Health Care Conference.  During the conference, Defendant Suria described how the Phase 2a AD Trial showed the efficacy of etokimab in treating atopic dermatitis, touting that it was a "*really remarkable result where a single dose of our drug . . . had widespread efficacy across all these individuals*" such that etokimab showed "a widespread, rapid and durable response in atopic dermatitis."  Defendant Suria explained that as a result of the Phase 2a AD Trial, the Company began the Phase 2b ATLAS trial, where "the key question that we're trying to answer from this trial is . . . which dose level . . . we proceed forward into subsequent Phase III studies."  In making these statements,

Defendant Suria assured investors that the efficacy of etokimab was assured as a result of the Phase 2a AD Trial, and all that remained to be determined was the correct dosage of the drug. Defendant Suria noted that "[d]ata from this ATLAS Phase IIb trial will be available in the second half of this year [2019] and we look forward to that readout and that enabling further development and registration trials of etokimab in the atopic dermatitis."

**F.    Reports of Serious Design Flaws In The Phase 2a AD Trial Raise Concerns About Etokimab's Efficacy—Concerns That Are Confirmed When The Phase 2b Trial And Atopic Dermatitis Program Fails**

104.    On June 21, 2019, analysts from Credit Suisse issued a report questioning the veracity of AnaptysBio's Phase 2a AD Trial data, titled: "Re-Analysis of Etokimab Ph2a Atopic Dermatitis (AD) Data Prompts Incremental Questions." Credit Suisse decided to issue a report "digging deeper" into the Phase 2a AD Trial study because it had come to the analyst's attention that "the principal investigator (PI) of the etokimab atopic dermatitis Ph2a trial has stated that topical corticosteroids were utilized as a rescue therapy in the study in controlled amounts, among a 'small number of patients.'" While Credit Suisse reported that AnaptysBio management and the principal investigator represented to Credit Suisse that the use of rescue therapy was "immaterial" and on a "limited basis," Credit Suisse expressed skepticism of these attempts to downplay this information because "additional information is not available regarding whether any EASI-50/75/IGA responders had received such rescue medications and when in the course of the study patients received them."

105.    Credit Suisse noted that in a study with only 12 patients, "even one response potentially benefiting from rescue medications could skew response rates and materially change the interpretability of Ph2a results." Credit Suisse concluded that while it was possible "that utilization of rescue therapy may be immaterial to

efficacy results observed, due to lack of further details and small sample size, *we must consider the possibility that the presence of rescue medications could have influenced the trial's response rates*."   Credit Suisse allowed that although they "would expect rescue medications to be employed," they would also "expect the actual utilization of rescue therapy to be disclosed, since it could be a meaningful factor in explaining/interpreting the clinical results."   Credit Suisse noted that Defendants' decision to not release rescue therapy information was internally inconsistent because "[w]e have recently seen an example of disclosure from ANAB's Ph2a asthma study in which rescue therapy was utilized after day 64 in three subjects: one in the active arm and two in the placebo arm."   Credit Suisse concluded that the use of rescue therapy in the Phase 2a asthma study was a material disclosure, because "[t]he use of rescue therapy seems to explain the sustained FEV1 (forced expiratory volume) improvement (and the placebo arm rebound after day 64)."   Given these facts, and the Company's refusal to "provide[] any additional details on the timing of rescue therapy use or whether the subjects that received rescue therapy were classified as responders at a given time," Credit Suisse would not accept the Company's representation that the use of rescue therapy was immaterial because the analysts did not "have enough information to independently arrive at the same conclusion."

106.   As a result of the disclosure of this new information concerning rescue therapy use, and the Company's refusal to provide any information to assist Credit Suisse in its analysis, Credit Suisse reduced its probability of success for etokimab in atopic dermatitis from 55% to 35% and in asthma from 45% to 40%.  Reflecting the impact of this reduced probability of success, Credit Suisse slashed its target price from $137 to $79, and downgraded the stock from "Outperform" to "Neutral".

107.   In response, AnaptysBio common stock declined nearly 12% on massive trading volume, from a closing price of $67.02 per share on June 20, 2019, to a closing price of $59.24 per share on June 21, 2019.

1   108.   On June 27, 2019, JP Morgan issued a report memorializing
2   "highlights" from an event where JP Morgan "hosted AnaptysBio for a West Coast
3   investor group meeting."   In the report, JP Morgan noted that, "[n]o surprise, the
4   focus of the discussion was on etokimab in atopic dermatitis (AD) and the upcoming
5   phase 2b ATLAS readout."   AnaptysBio provided no greater detail concerning the
6   use of rescue therapy, reporting only at the hearing, however, "that topical steroids
7   were permitted per the protocol, but were used in very low quantities (and
8   importantly, did not materially impact efficacy results)."

9   109.   On August 16, 2019, Defendant Piscitelli tendered his resignation
10  effective September 9, 2019.  His resignation was announced to the public on August
11  19, 2019.   Analysts immediately questioned whether his resignation was tied to
12  upcoming clinical trial results.   In an August 19, 2019 report, analysts at
13  Guggenheim Securities, LLC ("Guggenheim") wrote that "[g]iven the two
14  upcoming value inflection readouts (GPP and atopic dermatitis [AD]) in the next
15  few months, the timing of the move is likely to raise questions among investors."

16  110.   On October 2, 2019, Credit Suisse issued a report, titled "Revisiting
17  Investor Expectations Ahead of Atopic Dermatitis Readout in Q4," where Credit
18  Suisse analysts tempered their belief that a "positive outcome for etokimab in atopic
19  dermatitis is the most probable scenario," with the fact that "we think it's extremely
20  difficult to have high conviction on this outcome given limited data to date, lack of
21  detailed disclosures on the use of rescue therapy on the Ph2a AD study, and the
22  increased scrutiny over this dataset after the GPP setback [in the Company's
23  ANB019 indication]."

24  111.   Overall, expectations were high for the Company's Phase 2b ATLAS
25  Trial results.  On October 7, 2019, SunTrust issued a report, titled "…And It Comes
26  Down to ATLAS in 4Q19.  We Revisit the Hurdle."  SunTrust concluded, "If we
27  take etokimab's promising Ph2a data from single IV dose at face value, we think the
28  odds of etokimab clearing the hurdle with multiple SC dosing is pretty good."

112.   On October 23, 2019, what purported to be the full data from the Phase 2a AD Trial results, co-authored by Defendant Londei, was published in *Science Translational Medicine*.  However, while the authors confirmed the use of rescue therapy on some of the 12 patients, they once again opined without data or backup that the use of rescue therapy "was negligible throughout the duration of the study." The authors noted that the amounts of rescue therapy allowed "were recorded by weight," but they did not disclose that information or the number of patients who received rescue therapy in the article or in any supplementary materials.  On October 24, 2019 Cantor Fitzgerald published a report, titled "Full ph2a etokimab data publication in AD adds to body of evidence," where the analysts reported that "[n]o further information on rescue topical steroid usage" was disclosed.

113.   In anticipation of the ATLAS results, analysts predicted that the results would likely mirror the parallel Dupixent results.  Specifically, in a report dated November 4, 2019, Jefferies noted that "[t]he overall trial design mirrors dupi PIII trials, with similar enrollment criteria, treatment period, and limit on rescue steroid use," signaling that the ATLAS results would not be skewed by the unreported use of rescue therapy, unlike the Phase 2a AD Trial.  In Dupixent's Phase III trials, any patient that used a rescue therapy during the pendency of the study was automatically classified as a non-responder.  Based on Jefferies' reporting that the ATLAS trial treated patients who received rescue therapy in the same manner they were treated in the Dupixent PIII trials, Jefferies communicated that that patients in AnaptysBio's ATLAS study would (unlike the Phase 2a trial for atopic dermatitis) be automatically classified as a non-responder if they receive rescue therapy.

114.   Days later, on November 8, 2019, the Company announced "very disappoint[ing]" data from its ATLAS trial.  Specifically, AnaptysBio revealed that each of the etokimab dosing arms "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the Eczema Area and Severity Index (EASI) relative placebo at week 16."  The Company also

revealed that, as a result of this data, it had postponed the initiation of its Phase 2b etokimab clinical trial in asthma.

115.   On this news, the price of AnaptysBio common stock declined nearly 72%, from a closing price of $36.16 per share on November 7, 2019, to a closing price of $10.18 on November 8, 2019.  In response, Credit Suisse reduced its price target to $14 per share from $48 per share, stating:

> **Etokimab Fails in AD**.  Today's release offered no details beyond indicating that no etokimab arm showed a stat-sig improvement in Eczema Area and Severity Index (EASI) over placebo at week 16. While we had expected to see at least some evidence of efficacy in this study given the logic of the MoA, as we highlighted previously in our downgrade note, we had concerns about the interpretability of the Ph2a results and were cautious into this readout.  The company expects to provide a detailed update in Q1 2020.

116.   Numerous other securities analysts also immediately downgraded AnaptysBio's stock.  For example, Wedbush downgraded the Company's stock to neutral from outperform and slashed its price target to $20 per share from $96 per share following the Phase 2b miss from the ATLAS study.  The report stated that "we're disappointed and surprised by the readout" and "are now entirely removing etokimab from our valuation."   Analysts at Guggenheim downgraded the Company's stock to neutral from buy and removed its price target entirely "following negative Phase IIb results from their key drug etokimab . . . in atopic dermatitis" and concluded that etokimab is "likely to be discontinued."  Analysts at Cantor Fitzgerald "were surprised by the results" and highlighted that "the largest risk to the shares is the growing number of investor questions we are getting around credibility and execution."   As a result, Cantor Fitzgerald removed credit to etokimab in its valuation model of the Company and slashed its price target for AnaptysBio's common stock to $28 per share from $140.

117.   Analysts at RBC stated that "[w]hile we had reservations about prior data from etokimab programs . . . as well as [management] credibility . . . we're

1   surprised by this outright failure as well as the lack of an investor call to discuss the

2   most significant development in the history of the company."  Stifel analysts noted

3   that the "all out failure of etokimab" in the Company's ATLAS study "calls into

4   question its ability to demonstrate any efficacy in other atopic diseases and is no

5   doubt the worst case scenario" for the Company.

6       **G.    Post-Class Period Events**

7

8       118.   In its November 8, 2019 press release announcing the failure of

9   etokimab in the atopic dermatitis ATLAS trial, AnaptysBio had stated that it would

10  delay the initiation of a Phase 2b trial of etokimab in eosinophilic asthma while it

11  awaited the full AD ATLAS data, which it expected to release in the first quarter of

12  2020.  As of this filing, however, the data has not been released and the asthma study

13  remains in limbo.  Indeed, in early March 2020, the Company announced the

14  termination of the etokimab atopic dermatitis studies.   On March 2, 2020,

15  AnaptysBio released its 4th Quarter 2019 financial results and provided pipeline

16  updates on its drugs in development.  In its accompanying press release, and without

17  holding an earnings call to discuss, AnaptysBio announced that it had "discontinued

18  development of etokimab in moderate-to-severe atopic dermatitis."

19      119.   Analysts were not surprised by this news and expressed that they did

20  not have faith in etokimab's success despite its continued development in the sinus

21  inflammation indication.  Analysts at J.P. Morgan wrote, "While we believe there

22  are plenty of catalysts this year that will be important to monitor, Anaptys remains

23  a show me story post the etokimab setback in atopic dermatitis, which forms the

24  basis of our relative Underweight rating."  Analysts at Wedbush noted that they had

25  already "entirely removed etokimab from [their] valuation in all indications

26  following the atopic dermatitis miss[.]"  Similarly, on March 9, 2020, analysts at

27  Guggenheim wrote, "We currently lack conviction in ANAB's etokimab[.]"

28

120.   Just days later, on March 9, 2020, AnaptysBio announced that on March 6, 2020, management and Defendant Londei had "mutually agreed" that he would depart from AnaptysBio.   Guggenheim reported, "Mgmt. notes that the decision was due to personal reasons, and there were 'no negative data/changes in clinical timelines that drove this decision.'"   Despite this report, FE 1, the former Vice President of Cell and Functional Biology at AnaptysBio, who worked at the Company from 2011 through June 2020, and who worked directly with Defendants Suria and Londei, explained that, following Defendant Londei's departure, Defendant Suria had indicated to FE 1 that "he should have done it a year ago."  FE 1 took Defendant Suria's comment to mean that he had fired Defendant Londei, and that he believed that he should have fired Defendant Londei in early 2018.

121.   On August 10, 2020, AnaptysBio again announced "disappointing" results for etokimab, this time in its sinus inflammation study.   As a result, AnaptysBio announced that it had postponed its planned etokimab Phase 2b eosinophilic asthma trial.  Yet again, management failed to have a call to discuss the trial results or that quarter's earnings, which had been released that same day.

### H.   The Officer Defendants Reaped Nearly $19 Million From Insider Stock Sales While In Possession Of Material Non-Public Information

122.   The senior-most leaders of the Company—Officer Defendants Suria, Londei and Piscitelli—engaged in a series of suspicious stock transactions, reaping approximately $18.8 million during the period of time between the August 2018 failure of the peanut allergy clinical trials and the November 8, 2019 failure of the atopic dermatitis Phase 2b clinical trial and indefinite postponement of the Phase 2b asthma trial.   The Officer Defendants' sales are strong evidence that they were financially motivated to maintain and profit from the fraud during the Class Period.

123.   Throughout the Class Period, the Officer Defendants and other insiders and employees of AnaptysBio were barred from openly selling their personal

1  holdings of AnaptysBio common stock except for extremely short periods of time
2  when such trades were allowed.  The Company had in place a lock up period that
3  prohibited employees from selling stock—a prohibition put in place to prevent
4  employees from trading while they were privy to non-public, material information
5  concerning etokimab's and other drugs' progress in clinical trials.  According to FE
6  2, a Senior Associate Scientist II who worked in the Company's Protein Sciences
7  Group from the end of 2014 through the end of February 2020, the Officer
8  Defendants were allowed to trade AnaptysBio stock while the Company's
9  employees were locked out of doing so.  FE 3, the Director of Human Resources at
10  AnaptysBio from May 2012 to April 2017, explained that employees only had a
11  window of about two to four weeks per year in which they were permitted by the
12  Company to sell AnaptysBio stock.  FE 3 provided evidence of this through
13  exemplary images of an AnaptysBio internal calendar provided to FE 3 by a former
14  colleague that showed only 6 open trading days throughout January to March 2018.
15  FE 3 explained that this was typical for the Company.  Nevertheless, from December
16  3, 2018 and June 10, 2019—while AnaptysBio's stock price remained artificially
17  inflated by Defendants' materially false and misleading statements concerning the
18  Company's atopic dermatitis clinical trial design—Officer Defendants Suria, Londei
19  and Piscitelli collectively sold over 265,000 shares of their personally held,
20  artificially inflated shares.  These insider share sales, nearly all made at roughly
21  double the closing share price on October 9, 2017, the day before the Class Period
22  started, netted Defendant Suria *over $12 million*, Defendant Londei *over $4 million*,
23  and Defendant Piscitelli *over $2.6 million*.  The Officer Defendants effectuated these
24  sales quickly and in large chunks: Defendant Suria reaped his proceeds on three sales
25  sessions (December 10-14, 2018, January 14, 2019 and June 10, 2019); Defendant
26  Londei, in multiples sales over three similar periods; and Defendant Piscitelli
27  dumped all of his stock on a single day in December 2018.

28

124.    The Officer Defendants' trades were made largely pursuant to 10b5-1 trading plans entered into between August 16, 2018 and August 22, 2018, less than two weeks after the Company's peanut allergy trials were abruptly terminated, but while the Company was touting the likely successes of the atopic dermatitis and asthma studies.  Defendant Londei also entered into an additional 10b5-1 trading plan on March 13, 2019.  These trading plans enabled the Officer Defendants to rapidly offload millions of dollars' worth of shares at a massive profit when no one else at the Company could trade, and just before the June 21, 2019 Credit Suisse report and the Company's November 2019 disclosure, which both revealed the truth about the weaknesses of the atopic dermatitis trial design and trial plans, and caused AnaptysBio's stock price to plummet.

125.    A mere two weeks after the Company's August 7, 2018 disclosure that it had abandoned its long-awaited peanut allergy study and would not pursue a Phase 2b clinical trial for the peanut allergy indication—which caused the stock to drop significantly—the Officer Defendants decided to devise, for the first time, 10b5-1 trading plans that would allow them to sell millions of dollars of AnaptysBio common stock before more disappointing news could reach the market concerning etokimab's inefficacy and the AD trial's design flaws.  At the same time the Officer Defendants were devising these 10b5-1 trading plans, the Company continued touting etokimab's efficacy to treat atopic dermatitis.

126.    While AnaptysBio's stock price was artificially inflated due to Defendants' misleading statements about etokimab's clinical trials, the Officer Defendants took advantage of the artificially inflated stock price by selling substantial amounts of their AnaptysBio common stock, totaling over $18.8 million. During the Class Period, the Officer Defendants did not purchase a single share of AnaptysBio stock on the open market.

127.    Defendant Suria personally sold 169,741 shares of AnaptysBio common stock between December 2018 and June 2019—over 91% of his holdings

available for sale—and collected approximately $12,067,670 million in proceeds for a net profit of $11,858,527.  Defendant Suria's Class Period sales are reflected below:

| Transaction Date | Shares Disposed | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 12/10/2018 | 15,276 | $70.57 | $1,078,082 |
| 12/10/2018 | 10,347 | $71.49 | $739,701 |
| 12/10/2018 | 4,964 | $72.48 | $359,805 |
| 12/11/2018 | 4,998 | $70.83 | $354,008 |
| 12/12/2018 | 12,003 | $71.11 | $853,481 |
| 12/12/2018 | 9,673 | $71.92 | $695,718 |
| 12/12/2018 | 8,324 | $72.88 | $606,618 |
| 12/14/2018 | 24,844 | $68.89 | $1,711,429 |
| 12/14/2018 | 9,084 | $69.68 | $632,968 |
| 12/14/2018 | 7,800 | $70.51 | $549,979 |
| 1/14/2019 | 27,760 | $70.65 | $1,961,227 |
| 1/14/2019 | 12,240 | $71.10 | $870,304 |
| 6/10/2019 | 8,540 | $72.64 | $620,385 |
| 6/10/2019 | 6,440 | $73.70 | $474,637 |
| 6/10/2019 | 5,000 | $74.68 | $373,413 |
| 6/10/2019 | 1,994 | $75.86 | $151,271 |
| 6/10/2019 | 454 | $76.31 | $34,645 |
| **TOTALS** | **169,741** | | **$12,067,670** |

128.  Defendant Londei sold 59,183 shares of AnaptysBio common stock between December 2018 and June 2019—over 73% of his holdings available for sale—and collected approximately $4,073,699 million in proceeds for a net profit of $3,776,373.  Defendant Londei's Class Period sales are reflected below:

| Transaction Date | Shares Disposed | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 12/17/2018 | 12,120 | $65.36 | $792,178 |
| 12/17/2018 | 8,002 | $67.57 | $540,684 |
| 12/17/2018 | 6,741 | $68.47 | $461,578 |
| 12/17/2018 | 3,185 | $66.38 | $211,416 |
| 1/15/2019 | 14,894 | $70.04 | $1,043,195 |
| 1/15/2019 | 4,181 | $69.29 | $289,686 |
| 6/4/2019 | 6,009 | $72.45 | $435,359 |
| 6/4/2019 | 2,048 | $73.43 | $150,384 |
| 6/4/2019 | 2,003 | $74.50 | $149,219 |
| TOTALS | 59,183 | | $4,073,699 |

129.   Defendant Piscitelli sold 37,000 shares of AnaptysBio common stock in December of 2018—***all of his holdings available for sale***—and collected approximately $2,669,158 million in proceeds for a net profit of $2,249,578. Defendant Piscitelli's Class Period sales are reflected below:

| Transaction Date | Shares Disposed | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 12/3/2018 | 18,604 | $71.33 | $1,327,061 |
| 12/3/2018 | 6,624 | $74.33 | $492,362 |
| 12/3/2018 | 4,820 | $72.24 | $348,212 |
| 12/3/2018 | 3,554 | $70.34 | $249,974 |
| 12/3/2018 | 2,298 | $73.18 | $168,159 |
| 12/3/2018 | 1,100 | $75.81 | $83,390 |
| TOTALS | 37,000 | | $2,669,158 |

130.   Each of the Officer Defendants reaped vastly more in proceeds from their sales of AnaptysBio stock during the Class Period than they earned in salary. In 2019, Defendant Suria earned $567,000 in salary, yet reaped $4,485,882 from his insider stock sales—691.16%, or more than 6.9 times, his fiscal 2019 salary.  In 2018, Defendant Suria earned $547,000 in salary, yet reaped $7,581,788 in his insider stock sales—which was 1,286.07%, or more than 12.8 times, his fiscal 2018 salary.  Likewise, Defendant Londei, the Company's former Chief Medical Officer, received $453,000 and $436,000 in salary in 2019 and 2018, respectively, yet reaped $2,067,843 in 2019 and $2,005,856 in 2018 from his insider stock sales—which was more than 356.48% (or 3.5 times) and 360.06% (or 3.6 times) of his fiscal 2019 and 2018 salaries, respectively.  Defendant Piscitelli, the former Chief Financial Officer, earned a salary of $397,000 in 2018, yet garnered more than $2,669,158 for his insider stock sales—which was 572.33%, or over 5.7 times, his fiscal 2018 salary. The fact that the Officer Defendants earned vastly more from selling their AnaptysBio stock based on non-public information than they earned in annual salary further supports a strong inference of intentional or reckless misconduct.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

131.   As summarized in detail herein and below, throughout the Class Period, Defendants AnaptysBio, Suria, Londei and Piscitelli each made materially false and misleading statements and omissions concerning, among other things: (i) the design and reported results of the Phase 2a AD Trial; (ii) the design and reported results of the Phase 2a Peanut Allergy Trial; and (iii) the impact that the misrepresented Phase 2a AD and Peanut Allergy Trials had on the doomed Phase 2b AD and Peanut Allergy trials.

### A.     October 10, 2017 Press Release and Conference Call

132.   The Class Period begins on October 10, 2017, when AnaptysBio issued a press release announcing the results from an interim analysis of data from its Phase 2a clinical trial of etokimab in atopic dermatitis.  The press release touted the drug's efficacy results as "very encourag[ing]", highlighting the "***rapid and sustained benefit observed in patients after a single dose of [etokimab]***."  In that same press release, the Company reported that the interim results had met the "key efficacy objective" of the Phase 2a AD trial, which was to "demonstrate 50% EASI score improvement (EASI-50) in at least 50% of enrolled patients at 4 weeks after a single dose of ANB020."

133.   That same day, the Company presented a slideshow and held a conference call with analysts to discuss the interim analysis of data from its Phase 2a atopic dermatitis trial.  The press release, conference call, and slide presentation were all released before the start of trading on that day.

134.   During the call, Defendant Suria described the "positive" data as "***provid[ing] a solid foundation for the continued development of [etokimab] across a number of atopic diseases***" and stated that "[w]e believe we can build on that with multidosing . . . in a Phase IIb study, we anticipate that we can get to even greater EASI scores."  Defendant Londei stated that "***[b]ased upon this data, we believe that a single dose of [etokimab] can maintain efficacy benefit in adult moderate-to-severe atopic dermatitis patients for approximately 2 months, which meaningfully differentiate [sic] [etokimab] in terms of patient convenience***."  Similarly, Defendant Suria, in response to a question about how etokimab was differentiated from its competitors like Dupixent, stated that an "***aspect that's really important about ANB020 is the duration of effect after a single dose and the persistence of that effect all the way out to 2 months, which is meaningful from a patient convenience standpoint relative to other therapies that perhaps may need to be dosed every other week or perhaps even as a daily dosing paradigm***."  Further,

during the call, Defendant Suria explained that because the underlying physiological cause is similar across all the atopic diseases that etokimab was intended to treat, including atopic dermatitis, peanut allergy and asthma, "*we are encouraged by what we're seeing so far in the results disclosed today and what that means in terms of potential translation to the peanut allergy trial.*"  In the accompanying presentation, the Company stated that "EASI Score Improvement [was] Observed Early and Sustained Until Day 57."

135.   In the conference call, accompanying presentation, and press release, Defendants omitted information regarding the use of corticosteroids as rescue therapy during the trial.  Defendant Suria stated that "*we are only administrating these patients once with a placebo and once with a drug*," omitting that patients also used additional drugs as rescue therapy.  When asked whether the Company would need additional data for "patients that . . . remain on all their other meds," Defendant Suria stated, that "[e]ventually, commercially, topical corticosteroids will be involved at some level."

136.   The statements referenced above in ¶¶ 132-35 were materially false and misleading when made and omitted material facts necessary to make these statements not misleading.  These statements failed to disclose material adverse facts about the Phase 2a AD Trial design and use of rescue therapy, and therefore the prospects of the Company's lead drug asset.  Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.

137.   Although Defendants, and the market, were aware of the trial design of competitor drug Dupixent—where individuals who used rescue therapy were largely

excluded from Dupixent's efficacy analysis—Defendants failed to disclose the same critical information about the use of rescue therapy.  This created the false and misleading impression that etokimab was superior to competitor Dupixent by implying that, unlike Dupixent, etokimab showed efficacy without the use of rescue therapy.  In truth, because Defendants failed to disclose the use of rescue therapy in the Phase 2a atopic dermatitis study, Defendants misled the public about the actual efficacy of etokimab.  Further, Defendant Suria's claim that topical corticosteroids would be "involved" "eventually," and his omission of the actual usage of corticosteroids during the study, created the misleading impression that they were not "involved" during the Phase 2a atopic dermatitis study, which was false.  Analysts relied on these false statements and reacted positively.  RBC wrote, "We view this morning's . . . results for ANB020 as a best case scenario and highly competitive vs. other AD players[.]"  Credit Suisse wrote, "We . . . think that IL-33 is potential platform in other allergic diseases beyond AD . . . [T]he atopic dermatitis data came in above our expectations," and that "the positive data for ANB-020 seen today . . . validates the potential for ANB-020 in allergic diseases."  JMP viewed the data as "highly compelling" and believed it "validate[d] the company's approach to treating atopic diseases, including but not limited to atopic dermatitis."  Wedbush interpreted the data as "more positive on ANB020's prospects in atopic dermatitis and other conditions driven by atopy."

138.  Defendants Londei and Suria's statements that etokimab was meaningfully differentiated from competitors in terms of patient convenience was also false and misleading.  Analysts had been highly encouraged by this claim.  RBC wrote, "These dosing schemes could confer a significant patient convenience advantage over competitors [including Dupixent]."  Wedbush wrote, "ANB020's durability and safety are key differentiators to competition; taking our PT to $75.  We are adjusting our peak penetration estimate for ANB020 in AD from 20% to 35% based on the strength of early results that we believe could potentially support

a once every two month dose schedule with ANB020, a key advantage relative to Dupixent's every other week schedule . . . With clear evidence of durable disease remission . . . we see advantages in ANB020's clinical profile relative to other biologics on market and in development."  However, by omitting the use of rescue therapy in the trial, Defendants Suria and Londei misled the public about the actual likelihood of success and differentiation of etokimab compared to competitors, including Dupixent.

139.   Over eighteen months after the Phase 2a atopic dermatitis trial results were released, Credit Suisse uncovered that use of rescue therapy had been omitted from the market, and adjusted its valuation of AnaptysBio downward once the true impact of rescue therapy became apparent.  On June 21, 2019, Credit Suisse stated that "the principal investigator of the etokimab atopic dermatitis Ph2a trial has indicated at medical conferences that topical corticosteroids were utilized (in controlled amounts)" but that "the investigator and the company have not, however, provided any additional details on the timing of rescue therapy use or whether the subjects that received rescue therapy were classified as responders at a given time." These revelations coupled with AnaptysBio's recent voluntary and unsolicited disclosure of the actual use of rescue therapy in its Phase 2a *asthma* study and "investor feedback" "prompted us to take a closer look at utilization of rescue medication in the atopic dermatitis (AD) study."  Credit Suisse's findings were startling.  Patients in the atopic dermatitis study had been permitted to use rescue therapy, but AnaptysBio had failed to report which patients used rescue therapy, how much was used, and when in the course of the trial it was used.  Credit Suisse stated that management "views this use of rescue medications and immaterial and unlikely to have affected the efficacy as reported," but that "additional information is not available regarding whether any EASI-50/75/IGA responders had received such rescue medications and when in the course of the study patients received them." This omission was particularly important because of the small sample size of the

Phase 2a atopic dermatitis study.  Credit Suisse explained, "In the context of a small sample size, we believe even one response potentially benefiting from rescue medications could skew response rates and materially change the interpretability of Ph2a results."   After investigating the actual use of rescue therapy in the atopic dermatitis study, Credit Suisse slashed its target price nearly in half, from $137 to $79, and downgraded the stock to neutral.  Further, it reduced its assumed probability of success for etokimab in atopic dermatitis and asthma (from 55% to 35%, and from 45% to 40%, respectively).

### B.     October 12, 2017 First SPO Offering Materials

140.   On or around October 12, 2017, AnaptysBio conducted a secondary offering (the "First SPO") pursuant to a registration statement (the "First SPO Registration Statement").  On October 13, 2017, AnaptysBio filed a prospectus for the First SPO with the SEC on Form 424B4, which incorporated and formed part of the First SPO Registration Statement (collectively, the "First SPO Offering Materials").

141.   The First SPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading.  Specifically, in the First SPO Offering Materials, the Company described the data from the Phase 2a AD Trial demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial. In its registration statement, Defendants alluded to the possibility of the use of rescue therapy, stating in an amendment to October 12 Secondary Offering Registration Statement, "Patients were permitted to take a monitored amount of topical corticosteroids as rescue therapy during the course of the study," but reported no

actual use of rescue therapy, nor did they reveal the impact that such use would have on trial results.

142.   The statements referenced above in ¶¶ 140-41 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons stated above in ¶¶ 136-39.  Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose important data from the Company's Phase 2a AD Trial, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

143.   Although Defendants, and the market, were aware of the trial design of competitor drug Dupixent, where individuals who used rescue therapy were largely excluded from the Dupixent's efficacy analysis, Defendants failed to disclose the same critical information about the use of rescue therapy.  This created the false and misleading impression that etokimab was superior to competitor Dupixent, implying that, unlike Dupixent, etokimab showed efficacy without the use of rescue therapy. In truth, because Defendants failed to disclose the use of rescue therapy in the Phase 2a atopic dermatitis study, Defendants misled the public about the actual efficacy of etokimab.

### C.   November 7, 2017 Statements

144.   On November 7, 2017, AnaptysBio filed its quarterly report with the SEC on Form 10-Q for the third quarter of 2017.  The Company's 10-Q, signed by Defendants Suria and Piscitelli,  described the data from the Phase 2a Trial as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing]

1
2
3

that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial.

4
5
6
7
8

145.   That same day, Defendant Suria participated in the Credit Suisse Healthcare Conference, where he summarized the Phase 2a AD trial results, stating, "We observed robust and rapid improvement in the EASI score, and 83% of patients achieved EASI 50 at approximately 1 month after a single dose of ANB020 and that effect was consistently maintained until approximately 2 months after a single dose."

9
10
11
12
13
14
15
16
17
18
19
20

146.   The statements referenced above in ¶¶ 144-45 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons stated above in ¶¶ 136-39.  Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

21
22

**D.     January 9, 2018 Statements**

23
24
25

147.   Defendant Suria represented AnaptysBio at a JP Morgan Healthcare Conference on January 9, 2018.  Regarding the ongoing Phase 2a Peanut Allergy Trial, Defendant Suria stated:

26
27
28

> We are currently conducting our severe adult peanut allergy Phase IIa study, ***which is focused on severe patients, by definition, people that have a history of anaphylaxis that have previously had a severe episode in response to accidental peanut exposure***.  These are the

people that are always next to their EpiPen all the time, always know where the nearest ER is. ***We're treating 20 of those individuals with a single dose of our antibody versus placebo and the key clinical endpoint that we'll be looking for there is oral food challenge***, which we measured using the (inaudible) methodology, and that data is due out at a top-line level this quarter.

148.    The statements referenced above in ¶ 147 were materially false and misleading when made.  While the Phase 2a Peanut Allergy Trial had enrolled 20 patients with a history of anaphylaxis, Defendants removed four patients post-enrollment, an action that skewed the reported interim results to make the trial appear successful when, in reality, it was not successful.

### E.    February 17, 2018 Press Release

149.    On February 17, 2018, AnaptysBio issued a press release announcing updated data from its Phase 2a clinical trial of etokimab in atopic dermatitis, which was presented at the American Academy of Dermatology (AAD) Annual Meeting in San Diego.  The press release stated that "***[etokimab] was efficacious in all 12 patients enrolled in this trial***" and "[e]fficacy was sustained through day 140 following single dose administration of [etokimab] with five of 12 patients (42 percent) achieving EASI-50" and the drug's efficacy "***was not limited by disease severity***."  The press release also reported that "[d]ay 29 results exceeded the primary efficacy objective of the trial with 10 of 12 patients (83 percent) achieving EASI-50" and that "***[o]ther atopic dermatitis efficacy endpoints . . . demonstrated rapid and sustained single dose [etokimab] efficacy results in a similar manner to the . . . EASI results***."

150.    Analysts relied on Defendants' representations, which omitted the trial's use of rescue therapy, when they released positive reports about AnaptysBio and raised their price targets for the company.  Jefferies compared etokimab to Dupixent positively, stating that "[s]ustained efficacy on a single dose of '020 was seen up to Day 78 . . . comparable to PII data from competitor Dupixent," and raised

its price target to $145 from $101.  Wedbush also raised its price target, explaining that the "updated results demonstrate an impressive sustained peak through Day 78 following a single IV injection."  SunTrust repeated Defendants' representations exactly, that "disease severity does not limit ANB020 effectiveness."

151.  The statements referenced above in ¶ 149 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

152.   Again, Defendants omitted the use of rescue therapy in the patients involved in this study.  This created the misleading impression that etokimab had "impressive" efficacy without the use of rescue therapy.  This caused analysts and the market to over-value AnaptysBio stock because Defendants misleadingly implied that etokimab had a distinct competitive advantage over Dupixent with regard to the use of rescue therapy.

**F.    March 5, 2018 Form 10-K Annual Report**

153.   On March 5, 2018, AnaptysBio filed its annual report with the SEC on Form 10-K for the fourth quarter and full year 2017.  The Company's 10-K, signed by Defendants Suria and Piscitelli, described the data from the Phase 2a trial for atopic dermatitis as demonstrating "proof-of-concept for [etokimab]" in this

indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial. The 10-K also stated that the drug's "efficacy was not limited by disease severity." In response, RBC maintained its 50% probability of success for etokimab in the atopic dermatitis indication.

154. The statements referenced above in ¶ 153 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose important data from the Company's Phase 2a AD Trial, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time. As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

### G.     March 26, 2018 Press Release

155. On March 26, 2018, after the markets closed, the Company issued a press release, which it also filed on Form 8-K with the SEC, announcing data from an interim analysis of a Phase 2a trial for etokimab in adult patients with peanut allergy. The press release reported that six of 13 patients (or 46%) improved their peanut tolerance to a cumulative 500mg at day 14 after a single dose of etokimab compared to zero of three patients (or 0%) dosed with placebo. The press release stated that the Company excluded two etokimab-dosed patients and two placebo-dosed patients from its interim analysis because they exhibited "mild" baseline symptoms, with one etokimab-dosed patient and two placebo-dosed patients being

able to tolerate the 500mg maximum cumulative peanut dose at day 14 of the oral food challenge, but disclosed no further details on the excluded patients.  Further, the press release cited the PRACTALL guidelines as the authority behind the design of the study and exclusion of the four patients.  Although the Company had excluded 20% of the patients enrolled in the trial from the interim data analysis, the press release touted the drug as a "***promising new paradigm for peanut allergy patients***." Thus, based on the "positive" data from the study, the Company announced its plans to continue development of etokimab in a multi-dose Phase 2b trial in moderate-to-severe baseline peanut allergy patients.

156.   In that same press release, Defendant Suria stated, "***We are encouraged by the rapid improvement in peanut tolerance . . . We believe ANB020 has the potential to prophylactically protect moderate-to-severe baseline adult peanut allergy patients from anaphylaxis.***  In addition, we believe ANB020 may address multiple concomitant allergic conditions irrespective of the specific allergens involved."

157.   On a conference call with analysts that day to discuss the Company's etokimab Phase 2a peanut allergy trial data, Defendant Suria stated that "***[w]e have demonstrated proof of concept in adult peanut allergy patients with moderate-to-severe baseline symptoms [for] a single dose of [etokimab] resulting in 46% of patients achieving the maximum-tested peanut tolerance in 14 days***."

158.   On that same conference call, Defendant Londei contradicted previous statements made by Defendant Suria regarding the trial design.  In contrast to Defendant Suria's January 9, 2018 statement where he explained that the trial was, at the time, focused "on severe patients, by definition, people that have a history of anaphylaxis that have previously had a severe episode in response to accidental peanut exposure," Defendant Londei explained during the call that Defendants "excluded 2 ANB020 and 2 placebo dosed patients from the interim analysis because they exhibited mild symptoms at baseline."

159.   The statements referenced above in ¶¶ 155-58 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset.  Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose key information from the Company's Phase 2a Peanut Allergy Trial, including patients' average cumulative peanut dose tolerated at day 14 after the administration of etokimab or placebo as well as whether the Company's post-enrollment decision to exclude 20% of the patients enrolled in the study from the interim analysis.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of peanut allergy were materially false and/or misleading and/or lacked a reasonable basis.

160.   Defendant Suria's positive statements that excluding mild patients from the data was consistent with the "intent" of the study created the misleading impression that the exclusion of the patient data was part of the trial's original design and consistent with PRACTALL guidelines.  RBC revealed that a peanut allergy physician expert that it had hired "noted that this type of patient subgrouping/bucketing based on symptomology to peanut doses (i.e. ANAB's mild, moderate and severe patients) does not exist . . . [G]iven expert questions surrounding the very existence of these patient subgroups in PRACTALL guidelines, we're concerned this subgroup analysis was likely retrospective and not prespecified (aka statistically questionable)."  Defendant Suria misled the market about the integrity of the peanut allergy study, which was revealed by RBC to be "statistically questionable."

**H.   May 8, 2018 First Quarter 2018 Press Release and Form 10-Q**

161.   146.   On May 8, 2018, AnaptysBio issued a press release, which it also filed on Form 8-K with the SEC, announcing the Company's financial results for the

1  first quarter of 2018.  In the press release, Defendant Suria is quoted as saying *"[w]e*
2  *demonstrated proof-of-concept for [etokimab] in Phase 2a trials in atopic*
3  *dermatitis and peanut allergy*."

4          162.   That same day, the Company also filed its quarterly report with the SEC
5  on Form 10-Q for the first quarter of 2018.  The Company's 10-Q, signed by
6  Defendants Suria and Piscitelli, described the data from the Phase2a trial for atopic
7  dermatitis as demonstrating "proof-of-concept for [etokimab]" in this indication,
8  "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of
9  patient convenience," and serving as the basis for the Company's plan to initiate
10  further development in atopic dermatitis through the initiation of a Phase 2b multi-
11  dose trial.  Regarding the Company's interim analysis of data from its Phase 2a trial
12  in peanut allergy, the 10-Q stated that "six of thirteen (46%) patients administered a
13  single dose of [etokimab] improved peanut tolerance at the day 14 [oral food
14  challenge] to the maximum tested cumulative 500mg dose, compared to none of the
15  placebo dosed patients."

16          163.   In response, Jefferies and SunTrust reiterated their "buy" ratings and
17  JMP and Wedbush reiterated their "outperform" ratings.  Wedbush noted, "[W]e see
18  less frequent dosing (that provides comparable efficacy to Dupi) providing a key
19  market differentiator."

20          164.   Defendants' statements about the atopic dermatitis data referenced
21  above in ¶¶ 161-62 were materially false and misleading because they omitted the
22  patients' usage of rescue therapy, which created a false impression about the drug's
23  efficacy, for the reasons stated above in ¶¶ 136-39.  Defendants' statements about
24  patient convenience are likewise false and misleading because, by omitting the
25  patients' usage of rescue therapy, Defendants created the false impression that
26  etokimab had a competitive advantage over other atopic dermatitis drugs on the
27  market, such as Dupixent, whose trial did report meaningful details about patients'
28  use of rescue therapy.

165.   Defendants' statements about the peanut allergy data were false and misleading because the reported data omitted 20% of the enrolled patient population, the inclusion of which would have dramatically and negatively impacted the Phase 2a Peanut Allergy Trial's success.  The omitted placebo patients actually had a better response to the placebo, instead of etokimab.  By omitting this information from its results, Defendants created the false impression that etokimab had impressive efficacy for peanut allergy, when that was not the case.

## I.     May 16, 2018 Bank of America Merrill Lynch Healthcare Conference

166.   On May 16, 2018, Defendant Suria represented AnaptysBio and presented at the 2018 Bank of America Merrill Lynch Healthcare Conference. During the conference, Defendant Suria touted the data from the Phase 2a trial of etokimab for peanut allergy as showing a "***remarkable efficacy result***" and stated that "***we're quite excited by this data***" and "look forward to moving into a Phase IIb trial."  During the conference, Defendant Suria also described etokimab as having a "***pretty profound efficacy***" in its treatment of moderate-to-severe atopic dermatitis patients based on the Company's Phase 2a trial data for that indication.

167.   The statements referenced above in ¶ 166 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39; 159-60. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that failed to disclose key information from the Company's Phase 2a trial in peanut allergy, including patients' average cumulative peanut dose tolerated at day 14 after the administration of etokimab or placebo as well as whether the Company's decision to exclude 20% of the patients enrolled in the study from the interim analysis due to their mild symptoms was retrospective.  As a result, Defendants' positive statements

about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis and peanut allergy were materially false and/or misleading and/or lacked a reasonable basis.

## J.   May 29, 2018 Press Release

168.   On May 29, 2018, AnaptysBio issued a press release announcing the presentation of updated data from its Phase 2a AD Trial at the 2018 European Academy of Allergy and Clinical Immunology (EAACI) Congress in Munich, Germany.   The press release stated that *"[etokimab] was efficacious in all 12 patients enrolled in this trial*," "[e]fficacy was sustained through day 140 following single dose administration of [etokimab] with five of 12 patients (42%) achieving EASI-50," and the drug's efficacy "*was not limited by disease severity*."   The press release also reported that "*[d]ay 29 results exceeded the primary efficacy objective of the trial with 10 of 12 patients (83%) achieving EASI-50" and that "[o]ther atopic dermatitis efficacy endpoints … demonstrated rapid and sustained single dose [etokimab] efficacy results in a similar manner to the … EASI results*."

169.   Tellingly, while the Company failed to mention rescue therapy in its written submission to the SEC, the Company clearly communicated to attendees that rescue therapies were not used in the Phase 2a AD Trial.   Indeed, as noted above in ¶ 98, SunTrust wrote in its May 29, 2018 analyst report that "*[n]o oral corticosteroids were used in the [atopic dermatitis] study to rescue patients*." [Emphasis in original.]

170.   In response to this presentation, JMP reiterated its "Market Outperform" rating and $180 price target.   Wedbush stated that "ANB020 data observed to date improves probability of topline asthma data in Q3."

171.   The statements referenced in ¶¶ 168-69 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39.

Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that omitted important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  By omitting details about the usage of rescue therapy in the Phase 2a atopic dermatitis trial, Defendants misled the market about etokimab's competitive advantage over Dupixent, in both efficacy and patient convenience, and etokimab's efficacy in other allergic diseases such as asthma.  SunTrust expressly relied on these omissions when it falsely stated that no oral corticosteroids had been used in the atopic dermatitis study as rescue therapy.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis and peanut allergy were materially false and/or misleading and/or lacked a reasonable basis.

### 1.   August 7, 2018 Press Release and Form 10-Q

172.   On August 7, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the second quarter of 2018.  The Company's 10-Q, signed by Defendants Suria and Piscitelli, described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.  The 10-Q also stated that "[e]tokimab results were not limited by disease severity" and "[o]ther efficacy endpoints . . . demonstrated rapid and sustained single dose etokimab results in a similar manner to the . . . EASI results."

173.   The statements referenced in ¶ 172 were materially false and misleading and failed to disclose material adverse facts about the prospects of the

Company's lead drug asset for the reasons discussed above in ¶¶ 136-39. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that omitted important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  By omitting details about the usage of rescue therapy in the Phase 2a atopic dermatitis trial, Defendants misled the market about etokimab's competitive advantage over Dupixent, in both efficacy and patient convenience.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

### K.    September 25, 2018 SPO Offering Materials

174.   On or around September 25, 2018, AnaptysBio conducted a secondary offering (the "Second SPO") pursuant to a shelf registration statement that the Company filed with the SEC on Form S-3 on February 5, 2018 (the "Second SPO Registration Statement").  On September 26, 2018, AnaptysBio filed a prospectus supplement to the Second SPO Registration Statement with the SEC on Form 424B5, which incorporated and formed part of the Second SPO Registration Statement (collectively, the "Second SPO Offering Materials").

175.   The Second SPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading.  Specifically, in the Second SPO Offering Materials, the Company described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate

further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.  As before, Defendants noted only that "[p]atients were permitted to take a monitored amount of topical corticosteroids as rescue therapy" in the Phase 2a AD trial, but provided no information on the actual usage or impact of any rescue therapy.

176.   In response, JMP reiterated its "Market Outperform" rating.  Credit Suisse reiterated its "outperform" rating and raised its target price from $104 to $147, noting, "AnaptysBio continues to be a small cap biotech company that could potentially see substantial appreciation over the next few years as lead asset etokimab continues to de-risk across multiple indications."

177.   The statements referenced in ¶ 175 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39.  Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that omitted important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  By omitting details about the usage of rescue therapy in the Phase 2a atopic dermatitis trial, Defendants misled the market about etokimab's competitive advantage over Dupixent, in both efficacy and patient convenience.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

## L.   November 8, 2018 Form 10-Q

178.   On November 8, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the third quarter of 2018.  The Company's 10-Q, signed by

Defendants Suria and Piscitelli, described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.

179.   In response, Credit Suisse and Wedbush reiterated their "outperform" ratings, Cantor Fitzgerald reiterated its "Overweight" rating and $140 price target, and SunTrust reiterated its "buy" rating and price target of $156.

180.   The statements referenced in ¶ 178 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that omitted important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  By omitting details about the usage of rescue therapy in the Phase 2a atopic dermatitis trial, Defendants misled the market about etokimab's competitive advantage over Dupixent, in both efficacy and patient convenience.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

## M.   January 8, 2019 JPMorgan Global Healthcare Conference

181.   On January 8, 2019, Defendant Suria represented AnaptysBio and presented at the JPMorgan Global Healthcare Conference.  During the conference, in describing the results from the Phase 2a trial in atopic dermatitis, Defendant Suria

stated that the Company had exceeded its goal of 50% responders "quite robustly" and touted the results as "a very exciting data event" because all the patients administered with a single dose of etokimab achieved at least 50 percent improvement in their EASI score relative to enrollment baseline. Defendant Suria also stated that the "time line and robustness of that single dose efficacy . . . gave us a sense that we could robustly advance this program into a multidose Phase IIb."

182. In response, J.P. Morgan reiterated its "overweight" rating and SunTrust reiterated its "buy" rating.

183. The statements referenced in ¶ 181 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that omitted important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time. By omitting details about the usage of rescue therapy in the Phase 2a atopic dermatitis trial, Defendants misled the market about etokimab's competitive advantage over Dupixent, in both efficacy and patient convenience. As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

**N.    February 28, 2019 Form 10-K Annual Report**

184. On February 28, 2019, the Company filed its annual report with the SEC on Form 10-K for the fourth quarter and full year 2018. The Company's 10-K, signed by Defendants Suria and Piscitelli, described the data from the Phase 2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this

indication and "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience." The 10-K also stated that "etokimab efficacy was not limited by disease severity."

185. In response, Credit Suisse and Wedbush reiterated their "outperform" ratings, Guggenheim and Jefferies reiterated their "buy" ratings, and Cantor Fitzgerald and J.P. Morgan reiterated their "overweight" ratings.

186. The statements referenced in ¶ 184 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that omitted important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time. By omitting details about the usage of rescue therapy in the Phase 2a atopic dermatitis trial, Defendants misled the market about etokimab's competitive advantage over Dupixent, in both efficacy and patient convenience. As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

### O.    May 14, 2019 Bank of America Merrill Lynch Health Care Conference

187. On May 14, 2019, Defendant Suria represented AnaptysBio and presented at the Bank of America Merrill Lynch Health Care Conference. During the conference, Defendant Suria described etokimab's treatment of patients in the Phase 2a trial in atop dermatitis as a "really remarkable result where a single dose of our drug . . . had widespread efficacy across all these individuals." Based on the "efficacy data" from the Phase 2a trial, Defendant Suria then touted etokimab as "a

widespread, rapid and durable response in atopic dermatitis." Defendant Suria explained that as a result of the Phase 2a AD Trial, the Company began the Phase 2b ATLAS trial, where "the key question that we're trying to answer from this trial is . . . which dose level . . . we proceed forward into subsequent Phase III studies."

188.  The statements referenced in ¶ 187 were materially false and misleading and failed to disclose material adverse facts about the prospects of the Company's lead drug asset for the reasons discussed above in ¶¶ 136-39. Specifically, Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements to the investing public that omitted important data from the Company's Phase 2a trial in atopic dermatitis, including the timing and extent of patients' use of topical corticosteroids as a rescue therapy during the study and whether any of the patients that utilized rescue therapy were classified as responders at a given time.  By omitting details about the usage of rescue therapy in the Phase 2a atopic dermatitis trial, Defendants misled the market about etokimab's competitive advantage over Dupixent, in both efficacy and patient convenience.  As a result, Defendants' positive statements about the efficacy and prospects of AnaptysBio's lead drug asset in the treatment of atopic dermatitis were materially false and/or misleading and/or lacked a reasonable basis.

## VI.    ADDITIONAL LOSS CAUSATION ALLEGATIONS

189.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Throughout the Class Period, AnaptysBio's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions.  Had Defendants disclosed complete, accurate and truthful information concerning these matters during the Class Period, Plaintiff and other Class members would not have purchased or otherwise acquired AnaptysBio's securities or would not have

purchased or otherwise acquired these securities, at the artificially inflated prices that they paid.

190.   As alleged above, on March 26, 2018, AnaptysBio announced data from an interim analysis of the Phase 2a Peanut Allergy Trial for etokimab, and Defendants claimed the Company demonstrated "proof of concept in adult peanut allergy patients with moderate-to-severe baseline symptoms[,]" achieving a 46% response rate in etokimab-treated patients over the placebo-arm of the study.  Later the same day, however, analysts from RBC Capital Markets issued a report revealing that (i) AnaptysBio misrepresented etokimab's response rate by only releasing data for a subset of the total population of patients enrolled in the study instead of the entire population of patients that had initially been enrolled in the trial; (ii) the response rate for etokimab in the full trial population of the study "does not appear to be meaningfully differentiated" relative to the placebo arm of the study, explaining that the difference between the etokimab-treated arm and the placebo arm was only approximately 7% as compared to the 46% response rate that the Company had reported in its interim analysis; (iii) Defendants employed the questionable practice of placing patients into "mild" and "moderate-to-severe" subgroupings based on observed symptomology—a practice that the Company did not disclose in the clinicaltrials.gov listing nor in management's prior trial descriptions—and excluding patients on this basis; and (iv) the Company's lack of disclosure of the data showing the improvement between baseline and day 14 in both the etokimab-treated arm and the placebo arm made it "difficult to contextualize the breadth of allergic protection provided by [etokimab]."

191.   In response to the release of information calling into question the Company's use of improper clinical practices in order to claim a high response rate, AnaptysBio's stock fell nearly 6%, from a closing price of $113.83 per share on March 26, 2018, to a closing price of $107.52 on March 27, 2018.

192.   On April 4, 2018, the same RBC analysts issued a report downgrading the Company's stock and reducing its price target to $86 from $144 citing "increased skepticism regarding [etokimab's] path forward in peanut allergy" as well as "concern surrounding management credibility."  The analysts noted that they had consulted with an expert peanut allergy physician, who reviewed the data and subgrouping analysis from the Phase 2a Peanut Allergy Trial who concluded that the subgrouping into "mild", "moderate", and "severe" patients based on symptomology does not exist in the PRACTALL guidelines.  Given the "expert questions surrounding the very existence of these patient subgroups," the report highlighted concern that AnaptysBio's subgrouping analysis "was likely retrospective and not prespecified" and thus "statistically questionable," and RBC nearly fully removed etokimab for the treatment of peanut allergy from its valuation model and decreased its probability of success estimates for etokimab to treat adults with severe peanut allergy to 5% from 35%.

193.   In response to further questioning of management's credibility and the statistical soundness of AnaptysBio's Phase 2a study of etokimab in patients with peanut allergy, AnaptysBio's stock price fell nearly 7.5%, from a closing price of $94.35 per share on April 4, 2018, down to a closing price of $87.32 per share on April 5, 2018, a drop of $7.03 per share.

194.   As alleged above, several months later, the Company aborted clinical trials for etokimab in peanut allergy altogether on August 7, 2018, abruptly announcing that "as a result of market assessment regarding the adoption of the peanut oral food challenge in future commercial usage of etokimab in peanut allergy patients, AnaptysBio has decided to deprioritize further company-sponsored clinical development of etokimab in moderate-to-severe baseline adult peanut allergy patients" and that the Company "does not intend to utilize its clinical development resources to pursue a Phase 2b clinical trial of etokimab in peanut allergy."

195.   As alleged above, on June 21, 2019, analysts for Credit Suisse issued a report that provided an in-depth analysis of the Company's clinical data from its Phase 2a AD Trial.  This report issued concerns about the efficacy profile of etokimab because, as the report noted, the Company did not disclose the timing of the corticosteroid rescue therapy use nor whether patients in the responders group had used the rescue therapy during the Phase 2a study.  Further, the June 21, 2019 Credit Suisse report noted that because of the study's small sample size, a single subject from the responder group having used rescue therapy "could substantially skew the response rates" and "chang[e] the interpretation of the data as it relates to the overall prospects of the asset."

196.   In response to these disclosures concerning the Company's lack of candor regarding the use of corticosteroid rescue therapy in its Phase 2a AD Trial and the likelihood that the rescue therapy use negated the efficacy profile that Defendants had claimed was demonstrated by the Phase 2a study's data, the price of AnaptysBio common stock fell nearly 12%, from a closing price of $67.02 per share on June 20, 2019, to a closing price of $59.24 per share on June 21, 2019.

197.   As alleged above, on November 8, 2019, AnaptysBio announced that its ATLAS trial, a Phase 2b study of etokimab in atopic dermatitis patients, had "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the Eczema Area and Severity Index (EASI) relative placebo at week 16."  The Company also revealed that, as a result of this data, it had postponed the initiation of its Phase 2b etokimab clinical trial in asthma.

198.   Following this stunning failure of its lead drug candidate, the Company provided no detailed explanation for the failure nor the top-line results, and Defendants did not hold a conference call with investors to discuss the failure and to answer lingering questions about the ATLAS trial.  In a report dated November 8, 2019, the same Credit Suisse analyst who, on June 21, 2019, had raised concerns about the efficacy profile of etokimab and had noted the lack of disclosure regarding

patients' use of corticosteroids as rescue therapy during the Phase 2a study, wrote that they "had concerns about the interpretability of the Ph2a results and were cautious into this readout."  Moreover, other analysts from Jefferies had noted that on November 4, 2019 that rescue therapy use was not allowed in the Phase 2B ATLAS Trial.  The removal of rescue therapy use in the trial was a key differentiator that likely contributed to the ATLAS study failure.

199.   In response to the truth about etokimab's efficacy and prospect to treat atopic dermatitis, the price of AnaptysBio stock fell ***nearly 72%,*** from a closing price of $36.16 per share on November 7, 2019, to a closing price of $10.18 on November 8, 2019.

200.   It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of AnaptysBio securities.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VII.   SUMMARY OF SCIENTER ALLEGATIONS

201.   A host of facts, including and in addition to those discussed above, support a strong inference that Defendants AnaptysBio, Suria, Londei and Piscitelli knew, or, at minimum, were severely reckless in not knowing, the true undisclosed facts when they made their false or misleading representations to investors.  The information in this section summarizes certain of the allegations-that are set forth more fully above-that detail the Defendants' scienter.  All of these allegations must be considered holistically in evaluating Defendants' scienter.  The cumulative knowledge of all members of AnaptysBio's senior management team, including the Officer Defendants, regarding the matters addressed herein is properly imputed to AnaptysBio.

## A.     The Officer Defendants Reaped $18.8 Million From Insider Sales

202.   Defendants' suspicious stock sales support an inference that Defendants had the motive and opportunity to commit fraud and inflate the price of AnaptysBio stock, and that Defendants' false and misleading statements were knowingly made.  At all relevant times, AnaptysBio's Code of Conduct and Ethics provided:

INSIDER TRADING

Every employee and director is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which it does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information.  It is illegal, and it is a violation of this Code and other Company policies, to tip or to trade on inside information. Employees or directors who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Company business.

Employees must exercise the utmost care when in possession of material nonpublic information.   The Company's Insider Trading Policy provides guidance on the sorts of information that might be nonpublic and material for these purposes, and guidelines on when and how employees and directors may purchase or sell shares of Company stock or other Company securities.

203.   As discussed in detail above in Section IV.H, supra, in violation of the Company's Code of Conduct and in violation of the Exchange Act, the Officer Defendants had the motive and opportunity to commit the alleged fraud since they personally reaped a windfall of $18.8 million collectively by selling AnaptysBio stock while it was inflated due to misrepresentations regarding the design, risks and results of the clinical trials for etokimab.  Mere weeks after the Company announced that it would no longer pursue clinical approval for etokimab to treat peanut allergies, when Defendants were aggressively touting results from its Phase 2a AD Trial as establishing a "proof-of-concept" while concealing the use, amount, and impact of

rescue therapy used by patients in the trial, the Officer Defendants entered 10b5-1 trading plans that enabled them to sell the vast majority or all of their holdings of AnaptysBio stock.  As recounted by FE 2 and FE 3, the Officer Defendants' stock sales occurred despite the fact that the Company regularly blocked other employees from selling shares on all but a few days a month, if that.

204.   The proceeds from the Officer Defendants' stock sales were vastly greater than the annual salaries each was earning from the Company.  Indeed, for Defendant Suria, his stock sales during the Class Period resulted in proceeds that were more than 6.9 and 12.8 times greater than his fiscal 2019 and 2018 salaries, respectively.  For Defendant Londei, his stock sales during the Class Period resulted in proceeds that were more than 3.5 and 3.6 times greater than his fiscal 2019 and 2018 salaries, respectively.  And for Defendant Piscitelli, his stock sales during the Class Period resulted in proceeds that were more than 5.7 times greater than his fiscal 2018 salary.  That the Officer Defendants sold most or all of their holdings of AnaptysBio stock after the failure of the peanut allergy clinical trial and while they were misleading investors concerning the design and impact of rescue steroids in the Phase 2a AD Trial, earning vastly more from selling their AnaptysBio stock than they earned in salary, further supports a strong inference of intentional or reckless misconduct.

205.   The SEC recognizes the establishment of a 10b5-1 trading plan as a potential, but not absolute, defense to accusations of insider trading when it is entered into by an insider "[b]efore becoming aware" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.  17 CFR § 240.10b5-1(c)(ii).  Here, while the insider trades of Defendants Suria, Londei and Piscitelli were made pursuant to 10b5-1 trading plans, those plans were purportedly entered into in August 2018 and March 2019, while Defendants engaged in their illicit scheme and possessed material

1  nonpublic information.   Therefore, the existence of those plans provides no

2  affirmative defense and, to the contrary, supports scienter here.

**B.     The Officer Defendants Were Subject-Matter Experts in Clinical Drug Development, or Falsely Claimed to Have Such Expertise**

206.   Defendant Londei was a highly trained and credentialed scientist and expert in the field of clinical drug development and held himself out as knowledgeable about the content of his Class Period statements alleged to be false and misleading.

207.   Prior to joining AnaptysBio and serving as its Chief Medical Officer and Chief Development Officer, Defendant Londei held the position of Therapeutic Area Head, Immunosciences at Bristol-Myers Squibb where he was responsible for early clinical research for a portfolio of immune-related therapeutics.  Prior to his experience at Bristol-Myers Squibb, Defendant Londei served as the Global Head of Autoimmunity Translational Medicine at Novartis and served as the Translational Science Officer for the Genomics Institute of the Novartis Research Foundation.  In his roles at Novartis and Bristol-Myers Squibb, he led the design and execution of early state clinical studies that were developing immune-related therapies for inflammatory diseases.  Defendant Londei earned an M.D. degree from the Faculty of Medicine at University of Bologna and has conducted post-doctoral studies at Tumor Immunology Unit, London, UK.  Defendant Londei was part of a team at the Kennedy Institute of Rheumatology at the Faculty of Medicine Imperial College, London which pioneered the development of anti-Tumor Necrosis Factor therapies to treat autoimmune diseases.  As a widely recognized expert in inflammation, Defendant Londei has published over 160 peer-reviewed writings in the field of autoimmunity.

208.   When Defendant Londei joined AnaptysBio in October of 2014, Defendant Suria touted Defendant Londei's experience and specifically noted its importance to the Company's "strategic priority" of developing etokimab, its anti-

IL-33 antibody program.  Indeed, in a press release dated October 20, 2014, Defendant Suria said, "Dr. Londei's extensive expertise includes successful translational and clinical development of monoclonal antibodies and small molecules for dermatology, rheumatology, neurology, oncology and allergy.  Novel anti-inflammatory programs are a strategic priority for AnaptysBio's proprietary pipeline, particularly our first-in-class anti-IL-33 antibody program applicable to a variety of Th2-driven diseases."  At the Credit Suisse Healthcare Conference on November 16, 2017, Defendant Suria touted that "Our Chief Medical Officer, Marco Londei, is a clinician scientist with deep expertise in many areas including dermatology and allergy."

209.  According to FE 1, Defendant Londei was "heavily involved" in the clinical trials for etokimab—he designed all of the clinical trials and worked with the principal investigators to monitor them.  Further, FE 1 recounted that Defendant Londei would not let anyone else handle these responsibilities.  When data became available from AnaptysBio's clinical trials, FE 1 said that Defendant Londei was one of the first people at the Company to see them.  According to FE 2, Defendant Londei kept the clinical information between himself and Defendant Suria.

210.  Defendant Londei's extensive background in clinical drug development, his involvement in the design and monitoring of the clinical trials of etokimab, and the Company's emphasis of Defendant Londei's experience in relation to its clinical pipeline and expected growth of the Company, further supports the strong inference of scienter.

211.  Defendant Suria likewise presented himself and AnaptysBio's senior management as subject matter experts in the biopharmaceutical field.  On November 7, 2017, at the Credit Suisse Healthcare Conference, Defendant Suria assured investors, "Our management team has a deep strength in antibody development and business leadership.  I, myself, am an immunologist by background and have been focused on developing biologics for approximately the last 20 years.  Prior to

AnaptysBio, I was at Maxygen where I was part of the team that took a technology platform in biologics and advanced it into the clinic in many different directions, and I look forward to applying that experience for the benefit of AnaptysBio."

212.   Notwithstanding these assurances of his expertise, Defendant Suria falsely stated that he had a Bachelor of Science in degree in biochemistry from Kalamazoo College.  In the Company's Form 10-K dated March 8, 2017, the Company represented that "Mr. Suria received his M.S. in immunology from the University of Western Ontario, his Executive M.B.A. from the Richard Ivey School of Business of the University of Western Ontario and his B.S. in biochemistry from Kalamazoo College."  Yet, the Company was later forced to clarify that Defendant Suria did not, in fact, possess a science degree in biochemistry.  At a Robin Hood Investors Conference held in New York on October 19 and 20 of 2017, an investor, Joseph Lawler, founder of JFL Capital Management, pointed out that AnaptysBio's regulatory filings and website erroneously claimed that Defendant Suria has a Bachelor of Science degree from Kalamazoo College when, in fact, the degree he has is a Bachelor of Arts.  The information was only corrected on the Company's website after Bloomberg News asked for comment from the Company.  That the Company misrepresented Defendant Suria's educational background on ***both*** its website and in its SEC filings, which are heavily scrutinized and vetted documents, suggests that this misrepresentation of Defendant Suria's education was intended to create the illusion of deep scientific expertise and thereby increase the Company's credibility to investors.

213.  Defendant Suria held himself out as the spokesperson and the Company's mouthpiece when communicating to investors about etokimab.  Indeed, Suria fielded all questions from analysts at conferences and in earnings calls.  As with Defendant Londei, FE 1 recounted that Defendant Suria was heavily involved in AnaptysBio's clinical trials and was one of the first persons at the Company to see the data from clinical trials when they became available.  Further, FE 1 recounted

instances where Defendant Suria would write up the narratives about the science underlying the information he would show investors and partners in private meetings, and then FE 1would later correct this work as much as possible.  FE 1 told Defendant Suria that what he wanted to say in these meetings was not really correct, to which Defendant Suria would say that investors could not understand, so therefore they should say it the way he wanted.

214.   Defendant Suria's role as the mouthpiece for the Company when speaking to investors about etokimab, his involvement crafting the message to investors explaining the scientific underpinnings of AnaptysBio's drug candidates, and his heavy involvement AnaptysBio's clinical trials, support the strong inference of scienter.

## C.   The Officer Defendants Spoke Authoritatively to Investors about Etokimab and the Clinical Trials Studying Etokimab and Held Themselves Out as Knowledgeable About These Topics

215.   The Officer Defendants' scienter is further supported by the fact that they consistently spoke to investors authoritatively about etokimab, the science underlying the functioning of the drug, and the design of the clinical trials for the peanut allergy and atopic dermatitis indications.  Defendants Suria and Londei, in particular, were the key spokespersons for the Company regarding etokimab's clinical trials and spoke to investors through earnings calls and press releases about etokimab and the clinical results.  Indeed, Defendant Londei, as AnaptysBio's CMO, participated directly in the design and reporting of the etokimab studies, including specifically the Phase 2a and 2b AD Trials and the Phase 2a Peanut Allergy Trial, and served as a co-author of the October 23, 2019 publication of the Phase 2a AD Trial results.

216.   Defendant Suria also spoke regularly about the science behind etokimab and the design of the etokimab studies. For example, in the October 10, 2017 earnings call with analysts, when asked about the potential for future trials for

etokimab after it has been commercialized, Defendant Suria answered "With the data that we're seeing today and our confidence in the biology and the opportunity to improve upon that in a multidose setting, *we're confident that we can be a first-line biologic in moderate-to-severe adult atopic dermatitis.*"

217. Defendant Suria also frequently and authoritatively spoke to investors about the scientific basis for his confidence in the etokimab. For example, on a special call on April 28, 2018, Defendant Suria stated,

> IL-33 is a compelling target due to its role as a central mediator of atopic diseases. Human genetics have demonstrated that mutations of the IL-33 signaling pathway are associated with susceptibility to asthma and atopic dermatitis . . . IL-33 acts upstream of other cytokines involved in the atopic diseases, such as IL-3, IL-5, IL-13. And stimulate the release of these downstream cytokines by acting directly on key white blood cells, which infiltrate into disease tissues, which is known as the initiation phase of allergic response . . . Lastly, and very importantly for peanut allergy, IL-33 is a key signal involved in degranulation of mast cells and basophils. Published data and in-house experiments specifically with ANB020 have illustrated that mast cell degranulation in vitro is reduced to a small fraction of normal levels when IL-33 is inhibited. Hence, IL-33 has been of significant interest as a therapeutic target for allergic disease therapy because it has the potential to deliver a broader efficacy profile than antibodies targeting downstream cytokines.

218. At the Bank of America Merrill Lynch Health Care Conference on May 14, 2019, Defendant Suria further purported to be an authority on the biology behind etokimab and its relationship to atopic dermatitis:

> In addition to these efficacy scores, we looked at biomarkers that were consistent with inhibition of IL-33 and how long those biomarkers perpetuated. From human genetics, we actually knew that loss of IL-33 not just protects you from disease but actually leads to reduction of eosinophils. That's actually published information from human genetics. And by inhibiting IL-33 with etokimab, even after a single dose, we saw a 40% reduction of eosinophils, which is maintained all the way out to day 57 and was perpetuated after that single-dose administration. So all of the efficacy data and the biomarkers were consistent with the activity of IL-33 inhibition by etokimab being a

widespread, rapid and durable response in atopic dermatitis.

219.   That the Officer Defendants spoke authoritatively to investors about the clinical trial data for etokimab and about the biologic operation of the drug supports the strong inference of scienter.   Therefore, investors reasonably expected the Officer Defendants to have knowledge about the truth or falsity of their statements.

### D.   Etokimab Was AnaptysBio's Lead Drug Candidate and Was Critically Important to the Financial Success of the Company and the Officer Defendants

220.   Defendants' scienter is supported by the critical importance of etokimab to the financial success of the Company and to investors' continued interest in the Company.   The development of etokimab and achieving FDA approval throughout the Class Period (as well as all times prior thereto) were AnaptysBio's "core operations."

221.   AnaptysBio only had two drugs in its wholly-owned pipeline that had proceeded to clinical trials during the Class Period—etokimab and ANB019.  At all times during the Class Period, AnaptysBio's focus was on the clinical development of etokimab, directly referenced as one of its "lead product candidates" in its annual filings with the SEC.  Indeed, in the Company's Form 10-K, dated March 5, 2018, under the heading "Our Strategy," AnaptysBio described a "key element[] of our strategy" as "Advancing our wholly-owned lead product candidates to clinical milestones.  We are working to demonstrate the safety and efficacy of our wholly-owned pipeline programs" and then described the progress of the clinical trials in etokimab as follows: "We have completed a Phase 2a trial of ANB020 in patients with moderate-to-severe adult atopic dermatitis where top-line data efficacy was announced in October 2017 and completed trial data was presented at the 2018 AAD Annual Meeting, and have completed enrollment of a severe adult peanut allergy Phase 2a trial where top-line data is anticipated in March 2018 and a severe adult eosinophilic asthma Phase 2a trial where enrollment is ongoing and top-line data is

anticipated during the second quarter of 2018." As detailed herein, Defendants consistently discussed in their SEC filings, their press releases, and in their conference calls the status of AnaptysBio's lead product candidate, etokimab, and its progress through the clinical trials, particularly Phase 2a of the atopic dermatitis and peanut allergy studies.

222.   Analysts saw etokimab as potentially producing "blockbuster" financial results and were under the belief that etokimab could potentially bring in billions of dollars in annual revenue once approved. Indeed, a September 14, 2017 report from RBC noted, "We see each of these indications [severe asthma, atopic dermatitis, and peanut allergies] as a potential blockbuster opportunity, and anticipate that competitive data in one of these indications could lead to an inflection point for the stock. Should ANB020 prove effective, it could command sales estimates similar to REGN's [Dupixent]." A March 29, 2017 report from Wedbush analysts similarly noted, "[w]e continue to model for a 20% peak penetration for [etokimab] in moderate to severe [atopic dermatitis market], and forecast peak sales in the US reaching $1B." This same report, in a chart, conveyed that the sales ramp for etokimab would generate approximately $4 billion by 2029 across all three indications.

223.   Before and throughout the Class Period, investors focused keenly on etokimab's clinical results and viewed any positive readouts from etokimab's clinical studies as potential inflection points for the stock price that would make the value of the Company's stock much higher. For example, in a March 8, 2017 report, analysts for Credit Suisse wrote, "Phase 2a proof of concept data [from the atopic dermatitis trial] could be a ***key value driver for the company***." And in a report dated August 11, 2017, analyst for Credit Suisse wrote, "Our focus in 2017 remains ANB020's ph2 clinical updates, which ***we view as a key inflection point for the stock***." When the Company did report positive results from the Phase 2a AD Trial at the start of the Class Period, analysts reacted favorably and forecasted continued

price increases based on the likelihood of more positive data readouts.  For example, in a report dated October 10, 2017, analysts for Credit Suisse raised their price target from $35 to $85 and wrote, "We continue to like this catalyst rich story into further proof of concept readouts . . . We remain positive this story into many catalysts over year end and 1H18.  We also think IL-33 is potential platform in other allergic diseases beyond AD . . . [T]he interim atopic dermatitis data came in above our expectations.  Stock is up close to 70%, but we continue to see upside into proof of concept data in food allergy, asthma and pustular psoriasis coming in the next 12 months."

224.   Defendant Suria was also keenly aware that positive data from the interim phases of the Company's clinical trials was essential for generating demand for the Company's stock.  In an article dated April 7, 2017 on the *Endpoint News* website, Defendant Suria wrote, "Public market investors are generally looking for a tangible path to post-IPO value inflection points, which for most biotechs means clinical data catalysts.  The longer it takes for an investor to understand what, when and how you will generate meaningful clinical data, the more likely they are to disengage.  The primary focus your IPO pitch ought to be on your most advanced program(s) and their proximal clinical readouts, where 'proximal' means the next 18 months.  A longer horizon to clinical data is likely to impact your investor appeal."

225.   Underscoring how integral positive clinical trial data from etokimab's trials were to the value of the Company, on November 8, 2019, when the Company announced the failure of the ATLAS trial, the stock price plummeted from a closing price of $36.16 per share on November 7, 2019, to a closing price of $10.18 on November 8, 2019, representing a 72% decrease in the value of the stock.

226.   Further, at all relevant times, AnaptysBio was a relatively small company.  As of December 31, 2017, AnaptysBio had only 60 employees with 48 of them engaged in research and development and 10 of them holding an M.D. or

Ph.D. degree, up from 49 employees with 41 engaged in research and development and 14 of them holding an M.D. or Ph.D. degree as of December 31, 2016.  As of December 31, 2018, AnaptysBio had 78 employees with 60 of them engaged in research and development and 24 had an M.D. or Ph.D. degree.

227.   That the majority of AnaptysBio's employees working in research and development and that AnaptysBio had only two drug candidates in its pipeline during the Class Period (with etokimab being the most developed), further supports the inference of scienter, making it less likely that details concerning etokimab's clinical studies and data would be known only to front-line technical personnel, and making it more likely that the details were fully known by the Officer Defendants.

228.   These facts support that the development of etokimab was a "core operation" of AnaptysBio.  Consequently, Defendants' scienter concerning such core operations – and, specifically, etokimab's studies, the issue concerning the use of rescue medications in the ATLAS study, and the retrospective exclusion of patients from the peanut allergy study – may be inferred.  Collectively, these facts further support a strong and cogent inference of Defendants' scienter.

### E.   Defendants Refused to Answer Pointed Questions from Analysts Regarding the Company's Clinical Trial Data from the Phase 2A AD and Peanut Allergy Trials

229.   Following the release of the interim results of the Company's phase 2a peanut allergy study, Defendants knew that investors were keenly focused on the question of whether the four patients who were screened from the study purportedly because they had "mild" symptomology had been so excluded on a prospective, prespecified or retrospective basis.  As discussed above, in a report dated March 26, 2018, analysts for RBC Capital Markets sharply called into question the results from the Company's phase 2a peanut allergy study by noting that but for the screening out of patients due to exhibiting "mild" symptomology, the resulting response rate would have been a mere 7% when comparing etokimab-treated patients with

placebo-treated patients in the study as compared to the 46% response rate reported by the Company.  The RBC analysts specifically questioned whether the exclusion of so-called "mild" patients "was defined on a prospective basis" and noted that "these exclusions were not detailed in the clinicaltrials.gov listing nor prior mgmt. trial descriptions."

230.   Tellingly, Defendants refused to answer this pointed question about its exclusion of "mild" patients from its peanut allergy study.  The analyst for RBC wrote in their March 26, 2018 report that "Anab mgmt would not accept my questions on the investor/analyst call and has not responded to my request for follow up."  Likewise, during the earnings call on the same day, an analyst for Jefferies presented the Officer Defendants squarely with this question twice by asking, "Just to maybe elaborate a little bit on this mild versus moderate symptoms . . . was it a prespecified design for the Phase II trial?" and when Defendant Suria evaded the question, the analyst asked again, "Just to be clear, the mild patients were prespecified and were excluded in a prespecified manner, correct?"  Instead of squarely answering the Jefferies analyst's question, Defendant Suria cryptically answered, "We did not want to enroll or want to include people with mild symptoms. We thought we were doing that or segregating that already by only enrolling people with an anaphylaxis history.  However, it turns out 20% of our patients were not of the right symptoms that would be relevant from an unmet medical need perspective." Knowing that analysts were focused on the question of whether patients had been excluded from the phase 2a peanut allergy study retrospectively, it was deliberately reckless, at a minimum, for Defendants to represent the data from this trial as a "proof-of-concept" for etokimab in the treatment of moderate-to-severe peanut allergy patients without being forthcoming and responding to analyst questions about when, how, and why these patient exclusions were made.

231.   Again, on November 8, 2019, when Defendants abruptly and unexpectedly announced that the ATLAS study, the phase 2b multi-dose study for

atopic dermatitis, failed to meet its primary endpoint, Defendants evaded answering any questions from analysts about the results of the study by refusing to hold an earnings call altogether.  In a report dated November 8, 2019, analysts for Jeffries took note of the Officer Defendants' silence and noted that many questions remained unanswered about etokimab's clinical trial data by writing, "today's press release failed to disclose any numbers related to the primary endpoint does not provide any insights into the study's failure and we think shareholders deserve this information, and also deserved a conference call to discuss the data."  When announcing that etokimab—the Company's lead clinical drug candidate—failed to show efficacy in its clinical program that Defendants did not answer any analyst's questions nor address the stunning failure supports the strong inference of scienter.

### F.      Defendant Piscitelli's and Defendant Londei's Untimely Departures

232.   Defendants' scienter is further supported by the fact that Defendant Piscitelli abruptly accounted his resignation from AnaptysBio on August 16, 2019, which was to become effective as of September 9, 2019.  This resignation occurred a mere two months before AnaptysBio announced the interim results of its ATLAS trial, which was the Company's most anticipated study and following Credit Suisse's June 21, 2019 report raising serious concerns about the Phase 2a AD Trial's design and credibility of the reported results.  In so resigning, Defendant Piscitelli forfeited the potential to receive substantial remuneration in the form of an appreciation of the Company's stock and an end-of-year cash bonus that would be expected if the Company had a positive read out from the ATLAS study.  According to FE 1, a former colleague of FE 1's who was a close colleague of Defendant Piscitelli, told FE 1 that Defendant Piscitelli resigned because he was "nervous" about the outcome of the clinical trials.  Corroborating that Defendant Piscitelli's departure was based on a belief that the clinical trials would not be fruitful, as discussed above, Defendant

1   Piscitelli sold all of his holdings of AnaptysBio common stock during the class
2   period.

3   233.   Defendants' scienter is also supported by the abrupt termination of
4   Defendant Londei on March 6, 2020—occurring several months after the revelation
5   that etokimab failed to show efficacy in its Phase 2b ATLAS trial.  In the Company's
6   Form 8-K filed with the SEC on March 6, 2020, the Company claimed that
7   Defendant Londei and the Company "mutually agreed . . . to end his employment."
8   However, according to FE 1, Defendant Londei was likely terminated because
9   Defendant Suria told FE 1 "the he should have done it a year ago, a year before he
10  did."   Based on this conversation, FE 1 believes that Defendant Londei was fired
11  and that this was the result of the failed studies of etokimab.

12  ## VIII.   CLASS ACTION ALLEGATIONS

14  234.   Plaintiff brings this action as a class action pursuant to Rule 23 of the
15  Federal Rules of Civil Procedure on behalf of all persons who purchased or
16  otherwise acquired the publicly traded common stock of AnaptysBio during the
17  Class Period (the "Class").  Excluded from the Class are Defendants and their
18  families, directors, and officers of AnaptysBio and their families and affiliates.

19  235.   The members of the Class are so numerous that joinder of all members
20  is impracticable.  The disposition of their claims in a class action will provide
21  substantial benefits to the parties and the Court.  As of August 6, 2020, AnaptysBio
22  had over 27 million shares of common stock outstanding, owned by hundreds or
23  thousands of investors.

24  236.   There is a well-defined community of interest in the questions of law
25  and fact involved in this case.  Questions of law and fact common to the members
26  of the Class which predominate over questions which may affect individual Class
27  members include:

28      (a)   Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of AnaptysBio common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

237.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

238.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

239.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Joinder of all Class members is impracticable.

## IX.   INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

240.   AnaptysBio's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

241.   Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of AnaptysBio who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.   PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

242.   At all relevant times, the market for AnaptysBio's common stock was an efficient market for the following reasons, among others:

(a)   AnaptysBio common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, AnaptysBio filed periodic public reports with the SEC and the NASDAQ;

(c)   AnaptysBio regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   AnaptysBio was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of

1   these reports was publicly available and entered the public marketplace.

2   243.   As a result of the foregoing, the market for AnaptysBio common stock

3   promptly digested current information regarding AnaptysBio from all publicly

4   available sources and reflected such information in the price of AnaptysBio common

5   stock.   Under these circumstances, all purchasers of AnaptysBio common stock

6   during the Class Period suffered similar injury through their purchase of AnaptysBio

7   common stock at artificially inflated prices and the presumption of reliance applies.

8   244.   A Class-wide presumption of reliance is also appropriate in this action

9   under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United*

10  *States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants'

11  material omissions.   Because this action involves Defendants' failure to disclose

12  material adverse information regarding the results of clinical trials of the Company's

13  lead drug asset—information that Defendants were obligated to disclose—positive

14  proof of reliance is not a prerequisite to recovery.   All that is necessary is that the

15  facts withheld be material in the sense that a reasonable investor might have

16  considered them important in making investment decisions.   Given the importance

17  of the clinical trial results to the approval of etokimab and AnaptysBio's subsequent

18  commercialization of the drug, that requirement is satisfied here.

19  ## XI.   CAUSES OF ACTION

20

21  ## COUNT I

22  ## For Violations of Section 10(b) of the Exchange Act and Rule 10b-5Against
23  ## All Defendants

24  245.   Plaintiff repeats and realleges each and every allegation contained

25  above as if fully set forth herein.

26  246.   During the Class Period, Defendants carried out a plan, scheme, and

27  course of conduct which was intended to and, throughout the Class Period, did: (i)

28  deceive the investing public, including Plaintiff and other Class members, as alleged

herein; and (ii) cause Plaintiff and other members of the Class to purchase AnaptysBio common stock at artificially inflated prices.

247.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for AnaptysBio common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

248.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information and misrepresented the truth about the prospects of the Company's lead asset.

249.   During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

250.   Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.   Defendants engaged in this misconduct to conceal AnaptysBio's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

251.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AnaptysBio's common stock.   Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market

prices for AnaptysBio's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

252.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

253.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

## For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants

254.   Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

255.   The Officer Defendants acted as controlling persons of AnaptysBio within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about AnaptysBio, the Officer Defendants had the power and ability to control the actions of AnaptysBio and its employees.  By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.   PRAYER FOR RELIEF

256.   WHEREFORE, Plaintiff prays for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

257.   Plaintiff, on behalf of the Class, demands a trial by jury.

1
2

DATED: September 30, 2020

Respectfully submitted,

3
4

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

5

/s/ Jonathan D. Uslaner

6
7

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

8

-and-

9
10
11
12
13
14
15
16

JOHN BROWNE
(johnb@blbglaw.com)
HANNAH ROSS
(hannah@blbglaw.com)
LAUREN ORMSBEE (*admitted pro hac vice*)
(lauren@blbglaw.com)
ALEXANDER PAYNE (*admitted pro hac vice*)
(alex.payne@blbglaw.com)
AMANDA BOITANO (*admitted pro hac vice*)
(amanda.boitano@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

17

*Counsel for Lead Plaintiff Iron Workers Local
580 Joint Funds and Lead Counsel for the Class*

18
19
20
21
22
23
24
25
26
27
28

1

## **CERTIFICATE OF SERVICE**

2

3

I, Jonathan D. Uslaner, herby certify that on September 30, 2020, I caused a

4

true and correct copy of the foregoing CONSOLIDATED AMENDED COMPLAINT

5

to be filed with the Clerk of Court using the CM/ECF system, which will send

6

7

notification of such filing to the email addresses denoted on the Electronic Mail

8

Notice List.

9

10

11

/s/ Jonathan D. Uslaner

12

Johnathan D. Uslaner

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28