1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE ANAPTYSBIO, INC.
SECURITIES LITIGATION,

Case No.:  20-CV-565 TWR (DEB)

**ORDER GRANTING MOTION TO DISMISS**

**(ECF No. 49)**

Defendant AnaptysBio has moved to dismiss Plaintiff's complaint.  ("Mot. to Dismiss," ECF No. 49.)  Plaintiff opposes.  ("Opp'n," ECF No. 50.)  For the reasons set forth below, the Court **GRANTS** the motion.

## BACKGROUND

Plaintiffs bring this securities class action against AnaptysBio and several of its current and former senior executives.  (Amended Complaint "AC" (ECF No. 45) ¶ 1.) AnaptysBio is a San Diego-based clinical stage biotechnology company that discovers and develops drugs to treat "inflammatory diseases and cancers." (*Id.* ¶¶ 2, 25.)  The individual Defendants are AnaptysBio's Chief Executive Officer ("CEO"), Hamza Suria, former Chief Medical Officer, Dr. Marco Londei, and the former Chief Financial Officer, Dominic Piscitelli.  (*Id.* ¶¶ 26, 109, 120.)  Relevant here, Plaintiffs purchased AnaptysBio stock during the Class Period and suffered significant losses due to alleged securities law

1

violations by Defendants.  (*Id.*)  Plaintiffs bring this case based on Defendants' statements about the ANB020 drug—also referred to as "etokimab."  (*Id.* ¶ 94.)  ANB020 was meant to treat "severe inflammatory disorders with unmet medical needs" like "atomic dermatitis, peanut allergies, and asthma."  (*Id.* ¶ 29.)

In September 2015, AnaptysBio, a privately held company, announced that it would be going public and filed a registration statement with the SEC.  (*Id.* ¶ 27.)  In its registration statement, AnaptysBio identified ANB020 as a drug that aims to treat "severe inflammatory disorders with unmet medical needs."  (*Id.*)  In its initial public offering ("IPO") prospectus, Defendants stated that the Company would use $25 million of the IPO proceeds towards initial clinical trials of ANB020.  (*Id.* ¶ 34.)  Defendants also made several warning statements in the Prospectus, one in bold type stating that its "product candidates [were] in early stages of development and may fail in development or suffer delays that adversely affect their commercial viability."  (ECF No. 49, Ex. A (IPO Prospectus) at 5, 41.)  Defendants went on to note that "[a] product candidate can unexpectedly fail at any stage of preclinical and clinical developments," and that the "historical failure rate for product candidates is high due to scientific feasibility, safety, efficacy, changing standards of medical care and other variables."  (*Id.*)  Defendants stated that "[t]he results from preclinical testing or early clinical trials of a product candidate may not predict the results that will be obtained in later phase clinical trials of the product candidate."  (*Id.*)

In October 2016, Defendants issued a press release reporting positive, topline results from the Phase 1 trial of ANB020.  (AC ¶ 30.)  Two months later, the Company announced that the U.S. Food and Drug Administration ("FDA") had approved its "investigational new drug application" to treat adults with severe peanut allergies, and that the United Kingdom Medicines and Healthcare Products Regulatory Agency had also cleared ANB020 to treat adults with moderate-to-severe atopic dermatitis.  (*Id.* ¶ 32.)  Both approvals allowed Defendants to proceed to Phase 2a of the clinical trials starting in 2017.  (*Id.*)

Generally, Phase 2 of clinical trials are critical in the drug development process, as it involves the gathering of "preliminary evidence of efficacy of potentially new therapies." (*Id.* ¶ 43.)   Starting on October 10, 2017, the date on which the class period began, AnaptysBio made various statements in press releases, conference calls, and slide presentations about the second phase of clinical trials that lie at the center of this case.  (*Id.* ¶ 132.)  Defendants allegedly made misleading statements about the results of the clinical trials as it relates to treating atopic dermatitis, or (1) Phase 2a "AD" Trial; and the results of the clinical trials as it relates to treating peanut allergies, or (2) Phase 2a "Peanut Trial."

**A. Phase 2a AD Trial: ANB020 and Atopic Dermatitis**

Starting on October 10, 2017, Plaintiffs claim that Defendants made various misleading statements in press releases, conferences, and SEC filings about the clinical trial results of ANB020 and atopic dermatitis.  (*See generally* AC.)  These statements, Plaintiffs argue, led to a rise in their stock prices.  For example, Defendant Suria remarked that he was "encouraged" by the trial results, describing them as "exciting" and "remarkable."  (*Id.* ¶¶ 132, 134, 156, 166, 181, 187.)  When asked during conference calls about the effectiveness of ANB020 compared to other drugs in the market, Suria "refused to provide any direct comparison" but stated that "what's really important about ANB020 is the duration of effect after a single dose and the persistence of that effect all the way out to 2 months, which is meaningful from a patient convenience standpoint relative to other therapies."  (*Id.* ¶ 52.)  Defendants repeated these statements at various conferences and press releases.  (*Id.* ¶¶ 45, 49–50, 63, 69, 97, 103.)  AnaptysBio's stock prices rose as a result.  (*Id.* ¶ 68.)  Defendants also made similar claims in their SEC filings.  On October 13, 2017, AnaptysBio filed a secondary offering prospectus, commenting on the results of the Phase 2a AD Trial and noting that "[p]atients were permitted to take a monitored amount of topical corticosteroids as rescue therapy during the course of the study."  (*Id.* ¶¶ 61, 140.)  Defendants repeatedly described the data from Phase 2a of the clinical trials as "proof-of-concept for [ANB020]" (*i.e.*, that ANB020 had enough potential to proceed to the next trial phase for moderate to severe atopic dermatitis) and that ANB020 "may

provide meaningful differentiation in terms of patient convenience." (*Id.* ¶¶ 153, 161–62, 172.)

### B. Phase 2a Peanut Allergy Trial: ANB020 and Peanut Allergies

Defendants made similar statements about ANB020's effectiveness against peanut allergies. The clinical trial examined twenty individuals with severe peanut allergies and applied a "single dose of [Defendants'] antibody versus placebo" to assess ANB020's efficacy. (*Id.*) In March 2018, AnaptysBio issued a press release characterizing the results as "positive, top-line proof-of-concept data for ANB020." (*Id.* ¶ 72.) The Company also disclosed that, after enrollment, four patients (out of a total of 20) had been excluded from the analysis because they had been found not to have "moderate-to-severe baseline symptoms." (*Id.* ¶ 73.) Out of the four excluded patients, two placebo-dosed patients and one ANB020-dosed patients had improved their peanut tolerance. AnaptysBio further reported that six out of the remaining 13 patients (46%) improved their peanut tolerance at day 14 of the trials. (*Id.*) Defendants noted that they would continue to report detailed data from the trials as they progressed but noted that they were "encouraged by the rapid improvement in peanut tolerance" and that it was a "promising new paradigm for peanut allergy patients." (*Id.* ¶ 74.) Still, analysts expressed concerns over the trial design and results. (*Id.* ¶ 75.) During a conference call held on March 26, 2018, Defendant Suria noted that the Company had "demonstrated proof of concept in adult peanut allergy patients with moderate-to-severe baseline symptoms [for] a single dose of ANB020 resulting in 46% of patients achieving the maximum-tested peanut tolerance in 14 days." (*Id.* ¶ 76.) But due to the trial design and results, AnaptysBio stock dropped in price from $113.83 March 26, 2018, to a close of $87.32 per share on April 5, 2018. (*Id.* ¶¶ 83, 92.) In August 2018, AnaptysBio announced that it had terminated the peanut allergy trials due to "commercial considerations." (*Id.* ¶ 95.)

### C. Clinical Trial Results for ANB020 and Atopic Dermatitis

Even after the peanut allergy trials had ended, Defendants continued to hold out promise for the atopic dermatitis trials. In the same press release announcing the end of

the peanut allergy trials, Suria noted that the atopic dermatitis trials seemed encouraging. (*Id.* ¶ 99.)  In September 2018, one month after announcing the end of the peanut allergy trials, AnaptysBio reported positive topline data for the clinical trials examining the effect of ANB020 on asthma, and Defendants announced that it would offer its stock in a second public offering.  (*Id.* ¶ 101.)  Like before, Defendants noted that the patients in the atopic dermatitis trial "were permitted to take a monitored amount of topical corticosteroids as rescue therapy."  (*Id.*; ECF No. 49, Ex. D at 58.)

But the Phase 2b trials for atopic dermatitis ended up yielding disappointing results. (*Id.* ¶ 114.)  AnaptysBio revealed that Phase 2b "failed to meet the primary endpoint of the trial" and that the Company had postponed clinical trials for ANB020 and asthma.  (*Id.*) The Company's stock tumbled nearly 72 percent in one day—from $36.15 per share to $10.18.  (*Id.* ¶ 115.)

### D. Plaintiff's Claims under Section 10(b) and 10(b)-5

Plaintiffs claim that Defendants made various misleading statements in press releases and conferences about the results of the atopic dermatitis and peanut allergy trials. First, as for atopic dermatitis, Plaintiffs claims that Defendants continued to tout the effectiveness of ANB020 without disclosing the fact that the trial patients had used corticosteroids as rescue therapy.  (*Id.* ¶ 135.)  Thus, the statements about the clinical trials were misleading because they exaggerated the efficacy of ANB020 in treating atopic dermatitis.  (*Id.* ¶¶ 136–39.)  Second, Plaintiffs claim that Defendants made misleading statements about the results of the peanut allergy trials.  Plaintiffs argue that Defendants omitted key information about the peanut allergy trials, such as (1) the "patients' average cumulative peanut dose tolerated at day 14 after the administration of etokimab or placebo" and (2) the Company's "post-enrollment decision to exclude 20% of the patients enrolled in the study from the interim analysis," which exaggerated the effectiveness of the ANB020 and the clinical trial results.  (*Id.* ¶¶ 159–60.)

Based on these alleged misstatements, Plaintiffs bring this securities class action under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities

Exchange Commission ("SEC") Rule 10b-5.  (*Id.* ¶ 1.)  Defendants move to dismiss under Fed. R. Civ. P. 12(b)(6).

## LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) permits the dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, the complaint must contain a "short and plain statement showing that the pleader is entitled to relief," backed by sufficient facts that make the claim "plausible on its face."  Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 566 U.S. at 678.  Rather, it demands enough factual content for the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The court must accept as true "all factual allegations in the complaint" and "construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  This presumption does not extend to conclusory allegations, "unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B. Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA")

Rule 9(b) applies to claims based in fraud and imposes a heightened pleading standard.  Fed. R. Civ. P. 9(b).  Further, a complaint stating claims under Section 10(b) and Rule 10b–5 must also satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).  Under the PSLRA, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Ronconi*

6

*v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (quoting 15 U.S.C. § 78u–4(b)(1)).   The plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each alleged misleading statement or omission.  *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014) (quoting 15 U.S.C. § 78u–4(b)(2)(A)).

## C. Leave to Amend

Federal Rule of Civil Procedure 15(a) states that "the court should freely give leave [to amend] when justice so requires."  In exercising this discretion, the court must consider Rule 15's purpose, which is to "facilitate decision on the merits, rather than on the pleadings or technicalities."  *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  "[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (internal quotation marks and citation omitted).

## D. Judicial Notice

In support of their motion to dismiss, Defendants submit various SEC filings, a record of daily closing stock prices, and the transcript of a conference call for judicial notice.  (*See* ECF No. 49, Exs. A, C–H, I; ECF No. 54, Exs. J, K.)  Under Fed. R. Evid. 201, the court may take judicial notice of facts that are "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  Here, the Court **GRANTS** the Defendants' request and takes judicial notice of Exhibits A and C–H.  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) (stating that SEC filings may be judicially noticed).  In addition, the Court takes judicial notice of historical stock prices, (ECF No. 49, Ex. I), *see In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017), the conference call transcript, (ECF No. 54-1, Ex. J), and portions of the January 26, 2017, Prospectus.  (ECF No. 54-1, Ex. K.)  *See Wong v. Arlo Techs., Inc.*, No. 19-CV-

00372-BLF, 2019 WL 7834762, at *4 (N.D. Cal. Dec. 19, 2019) (taking judicial notice of a transcript of an earnings call and the Defendants' Prospectus filed with the SEC because "these documents are public records whose accuracy is not in dispute and because Plaintiff does not object.")

## ANALYSIS

In moving to dismiss, Defendants argue that Plaintiffs have not identified any misleading statement that gives rise to Section 10(b) liability. (Mot. to Dismiss at 7–16.) Further, even if the statements were misleading, Defendants argue, Plaintiffs have not adequately alleged scienter. (*Id.* at 16–25.) The Court agrees.

### A. Section 10(b) of the Exchange Act

"To plead a claim under section 10(b) and Rule 10b–5, the Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014). Here, Defendants' alleged misrepresentations concern two events: (1) Phase 2a Clinical Trials for Atopic Dermatitis; and (2) Phase 2a Clinical Trials for Peanut Allergies. The Court addresses each in turn.

### 1. Phase 2a Atopic Dermatitis Trials

To begin, Plaintiffs do not allege that the Defendants' statements about ANB020 were misleading per se. Rather, they argue that Defendants' claims were misleading because they omitted material information that should have been disclosed. (*See generally* AC.) Relevant here, for an omission to be misleading and actionable under securities laws, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Omission theories are not viable when "the Defendants clearly disclosed material information to investors." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 607.

Here, Plaintiffs' claims fail as a matter of law. Plaintiffs argue that Defendants' failure to disclose the patients' use of corticosteroids as rescue therapy misled investors

into thinking that ANB020 was far more effective in treating atopic dermatitis than it actually was.  But that information was disclosed.  Even Plaintiffs acknowledge that in October 2017, AnaptysBio shared that "[p]atients were permitted to take a monitored amount of topical corticosteroids as rescue therapy during the course of the [Phase 2a AD] study."  (AC ¶¶ 61, 141.)  Defendants also reiterated this at various times throughout the Class Period.  (*Id.* ¶¶ 108, 112, 175.)  Since the alleged omission was disclosed, Plaintiffs' arguments fail.

In response, Plaintiffs try to minimize the effect of this disclosure by arguing that it was "buried" in the October 2017 prospectus.  (AC ¶ 61.)  But that is not so.  The disclosure appeared on the *first page* of the October 2017 prospectus.  (ECF No. 49, Ex. C at 51.)  And contrary to Plaintiffs' argument, Defendants did not have a duty to disclose the use of rescue therapy at every speaking engagement.  *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1066 (N.D. Cal. 2012) ("[p]laintiffs have likewise failed to plead facts showing that Defendants had an affirmative duty to provide further disclosures beyond what was already included in [the] SEC filings.").  According to Plaintiffs, Defendants had such a duty because they were engaged in insider trading (Opp'n at 13), but as discussed more extensively below, Plaintiffs fail to show that Defendants were in fact engaged in insider trading.  And in any case, Plaintiffs' theory finds no basis in Section 10(b), and none of the cases they cite support this argument.[1]  Rather, under Section 10(b), the duty to disclose additional information only arises when it is necessary to correct a misleading statement.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 (9th Cir. 2012) ("[S]ection 10(b)(5) and Rule 10b–5 do not create an affirmative duty to disclose any and all material information; section 10(b) and Rule 10b–5 prohibit only

---

[1]    *Melcher v. Fried*, No. 16-CV-2440-BAS-BGS, 2018 WL 6326334, at *10 (S.D. Cal. Dec. 4, 2018) did not involve insider trading but rather a potential merger between two private companies.  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) involved information that should have been provided under Item 303 of Regulation S-K, which "imposes disclosure requirements on companies filing SEC-mandated reports."  *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 55 (S.D.N.Y. 2020) involved a securities fraud case based on bribery, not insider trading.

misleading and untrue statements, not statements that are incomplete."). So, the argument that Defendants had a duty to disclose material information every time they spoke about ANB020—even if they were engaged in insider trading—lacks basis in Section 10(b).

But even if the Defendants had not made these disclosures, Plaintiffs do not identify any misleading statement that triggers Section 10(b) liability. In their Opposition, Plaintiffs take issue with two statements that Suria made at a conference call on October 10, 2017. (Opp'n at 12.) First, Suria stated that AnaptysBio was "only administering these patients once with a placebo and once with a drug." (Opp'n at 12.) Here, because Suria did not mention that the patients were also using corticosteroids as rescue therapy, this statement was allegedly misleading. According to Plaintiffs, this statement suggests that the patients were *only* being administered with ANB020 or a placebo, and nothing else. But context matters. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("the context in which the statements were made is key."). Suria was responding to a question that had nothing to do with rescue therapy or corticosteroids. Rather, he was asked about the "low" placebo response in the atopic dermatitis clinical trials.[2] (*See* ECF No. 54, Ex. J at 143.) Here, and as Defendants note, Suria was explaining that "because the placebo was administered only once, the response might have been low compared to a trial with more frequent administration involving more 'patient touching and patient care.'" (*Id.*) The question did not call for Suria to comment on the use of corticosteroids as recuse therapy, so it makes sense that he did not mention it.

Second, Plaintiffs point to another statement that Suria made, where in the same conference call, he said, *"[e]ventually*," in later stages of development "topical corticosteroids will be involved at some level." (Opp'n at 12) (emphasis added). This, according to Plaintiffs, suggested that the atopic dermatitis trials were not *currently* using

---

[2]    The question was the following: "I was wondering if you could maybe comment on the placebo responses in the run-in?  And why they were – they might have been a little bit low compared to some of the early stage studies?"   (ECF No. 54, Ex. J at 143.)

topical corticosteroids, when in fact they were.  (*Id.*)  But here again, context matters.  As Defendants point out, Suria was responding to a question about whether AnaptysBio, at a *later* trial, would study patients taking additional medication, like corticosteroids.[3]  (ECF No. 54, Ex. J at 142.)  The question had nothing to do with the Company's *current* atopic dermatitis trials, so Suria's statement was not misleading in the way that Plaintiffs allege.  Further, in the context of the question asked, Plaintiffs do not point to any misleading statement by Suria that would trigger a duty to disclose the use of corticosteroids.  *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020) (rejecting Plaintiff's theory of falsity because it "selectively emphasizes parts of [the Defendant's] statement, while ignoring the context and the full statements that were made.").  And what is more, three days after this conference call, Defendants disclosed in the IPO Prospectus that patients in the clinical study were allowed to take a "monitored amount of topical corticosteroids as rescue therapy," and that disclosure appeared on the *first page* of the October 2017 Prospectus.  (ECF No. 49, Ex. C at 51.)  These facts undercut any notion that Suria was trying to mislead investors.

Finally, Plaintiffs do not show that Suria made misleading statements about ANB020's efficacy relative to its competing products—because *there were none*.  As Plaintiffs themselves note, Suria "refused to provide any direct comparison" when asked to do so at conferences.  (AC ¶ 52.)  Still, Plaintiffs point out, Suria made a misleading statement when he commented on ANB020's "duration of effect after a single dose[,] and the persistence of that effect all the way out to 2 months, which is meaningful from a patient convenience standpoint relative to other therapies."  (*Id.* ¶ 52.)  But, as Defendants point out, this had little to do with the effectiveness of ANB020 relative to its competitors as

---

[3]     Suria was asked: "Just – the Phase II Trial.  So this is a washout trial.  Can you go right to an on top of standard of care trial next?  Or would you need some additional data for patients that are – remain on all their other meds?  Or just your thoughts on whether you need 2 Phase II Trials.  Just your thoughts there."  (ECF No. 54, Ex. J at 142.)

opposed to dosing schedules for patients.  Suria was not saying that ANB020 performs better than its competitors overall at treating atopic dermatitis.  Rather, Suria was suggesting that it allows more time in between doses.  When read in context, this statement does not give rise to Section 10(b) liability.

### 2.  Phase 2a Peanut Allergy Trials

Plaintiffs also argue that Defendants made misleading statements about ANB020's clinical trial results for peanut allergies.  Here, Plaintiffs allege that Defendants did not disclose (1) the "patients' average cumulative peanut dose tolerated at day 14 after the administration of etokimab or placebo" and (2) the Company's "post-enrollment decision to exclude 20% of the patients enrolled in the study from the interim analysis."  (*Id.* ¶¶ 159–60.)  This latter omission was critical, Plaintiffs argue, because excluding those four individuals led to clinical study results that suggested that ANB020 was far more effective in treating peanut allergies than if the four individuals were included.  (Opp'n at 15.)

Plaintiffs' arguments fall short for two reasons.  First, Plaintiffs do not explain how or why Defendants' statement that "six out of 13 patients (or 46%) improved their peanut tolerance" is misleading without disclosing the patients' average cumulative peanut dose.  (*Id.* ¶ 155.)  To be sure, knowing the cumulative peanut dose rate might help explain what Defendants' statistics mean in context, but as noted above, merely wanting more information does not give rise to Section 10(b) liability.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n. 8 (9th Cir. 2012) ("[S]ection 10(b) and Rule 10b–5 prohibit only misleading and untrue statements, not statements that are incomplete," and "as long as the omissions do not make the actual statements misleading, a company is not required to disclose *every* safety-related result from a clinical trial, even if the company discloses some safety-related results and even if investors would consider the omitted information significant.") (emphasis added); *see also Jasin v. Vivus, Inc.*, No. 14-CV-03263-BLF, 2016 WL 1570164, at *14 (N.D. Cal. Apr. 19, 2016), *aff'd,* 721 F. App'x 665 (9th Cir. 2018) ("though investors may have preferred to have more information regarding the reports,

section 10(b)(5) and Rule 10b-5 do not require such full disclosure as long as that which is disclosed does not misrepresent the remaining contents"). Here, Plaintiffs do not allege that Defendants made a misleading statement by saying that 46 percent of trial patients improved their peanut tolerance, per se. Rather, to better understand the data, they argue that it would have been helpful to know the average cumulative peanut dose. That theory finds no basis in Section 10(b).

Second, Plaintiffs argue unconvincingly that Defendants intentionally removed four individuals from the peanut allergy trials to "manipulate the patient pool" and exaggerate ANB020's effectiveness. (Opp'n at 3–4.) Plaintiffs allege that this removal was done purposely once Defendants realized that the clinical trial results would not yield positive results for ANB020 and its efficacy in treating peanut allergies. To that end, Plaintiffs identify one statement that Suria made at a healthcare conference, where he said that the Company was conducting clinical trials on adults who, by definition, have a "history of anaphylaxis" and have experienced a "severe episode in response to accidental peanut exposure." (*Id.* ¶ 67.) Plaintiffs argue that removing the four individuals *after* Suria had made this statement suggests the Defendants were "cherry-picking" their data after-the-fact to inflate the clinical trial results in favor of ANB020.

This argument is unconvincing. First, since Suria also mentioned at the same conference that the peanut allergy trials were focused on adults with severe peanut allergies (AC ¶ 67), it makes sense—and indeed, it appears more honest—that the Company would remove those four individuals once it discovered that they did not fit this profile. Although keeping the four individuals in the clinical trials would have led to results that suggest ANB020 is less effective against peanut allergies, keeping them would also have rendered those results meaningless since they should not have been included in the first place.

Second, and more important, Suria *disclosed* the fact that these four individuals were removed from the clinical trials, and he *shared their results*. (AC ¶¶ 77, 155, 158.) Suria noted that out of the four removed individuals, two from the placebo-dosed group had improved in their peanut allergies compared to only one from the ANB020-dosed group.

(*Id.* ¶ 73.)  So, even if the Defendants had removed these four individuals after the clinical trials had started, they did not omit any relevant information.  Plaintiffs and the analysts had all the information necessary—including the results of the omitted individuals—to assess the outcome of the clinical trials.  As a result, Defendants' statements about the results of the peanut allergy trials were not misleading.

At bottom, Plaintiffs fail to explain how the Defendants' statements were misleading.  Plaintiffs wanted more information, but that is not the standard for Section 10(b) liability.  As a result, their Section 10(b) claims fall short.

### 3.  Scienter

Even if Plaintiffs were able to show that the Defendants had made misleading statements, Section 10(b) requires a showing of scienter.  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (citation omitted).  "A defendant who makes misrepresentations or omissions either intentionally or with deliberate recklessness acts with scienter." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 607 (internal quotation marks omitted).  To state a claim for securities fraud that complies with the PSLRA, the complaint must raise a "strong inference of scienter—*i.e.,* a strong inference that the defendant acted with an intent to deceive, manipulate, or defraud."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).  "To qualify as a strong inference," the inference must be "more than merely plausible or reasonable." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 882–83 (9th Cir. 2012).  And since Plaintiffs seek to hold "individuals and a company liable on a securities fraud theory," they "must allege scienter with respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 607.

### a.  Defendant Suria

Plaintiffs argue that Suria knowingly or recklessly made misleading statements about the effectiveness of ANB020 in treating atopic dermatitis and peanut allergies.  Plaintiffs base this argument on Suria's suspicious stock sales, personal background and statements, personal involvement in the clinical trials, and comments made by three former employees.  None of these claims are convincing.

14

1      **(i)    Stock Sales**

2          First, Defendants argue that Suria's stock sales during the class period suggest a

3   "motive and opportunity to commit fraud."  (AC ¶ 202.)  Insider trading may support an

4   inference of scienter if the plaintiff can show that the stock sales were "unusual" or

5   "suspicious."  *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).  Insider trading is

6   suspicious "only when it is dramatically out of line with prior trading practices *at times*

7   *calculated to maximize the personal benefit from undisclosed inside information*."  *Id.*

8   (internal quotation marks and citation omitted).  The court considers three factors: "(1) the

9   amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3)

10  whether the sales were consistent with the insider's prior trading history."  *Id.* (citation

11  omitted).

12         Here, Plaintiffs cite several facts that pertain to each of these three factors.  First,

13  Plaintiffs argue that in a span of six months during which he had "non-public material

14  information," Suria sold "91% of his holdings available for sale," making over $12 million.

15  (*Id.* ¶ 123; Opp'n at 18.)  Second, as for timing, Plaintiffs argue that Defendants, including

16  Suria, sold their stocks (1) "shortly after Defendants falsely touted positive information"

17  and (2) "shortly before [the] truth was disclosed."  (Opp'n at 19.)  In other words, between

18  December 2018 and June 2019, when the Company's stock prices remained "artificially

19  inflated by Defendants' materially false and misleading statements," Suria and the other

20  corporate officers collectively sold over "265,000 shares of their personally held,

21  artificially inflated shares."  (*Id.* ¶ 123.)  Third, according to Plaintiffs, Suria's stock sales

22  varied widely from his previous trading activity.  Plaintiffs argue that none of the corporate

23  officers, including Suria, had sold a "single share of stock prior to the Class Period" (Opp'n

24  at 21), which stands in marked contrast to their activities once the class period began.

25         None of these arguments are convincing.  To begin, Plaintiffs misrepresent the

26  amount and percentage of shares that Suria sold.  According to the Ninth Circuit, courts

27  must consider vested options in determining whether insider trades are suspicious.  *See*

28  *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. 2012), *aff'd*, 561 F.

App'x 598 (9th Cir. 2014) (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986–87 (9th Cir. 1999)); *see also Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) ("Stock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them.").   And when accounting for vested options, Suria's sales do not appear suspicious.   Although Plaintiffs claim that Suria sold "91 percent of his holdings available for sale," (AC ¶ 123; Opp'n at 18), when his vested options are considered, Suria only sold 20 percent of what he had owned.   In response, Plaintiffs state that courts do not have to consider vested options, but that is not true.[4]   *See In re Dura Pharms., Inc. Sec. Litig.*, No. 99CV0151-L(NLLS), 2000 WL 33176043, at *10 (S.D. Cal. July 11, 2000) ("The Ninth Circuit has found that vested stock options should be taken into account when determining whether insider sales are suspicious.").   Here, Suria started the Class Period with 556,790 shares of AnaptysBio, when accounting for his vested options.   (ECF No. 49, Ex. E (2018 Proxy) at 82.)   Then, another 290,993 options vested during the Class Period.   (*See* ECF No. 49, Ex. F (2019 Proxy) at 93; Ex. G (2020 Proxy) at 104.)   So, his sale of 169,741 shares of AnaptysBio common stock during the Class Period, which allegedly comprised over 91 percent of his holdings available for sale, was a mere *20 percent* of his total shares when accounting for his vested options.   In the Ninth Circuit, selling 20 percent of one's shares does not constitute "suspicious activity." *See Metzler Inv. GMBH*, 540 F.3d at 1067 (finding that a 37% sale of "total stock holdings during the Class Period" was not enough to support scienter); *see also Osher v. JNI Corp.*,

---

[4]        Plaintiffs cite cases in their Opposition that do not rebut this Ninth Circuit authority.   (*See* Opp'n at 18–19.)   For example, *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 989 (N.D. Cal. 2001) did not reject considering vested options but rather found that the timing of the sales were suspicious regardless of the percentage of shares sold.   Further, *In re Wireless Facilities, Inc. Sec. Litig.*, No. 04CV1589 JAH(NLS), 2007 WL 9667131, at *13 (S.D. Cal. May 7, 2007) did not consider vested options under the "law of the case" doctrine.

256 F. Supp. 2d 1144, 1163–64 (S.D. Cal. 2003) (finding that stock sales of 15.7%, 21%, and 23% of total holdings, including vested options, were not suspicious).

Further, the timing of Suria's sales does not support Plaintiffs' argument for two reasons.  First, Suria sold his shares at $76.31 per share (AC ¶ 127), which was far below the Class Period high of $133.89.  (*See* ECF No. 49, Ex. I at 123–35.)  And while Suria did not have to sell his stocks at their peak price to constitute suspicious activity, the fact that he sold them at a significantly lower amount undermines an inference of scienter.  *See In re Peregrine Sys., Inc. Sec. Litig.*, No. 02CV870-BEN (RBB), 2005 WL 8158825, at *63 (S.D. Cal. Mar. 30, 2005) (declining to find scienter in part because the defendant's sales were "well below the peak stock price."); *see also Osher*, 256 F. Supp. 2d at 1165 (rejecting an inference of scienter because the defendants sold their stock "between $42 and $70, and the peak price was $126.").  In *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001), the Ninth Circuit found against an inference of scienter when the defendants sold stock between $52 and $54 per share and the prices later rose to $73.  "When insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know." *Ronconi*, 253 F.3d at 435.

What is more, Suria's stock sales are not suspicious because he sold them according to a pre-determined 10b-5 trading plan.  (AC ¶¶ 124–25, 203–05.)  In other words, he had set these sales beforehand, which undermines an inference of scienter.  *See Metzler Inv. GMBH*, 540 F.3d at 1067 n.11 (noting that "[s]ales according to pre-determined plans may 'rebut [ ] an inference of scienter.'") (citation omitted); *see also In re Twitter, Inc. Sec. Litig.*, No. 19-CV-07149-YGR, 2020 WL 7260479, at *14 (N.D. Cal. Dec. 10, 2020) ("In general, automatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter.").  Still, Plaintiffs argue, Suria entered into his 10b5-1 trading plan knowing that "the Company's statements about the [atopic dermatitis trial results] were false."  (AC ¶¶ 124–25; Opp'n at 20.)  But Plaintiffs fail to allege any facts to support that claim.  As noted above, "an inference of scienter must be more than merely plausible or reasonable," *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 882–83 (9th Cir. 2012)

(internal quotation marks and citation omitted), and making a blanket claim that Defendants knew about the misleading statements without any factual support falls short of that standard.

Lastly, Plaintiffs fail to show that Suria's sales during the class period varied from his prior trading history. According to Plaintiffs, because Suria did not sell a "single share of stock prior to the Class Period" (Opp'n at 21), his sudden stock sales afterward appear suspicious. But Suria did not sell any stocks before the Class Period because *he was not allowed to do so*. As Defendants point out, AnaptysBio's corporate officers were not allowed to sell shares for 180 days after it went public due to "lock-up" agreements, which prohibit corporate officers like Suria from selling stock. (ECF No. 54, Ex. K at 149.) Since the decision not to sell before the Class Period was not by choice, Suria's trading history after the class period started does not appear suspicious. *See Welgus v. TriNet Grp., Inc.*, No. 15-CV-03625-BLF, 2017 WL 6466264, at *18 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019) ("the Officer Defendants were subject to lock-up agreements that prevented them from trading for 180 days following the IPO, so there is no pattern to compare the trades to."); *see also Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) (finding that the defendants' lack of stock sales before the Class Period compared to the sales that occurred afterward was not suspicious because the defendants were subject to a "180-day lock-up period" following their IPO).

### (ii)    Personal Background and Statements

Plaintiffs also argue that Suria's professional background and the "authoritative" statements he made at conference calls about ANB020's efficacy suggest that he had the requisite scienter. (AC ¶¶ 211–15.) That argument is unconvincing. First, Suria's background does not suggest anything about Suria's state of mind. As Defendants note, this background is commonly found in most CEOs of a biotechnology company. (Mot. to Dismiss at 19.) Without more, Suria's status and expertise alone do not clear the high bar of alleging scienter. *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1109 (9th Cir. 2021) (rejecting the argument that the Defendant CEO had the requisite scienter

based on his status as the "primary contact" because the SAC provides "no particularized facts."); *see also Applestein v. Medivation, Inc.*, 561 F. App'x 598, 601 (9th Cir. 2014) ("Plaintiff relies heavily on the inference that, due to their positions, the defendants must have known about the unmatched nature of the study. That inference is entirely speculative.").

Second, the fact that Suria spoke authoritatively about the clinical trial results does not mean that he knowingly made misleading statements—especially given what he had already disclosed.  In other words, because Defendants had disclosed the use of rescue therapy and corticosteroids, speaking authoritatively on this matter does not mean that Suria had meant to deceive.  Rather, it may be that he felt more emboldened because he presumed that all the relevant information had been shared.  Even when viewing all facts in the light most favorable to Plaintiffs, their allegations do not raise a strong inference of scienter.

Lastly, Plaintiffs argue that Suria was "cryptic" and "evasive" by declining to provide more details about the peanut allergy trials, especially when asked "pointed question[s]."  (AC ¶ 230.)  He also did not schedule a conference call after the atopic dermatitis trials yielded disappointing results.  (*Id.* ¶ 231.)  But as explained above, the failure to provide more details does not give rise to Section 10(b) liability.  Suria did not have a duty to answer all questions from analysts, and Section 10(b) does not have a "freestanding completeness requirement."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).   So, the fact that he did not answer all questions from analysts does not give rise to a strong inference of scienter.  Further, as Defendants note, these kinds of "*post-hoc* critiques" of Suria's answers or his failure to schedule a conference call do not suggest anything about whether Suria knew or believed that he needed to provide additional information—especially when such information was disclosed.  *See Colyer v. Acelrx Pharms., Inc.*, No. 14-CV-04416-LHK, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015) ("[K]nowing about the existence of certain optical system errors and knowing that one should report these errors to the public are two different things.").

### (iii)   Confidential Witnesses

Finally, Plaintiffs argue that statements made by two former employees and confidential witnesses support an inference of scienter.  "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements": (1) the statements must be "described with sufficient particularity to establish their reliability and personal knowledge"; and (2) those statements "must themselves be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

Here again, Plaintiffs fall short.  First, as evidence of scienter, Plaintiffs point to a former employee ("FE1") who stated that Suria was "heavily involved in AnaptysBio's clinical trials" and was "one of the first persons at the Company to see the data from clinical trials when they became available."  (AC ¶ 213.)  The former employee disagreed with Suria about the statements he planned on making to investors and tried to correct them as much as possible.  (*Id.*)  Still, Suria overrode those objections because he believed that investors would not understand what he was saying if stated otherwise.  (*Id.*)  Plaintiffs also cite another former employee ("FE2") who stated that Defendant Londei "kept the clinical information between himself and Defendant Suria."  (*Id.* ¶ 209.)  Both facts suggest, according to Plaintiffs, that Suria knew the truth about ANB020's efficacy and yet intentionally or recklessly made misleading statements.

But neither of those facts gives rise to an inference of scienter.  Suria's involvement in the clinical trials does not establish scienter "absent some additional allegation of *specific information* conveyed to management and related to the fraud or other allegations supporting scienter."  *Curry v. Yelp Inc.*, 875 F.3d 1219, 1227 (9th Cir. 2017) (internal quotation marks omitted) (emphasis added).  In other words, just because Suria was heavily involved in the clinical trials does not mean that he knew information that was inconsistent with the public statements that he made.  Further, FE1's disagreement with Suria's planned comments also falls short of establishing scienter.  First, Plaintiffs do not identify the topic of those public statements—*i.e.*, whether those statements had anything to do with the

atopic dermatitis or peanut allergy trials. Second, internal disagreements about what Suria should say in his public comments do not establish scienter unless, as noted before, Plaintiffs can show that Suria had specific information about the fraud. *See Kovtun v. VIVUS, Inc.*, No. C 10-4957 PJH, 2012 WL 4477647, at *18 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015) ("internal debates about various aspects of the safety of [the experimental drug at issue] or the progress of the clinical trials" does not give rise to an inference of scienter—especially since plaintiff does not allege that upper management had some knowledge of relevant information, and that they "proposed (or agreed) to conceal [the truth] from the public, or in fact did conceal it.") (internal quotation marks omitted). Here, Plaintiffs have not made that case. And for similar reasons, Plaintiffs' claims about FE2's statements fall short. FE2's allegation that Londei and Suria kept the clinical trial results confidential does not say much about Suria's state of mind—let alone whether he knew certain information that was contrary to his public statements.

### b. Defendant Londei and Piscotelli

Much of the analysis above also applies to Defendants Londei and Piscotelli. First, for Londei, Plaintiffs allege that Londei violated Section 10(b) for making misleading statements about ANB020's effectiveness in treating atopic dermatitis. (AC ¶ 134.) To establish scienter, Plaintiffs point to evidence of insider trading, comments made by AnaptysBio's former employees, and the timing of Londei's resignation. None of these arguments are convincing.

Most of the claims against Londei fail for the same reasons that it did against Suria. Here, Plaintiffs allege that Londei made a misleading statement when he said that ANB020 can remain effective in adults with moderate-to-severe atopic dermatitis for a longer time compared to its competitors, distinguishing it in terms of "patient convenience." (*Id.* ¶ 134.) But as explained above, Plaintiffs fail to show how that statement is misleading since it has little to do with ANB020's efficacy as opposed to patients' dosing schedules. In context, Londei had no reason to disclose the use of corticosteroids.

Further, Plaintiffs fail to allege scienter.  To begin, Plaintiffs argue that Londei knew that his statements were misleading because he engaged in insider trading during the Class Period and benefited from artificially inflated stock prices due to his statements.  But Londei only sold 17 percent of his total holdings.  (ECF No. 49, Ex. F at 93; Ex. G at 104.) If Suria's sale of 20 percent of his total holdings was not suspicious, Londei's sale of 17 percent is even farther from that.

Also, comments made by former employees do not show that Londei had the requisite scienter.  FE1's comment that Londei was heavily involved in the clinical trials does not establish scienter for the same reasons that it did not against Suria.  In addition, FE2's comment that Londei "kept the results of the clinical information between himself and Suria" (AC ¶ 209) also fails to show scienter.  Even if Londei had kept this information confidential, that does not necessarily mean that he knowingly made false or misleading statements about ANB020's efficacy.  *See McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008) (declining to find scienter based on the accounts of confidential witnesses because they did not interact or communicate with any of the defendants, and they did not allege that they "provided any defendant with information, or [] heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period.").

Lastly, Plaintiffs fail to allege enough facts showing that Londei resigned in suspicious circumstances.  "[A]n employee's resignation supports an inference of scienter only when the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (internal quotation marks and citation omitted).  Here, Plaintiffs claim that Londei's resignation was suspicious because he resigned several months after (1) the Company had revealed that ANB020 yielded disappointing results for treating atopic dermatitis, and (2) Suria allegedly commented that Londei should resign.  (*Id.* ¶ 233.)  But resigning after a product failure, and one that Plaintiffs allege was a "core

operation" of AnaptysBio, does not seem atypical for a high-ranking corporate officer.  As for Suria's comment, Plaintiffs do not describe the context and surrounding details of this statement.  Further, this comment does not seem reliable, since it is based on what FE1 *heard* Suria say.  (*See id.*)  Without more facts, this statement does not raise a strong inference of scienter.

Finally, Plaintiffs have an even weaker case against Piscitelli.  Unlike Suria and Londei, Plaintiffs do not allege that Piscitelli made any misleading statements about ANB020.  Rather, Plaintiffs base their Section 10(b) claim on his signature on AnaptysBio's SEC filings.  (AC ¶¶ 144, 153, 162, 172, 178, 184.)  According to Plaintiffs, Piscitelli's signatures indicate that he ratified the statements contained in those documents about ANB020's efficacy, even though he knew that they were misleading.  As evidence of his scienter, Plaintiffs point to his insider trading and sudden resignation.

But none of these claims passes muster.  To begin, Plaintiffs have not shown that Piscitelli knew anything about the misleading statements when he signed the SEC filings.  The SAC does not provide any facts showing that Piscitelli knew any information that was inconsistent with the statements in the SEC filings, or that he signed those documents despite believing that the Company's statements were incomplete.  Further, Plaintiffs' evidence of scienter falls short for the same reasons discussed above.  First, although Plaintiffs argue that Piscitelli's insider trading serves as evidence of his scienter, here again, they do not consider vested options.  Although Plaintiffs argue that Piscitelli sold "100% of his holdings available for sale" during the Class Period (AC ¶¶ 123, 129–30), when vested options are considered, Defendants correctly note that Piscitteli only sold 29 percent of his shares.  (*See* ECF No. 49, Ex. E at 82; Ex. F at 93.)  This hardly gives rise to an inference of insider trading.  *See Metzler Inv. GMBH*, 540 F.3d at 1067.  Further, and like Suria, Piscitelli sold his stock at prices significantly lower than their peak, and he made those sales according to a predetermined 10b5-1 plan.  Thus, none of his sales suggest insider trading.  *See Welgus v. TriNet Grp., Inc.*, No. 15-CV-03625-BLF, 2017 WL 6466264, at *18 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019) ("That

the trades were also executed pursuant to predetermined 10b5-1 plans is further dispositive of this theory of scienter.").

Lastly, Plaintiffs fail to show that Piscitteli resigned in suspicious circumstances. Plaintiffs' lone support comes from a former employee—who in turn heard from a "former colleague"—who said that Piscitteli resigned "because he was nervous about the outcome of the clinical trials." (AC ¶ 232.)  This statement raises serious reliability concerns.  Apart from being double hearsay, Plaintiffs fail to state any facts suggesting that this "former colleague" knew anything about Piscitteli's state of mind when he resigned or the circumstances of his resignation.  To take this anonymous "former colleague" at his word falls short of PSLRA's demand that Plaintiffs must allege specific facts to support a "strong inference" of scienter.  And even if the Court assumed the reliability of this statement, being "nervous" about clinical trial results does not mean that Piscitteli had information that were at odds with the alleged misleading statements at issue here.  This theory falls short of establishing scienter.

### c.  "Core Operations" Theory

Finally, Plaintiffs assert a "core operations" theory to support an inference of scienter.  The core operations theory is based on the principle that "corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062.  This theory applies only in "exceedingly rare cases where an event is so prominent that it would be absurd to suggest that key officers lacked knowledge of it." *Jun Shi v. Ampio Pharms., Inc.*, No. 218CV07476RGKRAO, 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020) (internal quotation marks and citation omitted).  "Proof under this theory is not easy," as Plaintiffs must produce "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring," or "witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062.

Here, Plaintiffs do not clear this high bar.  In the Complaint, Plaintiffs stress the importance of ANB020 to AnaptysBio's operations and thus argue that the Defendants

likely knew about the details of their clinical studies. But merely emphasizing the importance of ANB020 to the Company does not show that the core operations theory applies. "At best, these facts support a 'mere inference of [the defendants'] knowledge of all core operations,' not scienter." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062. Further, as Defendants note, Plaintiffs do not allege "the existence of contemporaneous information within [AnaptysBio] that contradicted or undermined Defendants' public statements at the time Defendants made those statements." *Shi*, 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020). If anything, Plaintiffs disclosed the use of rescue therapy for the atopic dermatitis trials and noted at the outset that the peanut allergy trials were aimed to test patients with severe peanut allergies. Thus, the core operations theory fails to establish scienter.

## B. Section 20(a): Control Person Liability

To establish Section 20(a) liability, plaintiffs must first adequately allege violations of Section 10(b) and Rule 10b-5. *See Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 610 (holding that "Plaintiffs cannot establish control person liability because they have not adequately alleged violations of section 10(b) and Rule 10b–5."). Liability under Section 20(a) is "derivative of liability under Section 10(b)." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1149 (9th Cir. 2017). Here, because Plaintiffs have failed to establish Section 10(b) liability, their Section 20(a) claim fails.

## CONCLUSION

For the reasons stated above, the Court **DISMISSES** Plaintiffs' claims **WITH LEAVE TO AMEND.** Plaintiffs will have thirty (30) days from the date of this Order to file an amended complaint.

**IT IS SO ORDERED.**

Dated: September 20, 2021

Honorable Todd W. Robinson
United States District Judge