1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE ANAPTYSBIO, INC.          ) Case No. 20-cv-0565-TWR
SECURITIES LITIGATION           )
                                ) San Diego,
                                ) California
                                )
                                ) Wednesday
                                ) May 12, 2021
                                ) 2:00 p.m.
_____ )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

BEFORE THE HONORABLE TODD W. ROBINSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:   BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
                     BY:  JOHN CHRISTOPHER BROWNE, Esq.
                          LAUREN AMY ORMSBEE, Esq.
                     1251 Avenue of the Americas
                     44th Floor
                     New York, NY  10020

For the Defendants:  WILMER CUTLER PICKERING HALE & DORR LLP
                     BY:  KEVIN P. MUCK, Esq.
                          NOAH S. GUINEY, Esq.
                     50 California Street
                     Suite 3500
                     San Francisco, CA  94111


Reported by:   CAMERON P. KIRCHER
               CSR NO. 9427, RPR, CRR, RMR
               333 W. Broadway, Suite 420
               San Diego, California  92101
               e-mail:  cpkirchercsr@gmail.com

COMPUTER-AIDED TRANSCRIPTION

2

San Diego, California - Wednesday, May 12, 2021

2:00 p.m.

THE CLERK:  Calling Matter No. 1, 20-cv-565, City of Hallandale v. AnaptysBio, Inc., et al.

THE COURT:  Before we get attorney appearances on that case, I hesitate to do this in this particular matter, but if you can wipe down the tables before you leave, that's our protocol.

Thank you very much.

THE CLERK:  Counsel on the telephone, can you please state your appearances for the record.  And we'll start with plaintiff.

MR. BROWNE:  Yes.  Good afternoon, your Honor.  This is John Browne from Bernstein, Litowitz, Berger & Grossman on behalf of the lead plaintiff.

THE COURT:  Good afternoon.

MR. MUCK:  Good afternoon, your Honor.  This is Kevin Muck from Wilmer Hale on behalf of the defendants.  And my colleague, Noah Guiney, is also on the call.

MR. GUINEY:  Good afternoon, your Honor.

MS. ORMSBEE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon to you as well.

MS. ORMSBEE:  This is Lauren Ormsbee.  I'm also with Bernstein, Litowitz, Berger & Grossman.  Mr. Browne will be doing the argument today.  Thank you.

COMPUTER-AIDED TRANSCRIPTION

3

THE COURT: Okay. Thank you. Thank you all for those appearances.

Give me just one second. I've got a number of papers I've got to sort out here. One second.

Okay. This matter is on calendar today for a consideration of the defense motion to dismiss filed as ECF 49-1. And I have read all of the briefing that was submitted for my consideration, and I appreciate the parties' efforts in that regard very much. I found it to be very helpful.

I do have some specific questions, and I'd like to start with counsel for the plaintiff. One of the issues raised is the October 10th, 2017 conference call and the statements that were made during that call by Mr. -- Defendant Suria.

At the beginning of that call, there is a preamble that references all SEC filings. How does that preamble play into your position that Mr. Suria made less than complete disclosures regarding the trials during that telephone call, if he directed individuals who were listening to the call to go back to the SEC filings?

MR. BROWNE: Yes. This is John Browne from Bernstein Litowitz.

Your Honor, I believe that -- that the October 10th, 2017 conference call is, of course, the first day of our

4

class period, so we -- we allege that the first false statements were made on that conference call.

If your Honor's question is directed towards what I do think is in some ways kind of the crux of this case, in that in prior and some subsequent SEC filings, the company, as we put in our complaint, you know, disclosed their rescue therapy was permitted under the study, then I will answer that very specifically. But other than that, I don't see a way as to how a reference to SEC filings by themselves would change the falsity or nonfalsity of the statements that we allege to have been made on October 10th, 2017.

Would you like me to address that reference in the SEC filings, or would you like me to respond to something different?

THE COURT: No. That's the direction in which I was headed.

The theory of 10(b) liability here is not that there were outright false statements that were made by the defendant; rather, it's misstatement by omission. Essentially touting the positive aspects, or at least their perception of the positive aspects of the trials, while leaving out certain critical facts in the view of the plaintiff; and that is, that there were topical corticosteroids that were used as rescue therapy by the participants in the study.

So if the individuals in the conference call were referred back to the SEC filings, and the SEC filings contained that disclosure, how does that affect your argument that there were material misrepresentations made during the call?

MR. BROWNE:  It doesn't impact it much, your Honor, because our theory isn't that people never saw the SEC -- that the defense never saw the SEC filings or the disclosures in those filings.

Our theory is that, as we allege in the complaint, that when those statements -- and in particular, we're talking about one statement I think here, that rescue therapy and cortical -- I'm going to mess it up.  Corticosteroids were permitted to be used in the filings, that even when that disclosure is included in the mix of information on the market, the other statements alleged in the complaint to be false were materially misleading primarily because they did not disclose the material facts that rescue therapy wasn't just permitted to be used in the clinical trial --

THE CLERK:  Sir.  Sir.  Sir, can you please slow down.

MR. BROWNE:  Oh, yeah.  I'm so sorry.  I'm sorry.

So our theory isn't that -- our theory is that even if those statements in the SEC filings are included in the total mix of information that's available on the market, it

6

did not cure the fundamental misleading nature of the statements that we allege to be false in the complaint, because even when read together, all of that -- the only thing that was disclosed to investors by those statements in the SEC filings was that corticosteroids were permitted to be used as rescue therapy in the etokimab -- I'm sorry if I'm mispronouncing the name of the drug potentially, but in the clinical trials for the drugs; not the material fact that was only disclosed later, that rescue therapy was actually used.

So the direct answer to your question, your Honor, I think that addresses it, but we don't -- we recognize that those statements were made and those SEC filings are out there.  Even with those out there, the statements were materially false and misleading, both we think for active misrepresentations and for omitting material information.

THE COURT:  Okay.  Going to the actual statement in the SEC filing -- and I'm reading from ECF Document No. 49-7. I believe it was Exhibit B -- it says as follows:  "Patients were permitted to take a monitored amount of topical corticosteroids as rescue therapy during the course of the study."

I read that to indicate that the individuals administering the study monitored the amount of corticosteroids that were taken by the participants and, therefore, that seems to me to be a clear indication that the

7

participants, at least some of the participants in this study, admittedly used corticosteroids as rescue therapy.

Do you read that statement differently?

MR. BROWNE:  I do, your Honor.  In fact, I have those exact words circled on my copy of that document.  I think you have to read -- I wasn't thinking about it the way your Honor was thinking about it.  I was thinking -- I'm sorry.  This is John Browne speaking again.  I'll do better saying my name.

But I was thinking that monitored is going to be relevant when we talk about scienter, such that it will indicate an admission, actually, that the defendants here knew the precise amounts of rescue therapy that was being used and they knew that it, in fact, was being used.

But what I would say to your Honor's point is that I think monitored, it doesn't change what comes before it in that sentence, which is patients were permitted, right, permitted to take a monitored amount.  It's still -- monitor doesn't in any way really change what we're -- what we're arguing about here from my point of view, because the question is, it wasn't just -- that still doesn't disclose that they actually took it.  It only says, that if they took it, we would monitor it.

THE COURT:  Okay.

MR. BROWNE:  Now -- I'm sorry.

8

THE COURT:  On that -- on just that point, and just that point alone, I would ask if the -- if there is a differing view on the other side.

How do you read that particular statement and how does that play into the allegation that the statements and all of the information available to the investors was misleading?

MR. MUCK:  Your Honor, this is Kevin Muck for the defendants.  Can you hear me?

THE COURT:  Yes, I can.

MR. MUCK:  Thank you, your Honor.

I think we need to back -- first of all, I think it's very clear what that statement means.  That statement means exactly what it says, that patients were permitted to take a certain amount of corticosteroids as necessary for rescue therapy.

And I think it's important to look at that statement in the context of what the plaintiff's pleading allegation is under the Private Securities Litigation Reform Act.  As all of the cases that we've cited to your Honor make clear, it's not enough for plaintiffs to suggest that there may have been additional information out there.

Judge Moskowitz's decision in the *Regulus* case, which we cite, makes clear what the plaintiff's burden is. The plaintiff needs to come forward with the specific facts

COMPUTER-AIDED TRANSCRIPTION

9

to show that the statement was materially false, that there was information that contradicted what was said.

So how does that relate to what's being said here? All the plaintiffs are doing is saying that it is possible that someone may have used corticosteroids, it is possible that that may have had an impact on the results.  That's not enough.

What the plaintiff has to do is more than just talk about possibilities.  They have to come forward with facts to show that what Mr. Suria said was materially false; that he somehow suggested that corticosteroids weren't used.  And I think that the SEC filing disposes of that suggestion, No. 1. No. 2, the plaintiff has to show that Mr. Suria knew or intended to deceive investors.  Plaintiff hasn't done that either.

And the SEC filing is critical to that point as well, because it makes no sense to suggest that Mr. Suria was saying, on October 10th, no one is using corticosteroids as rescue therapy, and then two days later have the company say, in its SEC filing very clearly, that, in fact, people were permitted to use corticosteroids.

Now, I don't want to get into the point, your Honor, that the plaintiff is clearly mischaracterizing what was said in that call, and the transcript of the call makes that clear, but even before you get to that point, what we have

10

here is a failure on the part of the plaintiff to show that anything that was undisclosed was in any way contradictory.

So, for example, the amount of corticosteroids use that was permitted, the only thing in the complaint on that point is a publication that the amended complaint cites that says that the amount of corticosteroids was negligible. Plaintiff doesn't plead a single fact to suggest that the use of corticosteroids is anything other than negligible.  Given that, this whole argument I think fades away.

But specifically, with respect to the SEC filing, it demonstrates that the plaintiff's effort to mischaracterize what Mr. Suria said on that October 10th, 2017 phone call -- or conference call, is simply inaccurate.  It's a mischaracterization.

The other thing I would point out in that regard, your Honor, plaintiff goes to great lengths to talk about what various analysts said and thought as a result of different conference calls.

The plaintiff doesn't cite a single analyst, not one, who says, at the end of that October 10th, 2017 phone call, oh, corticosteroids aren't being used at all; nor -- nor does the plaintiff cite a single analyst who says, wait a minute, I'm now looking at this prospectus which says corticosteroids may be used.  That seems inconsistent with what Mr. Suria said a couple days ago.  Not a single

11

allegation to that effect.

And, indeed, what the plaintiff talks about is Credit Suisse, the analyst that was most focused on rescue therapy, acknowledging that it understood and expected that corticosteroids were being used.  Its only complaint was they wanted more information about what was used and what the effect was.

So, your Honor, this is all a smoke screen, and I think the transcript, coupled with the SEC filing, makes that clear.

THE COURT:  Mr. Browne, wouldn't Mr. Suria have to know two things:  One, that the corticosteroids that were administered as rescue therapy somehow affected the EASI score, the patient's eczema area sensitivity index score, and, therefore, when he said that the results of the study were positive, that somehow he knew that the results of the study were being skewed because of the corticosteroids therapy and he withheld that information.

Isn't that what would be necessary under the PSLRA?

MR. BROWNE:  No, your Honor, it's not.  Because the question that is at issue -- we believe we do allege that, by the way, but -- again, this is John Browne.  I'm sorry.

Your Honor, that would not be necessary.  What we allege is that he -- he made a series of false statements, that are rendered false in part at least just because he knew

12

that rescue therapy was actually being administered to patients in the trial when he went out and conferences during the class period, in the beginning of the class period, and said things like, the only thing that is being administered to patients is a single dose of a placebo and a single dose of the drug.

We are only into --

THE REPORTER:  I'm sorry.  Wait.  Wait.

THE CLERK:  Hold on, sir.  Sir.

THE COURT:  Mr. Browne, you're going a little too quick for the court reporter.  If you can slow down just a little, please, sir.

MR. BROWNE:  Yes.  Absolutely.

THE REPORTER:  I didn't get the name.

MR. BROWNE:  I'm sorry.  I'm having a little bit of trouble hearing the court reporter.

Was there a question posed to me?

THE COURT:  Yes.  Mr. Browne, she lost you, you were making the following argument:  During the class period, in the beginning of the class period, and said things like the only thing that is being administered to patients is a single dose of placebo, a single dose of the drug.  That's where she lost you.

MR. BROWNE:  Okay.  Thank you.  I'm sorry.  This is John Browne.

13

That's what I said.  And then the next thing I said was that other statements he made were very similar.  We are only administering these patients once with the placebo and once with the drug.

What we allege, your Honor, is that in combination with -- that those types of statements misled investors into believing -- it's a misunderstanding of a material fact that rescue therapy was not only permitted in trials, it was actually being used.

And I want to comment on this idea about analysts' reactions, because I'm not speculating that reasonable investors were misled by Mr. Suria's and others' statements.  We're not -- we have really hard evidence in the complaint that the market was, in fact, misled.

And at paragraph 98 of the complaint, we cite to a report issued by SunTrust Analysts in May of 2018, where -- and the report says, "In addition, no oral corticosteroids were used in the study to rescue patients."

This was an experienced, sophisticated securities analyst, who closely covered the company, absolutely read the SEC filings and absolutely listened to the statements that Mr. Suria was making, and indisputably read those together to believe that no rescue therapy was being used.

THE COURT:  But, Mr. Browne, if I can interrupt you there.  I apologize for interrupting you.

14

But isn't that just one person's opinion based on his understanding of what was taking place?  Isn't the focal point of my inquiry in ruling on the pending motion whether or not Mr. Suria made material misrepresentations?

I mean, how does it inform my decision making in that regard if one person had a particular understanding of the situation?  And what evidence do I have before me that he's extremely well-qualified, that he read the SEC filings, that he listened to the conference call?  You know, on what basis am I supposed to credit his judgment of what happened and sort of use that in place of my own judgment?

MR. BROWNE:  This is John Browne.

Well, your Honor, I believe the question that's really in front of the Court on whether these statements were, given the misinformation on the market, materially false and misleading is whether a reasonable investor could be misled.

So to determine as a matter of law at the outset of the case that the combination of the SEC filings with Mr. Suria's statements could not have misled a reasonable investor is very difficult to do when a very sophisticated -- I have some other facts, too.  But when a very sophisticated investor, an analyst from SunTrust, who did cover the company, and they are alleged in the complaint in paragraph 98, reached opposite conclusions.

15

It's not like we're just pulling one of our friends out of the crowd and randomly asking them, What do you think about this?  This is strong evidence that the market was interpreting these statements, when read in combination, to mean that no rescue therapy was actually being administered.

But that's not all that we have.  We also point to the fact of -- the facts surrounding how the actual use of rescue therapy eventually came to light.  And it didn't come to light by the company responding to the SunTrust analyst or saying at any point in time, by the way, rescue therapy is not just permitted, it's actually being used.

And, remember, this is a trial that included 12 patients, so it wasn't a huge trial, and then small variances in the patients' responses could have big impacts on the efficacy of the drug.

But this -- the actual use of rescue therapy takes flight when another sophisticated analyst, Credit Suisse -- and we talked about this in paragraph 105 of the complaint.  They heard from a political investigator, a doctor, who was involved in the study, that rescue therapy had been used.  This analyst also didn't say, well, of course, we knew that.  They have always been telling us that's true.

They said, we had to dig deeper.  We're asking questions about it.  They wrote a report disclosing to the market that rescue therapy had actually been used.  Then,

16

further evidence that the market had not understood that material fact prior to this disclosure, the stock price reacted by dropping 12 percent upon that -- which is a statistically significant stock drop, upon that disclosure.

So we submit -- there is some other things in the complaint as well, but we submit that those are the primary pieces of evidence, and certainly at the pleading stage are sufficient to conclude that we've carried our burden of suggesting that a reasonable investor could have been misled by these statements.  We think reasonable investors are alleged to have been misled by the statements.

THE COURT:  Okay.  I think I understand your argument in its totality in that regard, Mr. Browne.

Mr. Muck, do you care to respond?

MR. MUCK:  Yes, please, your Honor.  Very briefly.

First, the Credit Suisse analyst did not disclose that it had suddenly discovered something.  It said actually something that's directly to the contrary.  It said, it expected that rescue therapy had been used and had been employed, because that was what everyone had said.

With respect to the SunTrust analyst, your Honor, the plaintiff quotes at various times analysts from JPMorgan, RBC, Jefferies, Credit Suisse.  This SunTrust analyst is an outlier.  It is the only one who apparently was laboring under some misimpression that rescue therapy wasn't being

COMPUTER-AIDED TRANSCRIPTION

17

used.  And that comes along, again, seven months after Mr. Suria's comments.

So what we're talking about now is the October 10th, 2017 conference call, at least I understood that was the Court's question.  Not a single analyst, not one, notwithstanding what the plaintiffs have otherwise done with respect to analysts, indicated that it understood anything Mr. Suria said to be a representation that rescue therapy was not being used.  And again, I submit, your Honor, that's because the actual transcript of the call makes clear that's not what Mr. Suria said.

This is a situation that is very similar to the one in a case that we cited, the *Align Technology* case from last year, where the plaintiff did exactly the same thing, took a snippet of a comment out of context, eliminated the question that the officer was answering and said, Here you go, your Honor.  This is a statement that was made.  And the Court said, you can't do that.  You have to go back and look at the transcript.  And when I look at the transcript, I can see that the officer said nothing like what you are saying he said.

That's exactly the same thing we have here. Exhibit J to -- that we've submitted, your Honor, pages 142 and 143 of our exhibits, reflect exactly what was said. That's the entire transcript.  And the transcript makes clear

18

that Mr. Suria was not saying anything about the use of rescue therapy in the Phase 2a trial. Nothing.

Putting all of that aside, your Honor, here is the more fundamental problem that the plaintiff has. It does not ever allege a single fact to show that rescue therapy affected the results one iota. There is nothing. All they have done is say, we don't know what the results were. We don't know what the data revealed.

That's not enough. This is a Private Securities Litigation Reform Act case. They are obligated to come forward with specific facts, as Judge Moskowitz said in the *Regulus* case, that contradict what was said, not just say there is some additional information that people would have liked to have known or maybe there was information that was at odds.

They had the affirmative obligation to come forward and to plead those facts. They haven't done it. They can't identify a single place in this complaint, not one, where they have alleged that any results in the atopic dermatitis trial was affected even by a little bit by the use of rescue therapy. And then even beyond that, your Honor, they can't come close to showing that anyone intended to mislead the market.

So we're hearing a lot of what I would view as misdirection, and the reason we're hearing the misdirection

COMPUTER-AIDED TRANSCRIPTION

19

is because this plaintiff understands that the Reform Act imposes what the Ninth Circuit called in the *Ronconi* case as an almost uniquely powerful motion to dismiss, in the sense that the plaintiff is put to a much more stringent requirement of pleading than in most cases.

And the plaintiff hasn't satisfied that standard. The plaintiff has not pled a single fact to show that this -- that the use of rescue therapy was anything other than negligible or that had it any impact, whatsoever.

THE COURT: Okay. Mr. Browne, final comment in that regard.

MR. BROWNE: Yes. This is John Browne.

Let me just go back to the beginning, to what Mr. Muck started with, and the Credit Suisse analyst, which is quoted in page -- paragraph 105 in the complaint. The Credit Suisse analyst -- we don't mischaracterize anything. We quote things.

The Credit Suisse analyst also said that they would expect, quote, expect the actual utilization of rescue therapy to be disclosed, so that it can be a meaningful factor in explaining, interpreting the clinical results.

This was a statement put out by an analyst on June 21st, 2019, following 18 months of positive statements from the defendants about the efficacy of this drug under the Phase 2a trial. And this analyst absolutely found out on its

20

own from a clinical investigator that rescue therapy was actually being used, absolutely thought it was material, and absolutely said we would have expected the actual utilization of it to be disclosed.

So moving on to this idea that we mischaracterized anything in Exhibit J or elsewhere, I do strongly disagree with it.  First of all, there is no mischaracterization argument that I'm aware of that defendants are making regarding any assertion that we've mischaracterized Mr. Suria's repeated statements that a single dose of a placebo and a single dose of the drug was administered.

The reference to Exhibit J gives a reference to another context clue that we -- that we cited in the complaint, where Mr. Suria also says, eventually commercially topical corticosteroids will be involved at some level.

Now, we allege that this is further part of the misleading nature of the statements, because -- according to us -- you know, Mr. Suria had said all along that rescue therapy -- heavily acknowledged that rescue therapy was being used, and misleadingly suggested it was not, and then further here says, in the future, it might have to be used.

And your Honor can look at Exhibit J and the statements and the back-and-forth from the analyst, but on pages 4 and 7, the quotes from the analyst and the answers from Suria are clearly marked out.  And I'll just say, rather

21

than reading a whole bunch of stuff into the record, because I know your Honor has read this.

There is a reference -- there is a question from an analyst on page 4 about whether this trial was a wash-out trial. A "wash-out drug trial" is a term of art that means that before the 12 patients were enrolled in this clinical trial, they had to stop using other medications, sort of like a clean start, so they can really assess whether etokimab was having the effect that they needed to measure.

So in that context, when Mr. Suria is talking about this being, you know, a wash-out trial, in this context he says, you know, eventually, commercially topical corticosteroids will be involved at some level. We believe that that is just a further misleading statement, which, again, we think is confirmed by this analyst's reaction.

I wouldn't mind moving on to scienter, which was kind of touched on at the end of my adversary's answer there, but I want to pause in case you have any further questions on this point, your Honor.

THE COURT: No. I think I understand the parties' respective positions in that regard.

What I do want to talk about is the allegation regarding the 2a peanut trial. And I have a question for Mr. Muck in that regard.

Out of the participants who were selected to enroll

in that particular trial, all of the participants were not prescreened for a severe reaction to a peanut allergy.  How is it that the four individuals ultimately excluded from the results were disclosed as having less than a severe reaction? And I didn't see that in the pleadings

MR. MUCK:  So, your Honor, I think if you look at paragraph 72 of the complaint, it answers the question.

And that is, that as the determination after the fact of whether -- of symptom severity was made -- and I'm looking at page 28 of the amended complaint, lines 20 through 22.  Symptom severity was adjudicated by an independent, blinded assessor that was not involved in performing the baseline or the day 14 OFC, which is oral food challenge, analysis.

So the answer, your Honor, is that after enrollment, there was a determination that was made by, according to this, an independent, blinded assessor -- and, again, plaintiff doesn't allege a single fact to suggest that that's inaccurate -- and as a result of that assessment, four of the participants were determined not to have moderate or severe baseline symptoms.

Now, I will say, your Honor, I believe, and I think that if you look at the cases that we've cited, this is ultimately not the dispositive issue.  Because even putting all of that aside, if you look at the *Abely* case -- and I'm

not sure I'm pronouncing that correctly, but it's A-B-E-L-Y, it is almost exactly on all fours with this case.

Same sort of thing, where the plaintiff attacked what it called a post-hoc analysis and accused the company in that case of having after-the-fact decided to exclude certain participants from the study.  And what the Court said was, that doesn't matter.  Because, just like in *Atlas Bio*, the company disclosed what it had done, it disclosed that certain people had been excluded.  And it included the data for those people.

So even if somebody disagreed with it, even if someone said, gosh, you should have caught this before, or you shouldn't have taken these four people out regardless of what this independent assessor said, it wouldn't matter because all of the data were there.  And what the Court said in the *Abely* case is that Section 10(b) doesn't go to the methodology.  Section 10(b) goes to the disclosure.

And because all of the relevant facts were disclosed, there is no claim.  There cannot be a material misrepresentation of fact.

THE COURT:  Mr. Browne, your response to that particular argument.

I didn't read anything indicating that you're taking the position that the four individuals ultimately deselected from the trial were not disclosed to the public.

24

MR. BROWNE:  This is John Browne.

No, your Honor.  They were disclosed.  Maybe not by name, but the fact that they were deselected from the trial was disclosed in March of 2018.

But our argument around the peanut allergy portion of the trial is that at the beginning of the trial, the defendants preselected individuals that had -- had severe allergic reaction tendencies.  They were prescreened and they were put into that trial, and at some -- at some point, they were taken out of that trial.

There is -- despite questions by analysts, there is absolutely no claim by defendants that the trial was set up to be run that way, that they had planned on being able to take people out of the trial, for a reason that they have already, purportedly had already been prescreened for, severe and moderate allergies.  In the course of two or three months, they just decided that, hey, four of these people weren't severe enough, let's take them out.

If those patients had been included in the trial, the peanut allergy portion of the trial, the placebo that was administered would have been almost exactly as effective, and completely effective on a scientific differentiating basis, as the actual drug.  So we believe that that -- the statements made at least in January, and also in the peanut allergy trial, were misleading.

COMPUTER-AIDED TRANSCRIPTION

25

THE COURT:  Well, have you pled -- Mr. Browne, have you pled any information that the deselection of the four individuals was done by anyone other than the independent entity running the trial?

MR. BROWNE:  Well, we haven't -- I don't believe we said it was done by an independent entity running the trial. I did hear opposing counsel say that.

But the trial was set up and structured by Defendant Londei and Defendant Suria, and they refused to say at the end of it that it was proper under protocol to deselect people -- there were only 20 patients in this trial -- to deselect people for things that they had been previously prescreened.

I think, your Honor, as with a lot of these drug cases, that's a complicated question that I -- that I doubt -- defendants haven't really answered it, and I can't answer it without discovery.  But I do know that the defendants are responsible for the statements that they made about the trial.  So that's what I will say there.

Is it okay if I move on to scienter?

MR. MUCK:  Your Honor, may I respond to that last point?

THE COURT:  Yes, please.

MR. MUCK:  This is Kevin Muck.

Once again, this is the same problem we had with the

26

atopic dermatitis trial.  The plaintiff is trying to shirk its obligation under the Reform Act.  This is not a case where Rule 8 standards apply and a plaintiff can say, as long as I put you on notice, I get to do discovery.

Congress has specifically said, plaintiff doesn't get to do discovery until and unless it can provide specific facts to show that statements were actually materially false; not that defendants could have provided more information or defendants didn't answer questions, or maybe what they said was false.  None of that is good enough under the Reform Act. And what Mr. Browne just said was, perhaps inadvertently, a concession that this complaint as pled doesn't satisfy the Reform Act.

And I was listening very carefully to his earlier comments.  Not once does he -- did he suggest that there was a single allegation in this complaint to show that, as I said earlier, any of the results of the atopic dermatitis trial were affected by rescue therapy, nor is there any allegation to controvert what he has put in his own complaint, which is a quote, that symptom severity for purposes of the peanut allergy trial was adjudicated by an independent, blinded assessor.

If plaintiff wants to make a claim that the disclosures were materially false, it needs to come forward with facts to show that.  It hasn't done that.

27

THE COURT:  Okay.  Mr. Browne, in regard to the scienter, I'm up to speed on the parties' respective arguments; but anything you'd like to add to the paperwork that's been submitted, I'd be happy to listen to.

MR. BROWNE:  Well, your Honor, no.  I mean, I think -- I think everything is included in the paperwork, and I don't want to just talk to hear my own voice.

I will say, I'm absolutely not trying to evade the PSRLA.  It's obviously our position that this complaint satisfies the requirements of the PSRLA.  It's not a requirement that everything is pled to the level of your closing argument before the jury.  But this complaint, you know, in our view, easily satisfies the standards that are actually applicable, which really is, you know, have these statements been adequately alleged to have misled reasonable investors.

The scienter facts, your Honor, I would only maybe like to reemphasize one point.  In addition to the insider selling that we have, you know, this is a case that in some ways if the statements are false, they almost had -- or misleading, they almost had to be made with scienter.  And in part, going back to the words that your Honor pointed out at the beginning of the argument, in the SEC filings, the defendants have admitted that they were monitoring the use of rescue therapy; so they must have known about it.

COMPUTER-AIDED TRANSCRIPTION

28

So if it's accepted that we've adequately pled that they have made misleading statements about it, scienter follows. We have other scienter facts, and they are in there, and I know that your Honor has read them.

One thing I would like to conclude with, if it's okay with your Honor, is some additional sort of post-complaint facts. Is that okay?

THE COURT: Sure. Very briefly if you would, Mr. Browne.

MR. BROWNE: Very briefly.

And I know your Honor read everything. The concessions, I believe the complaint should get over. We have pled enough to survive. But we have asked for leave to amend if -- if for some reason the complaint is found to be lacking in some respect.

We believe there is additional material that would provide further support for the allegations, including the employment discrimination lawsuit, you know, filed by a former employee, who actually alleges in there that the defendants have avoided giving additional information about these trials, specifically in part because they didn't want to prejudice themselves in this class action lawsuit.

And also, very recently, there was a derivative complaint filed against the defendants that has received some documents from the Board level, which are redacted from the

current public version of the derivative complaint.  But I do believe that if we -- you know, that, A, we should get over it; and, B, if we don't, there are facts that we can allege on amendment.

And with that, your Honor, I have nothing else, unless you have any questions.

THE COURT:  Okay.  Thank you, Mr. Browne.

Mr. Muck, any final words?

MR. MUCK:  Yes, your Honor.  Just briefly, just on the last point that Mr. Browne made.

The suggestion that if the plaintiff has pled that statements were false, then scienter must also be established is just absolutely wrong.  Obviously, for the reasons I've said, your Honor, we completely disagree that any statement has been alleged to be false.

I still have been waiting now for 35 minutes to hear the plaintiff identify a single allegation to show that, as I said before, any results of the AD trial were skewed by the use of rescue therapy.  I've listened in vain for the plaintiffs to talk about any fact that was inconsistent with what the company actually disclosed regarding the peanut allergy.

But even if the plaintiff had done that, scienter is still a significant additional hurdle.  And I would point your Honor to the *Mulquin vs. Nektar Therapeutics* case that

30

was decided in December.  We cited it in our reply brief.

And that's a case where the Court said, in essence, even if I were to find that internal information within the company was arguably inconsistent with what the company said, the plaintiff hasn't come forward with any facts to show that that information was omitted with the intent to deceive investors.  That's absolutely the case here as well.

And as we point out, your Honor, all of the other facts that the Court must take into account under the *Tellabs* case conclusively weigh against a finding of scienter here, including -- and I'll just point this out -- Mr. Suria actually increasing his holdings of AnaptysBio's stock during the class period, which numerous cases that we've cited have said is thoroughly incompatible with scienter.

The last point I'll make is -- and it perhaps is gilding the lily at this point, your Honor, because I think that this complaint is so far from stating a claim as to anybody, that maybe this goes without saying.  But counsel -- and this is also true in the brief, keeps using the term "defendants."  We're really just talking about Mr. Suria.

Mr. Piscitelli, who was the CFO of this company, is barely a footnote in any of the briefing here.  Dr. Londei is only identified as having made two statements.  And in the opposition brief, neither of those statements is alleged to be false.

COMPUTER-AIDED TRANSCRIPTION

31

So what we're really talking about is whether Mr. Suria made any statement that was either false or made with scienter. And for the reasons that we've laid out, your Honor, both this afternoon and in our papers, we think it's clear that the plaintiffs haven't done that.

THE COURT: Okay. Thank you very much.

I'd like to thank both parties for their excellent submissions in this case. I will take the matter under submission and issue a written order in short -- in due course.

If there is nothing else that we need to address this afternoon, I hope you all have a good afternoon slash evening, depending on your location.

MR. MUCK: Thank you, your Honor.

MR. BROWNE: Nothing from plaintiffs, your Honor. Thank you.

THE COURT: Okay. Thank you.

MR. MUCK: Thank you.

(Proceedings concluded at 3:08 p.m.)

--O0O--

32

C E R T I F I C A T I O N

I hereby certify that I am a duly appointed, qualified and acting official court reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

DATED:  April 9, 2025, at San Diego, California.

S/CAMERON P. KIRCHER
CAMERON P. KIRCHER

COMPUTER-AIDED TRANSCRIPTION